FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

04 AUG 16  AM 11: 49

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

MARY M. CAMPBELL, On Behalf of Herself and All Others Similarly Situated,

    Plaintiff,

    v.

CNL HOTELS & RESORTS INC. (F/K/A CNL HOSPITALITY PROPERTIES, INC.); CNL HOTEL DEVELOPMENT COMPANY; CNL HOSPITALITY CORP.; CNL FINANCIAL GROUP, INC.; CNL REAL ESTATE GROUP, INC.; FIVE ARROWS REALTY SECURITIES II, LLC; CNL HOSPITALITY PARTNERS, L.P.; RFS PARTNERSHIP, L.P.; JAMES M. SENEFF; JR.; ROBERT A. BOURNE; THOMAS J. HUTCHISON III; JOHN A. GRISWOLD; CHARLES E. ADAMS; LAWRENCE A. DUSTIN; CRAIG M. McALLASTER; AND ROBERT E. PARSONS, JR.,

    Defendants.

CIVIL ACTION FILE NO.

6:04-cv-1231
-31JGG

## CLASS ACTION

## CLASS ACTION COMPLAINT

Plaintiff alleges the following based upon the investigation of Counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by CNL Hotels & Resorts Inc., formerly known as CNL Hospitality Properties, Inc. ("CNL" or the "Company"), other regulatory filings and reports, industry analysts' reports about the Company, press releases and other public statements issued by the Company, media reports about the Company, reference to authoritative accounting literature and consultations with forensic accounting experts.

- 1-

**COMPLAINT SYNOPSIS**

1.      This suit asserts claims on behalf of two separate, but overlapping, classes of CNL investors:  first, persons who purchased CNL stock during the Class Period pursuant to Registration Statements that contained numerous false and misleading statements ("Purchaser Class"); second, all persons who received and were entitled to vote on a recent proxy statement ("Proxy") that proposed, among other things, CNL's merger with its Advisor, an entity virtually wholly owned (directly or indirectly) and controlled by CNL's management.

2.      The Purchaser Class claims are driven by CNL's failure to disclose that it used improper accounting practices and other manipulative devices to carry out a systematic scheme of materially inflating CNL's reported income and, thereby, created and maintained the appearance that CNL generated sufficient cash flow from operations to consistently pay dividends to shareholders at the levels promised in CNL's Prospectuses.

3.      Since at least 2001, cash from CNL's operations has represented a decreasing percentage of the funds used to pay dividends to its shareholders.  These financial realities have been masked by accounting chicanery carried out by CNL and the Individual Defendants, which conduct violates generally accepted accounting principles and applicable federal law governing the sale of securities.

4.      The success of this artifice has enabled CNL to continually attract additional investor capital through the sale of CNL stock at an inflated price of $10 per share. CNL has sold more than 300 million shares of stock at the same $10 per share price and that price has never been market-tested.  The house-of-cards that CNL management has been able to construct during the Class Period came crashing down on August 3, 2004.  An Underwritten Offering that CNL had planned in conjunction with certain transactions proposed in the Proxy,

including the Listing of CNL's stock, was uniformly criticized as overpriced and unsupportable

by analysts and institutional investors. Because of the manner in which the persons to whom

CNL stock had been historically sold (and the fact that it had never been listed on any exchange),

analysts and institutional investors had not previously monitored or evaluated CNL stock. The

Underwritten Offering was preceded by CNL management's road show, and after putting "its

best foot forward," industry experts placed a value on CNL's stock in the range of 50-60% of the

$10 per share that investors had paid for their CNL stock. CNL Management immediately

dropped the Underwritten Offering, announcing disingenuously on August 3, 2004, that the

action was taken because of "market conditions."

        5.     Raising investor capital has enabled CNL to have its Advisor (which is

virtually wholly owned by the Individual Defendants) to continue to garner excessive fees and

commissions. While the Advisor was "earning" and being paid these excessive fees and

commissions from CNL, the Individual Defendants owned virtually no interest in CNL.

        6.     CNL's Advisor is virtually wholly owned by CNL's management team.

CNL's Advisor has performed poorly for CNL. If CNL's Advisor were independent of CNL's

management, it would have been terminated under criteria that CNL's management has

acknowledged would apply in evaluating an Advisor. At a minimum, due to its poor

performance, the Advisor stood to receive no payment on a contractually provided deferred

incentive fee formula, which is to be applied when CNL stock is listed on an exchange (an action

CNL's Management proposes to take now). When it became apparent that the Advisor's

incompetence could no longer be concealed, the Individual Defendants caused CNL to solicit the

votes of CNL shareholders to enter into a merger agreement with its Advisor. By virtue of the

Proxy, CNL sought and received the approval of the transaction whereby CNL would pay

approximately $300 million for this poorly performing Advisor. CNL's management seeks to justify the Merger on the basis of an inflated and speculative income stream that could only be achieved if CNL continued to sell stock at inflated prices based on false and misleading financial data. Moreover, because the Advisor is highly overvalued, the proposed Merger is extremely dilutive to all existing CNL shareholders.

7.      This suit seeks to recover damages on behalf of the Purchaser Class, which has purchased approximately 90% of all the CNL stock ever sold. This suit also seeks injunctive relief and damages on behalf of the Proxy Class seeking to render null and void all approvals given by shareholders to CNL and its management in response to the materially false and misleading Proxy.

## NATURE OF THE ACTION

8.      In a Form S-3 filed with the SEC, CNL announced that it was going to engage in a firm commitment underwritten offering of additional common shares and preferred shares (the "Underwritten Offering") and to list those common shares and preferred shares, together with the existing outstanding common shares, on the New York Stock Exchange ("Listing"). In connection with the possible Listing and Underwritten Offering, CNL sought shareholder approval, via a Proxy filed with SEC, to become a self-advised REIT through the merger of CNL Hospitality Corp. (the "Advisor") into a wholly owned subsidiary of CNL ("Merger"). The Proxy contained materially false and misleading information with respect to the Advisor's performance, financial condition, prospects, and value. Certain aspects of the Merger, including the ultra-rich valuation of the Advisor for $300 million, all amount to a sweetheart deal for the Advisor's owners, certain of whom are also members of the senior management and board of directors of CNL, to the detriment of CNL's shareholders.

9.    Even prior to announcing such courses of action concerning CNL's future business and operations, CNL's disclosures to prospective purchasers of CNL stock concerning its financial condition were materially false and misleading.  In this regard, Defendants:

a.    carried on the business of CNL so as to improperly inflate CNL's income for the purpose of obfuscating from the investment community and its shareholders the reality that CNL could not support from its operations the expected or promised dividend amount which was the driving force behind the continued sale of CNL common stock at an otherwise unsustainable (inflated) price through new offerings.  CNL's income was artificially inflated through the improper inclusion of guaranteed payments in the guise of credit enhancements ("Credit Enhancements"), recycling of investor capital through an off-balance sheet entity and a reserve for furniture, fixtures and equipment ("FF&E Reserve Income"); and

b.    conveyed to CNL shareholders and the investment community, SEC filings and public statements that omitted material facts and contained materially false and misleading statements concerning, among other things, the nature of CNL's contractual relationship with the Advisor and the Property management companies/lessees; CNL's transition into a self-advised REIT, and the reporting of CNL's net cash from operations.

10.   On August 3, 2004, CNL's management cancelled (or, at a minimum, indefinitely postponed) the Underwritten Offering.  That last-minute, abrupt decision also postponed the Merger for which it had received shareholder approval on July 30, 2004, and the Listing.  CNL was seeking through the Underwritten Offering to sell 35 million of additional

shares of CNL to the investing public for a reverse split adjusted price of between $19 and $21 per share. Such a price would have been comparable to the inflated price CNL sold its shares to the Purchaser Class for during the Class Period. However, the investing community that scrutinized the Underwritten Offering was only willing to pay between $11.50 and $12 per share, approximately 55-60% the value professed by CNL to the Purchaser Class. The hollowness of CNL's business model and its true financial condition -- the historical inflated pricing of CNL shares to the Class, the unjustifiable and unsustainable dividends and the unsupportability and ill-advisedness of CNL's proposed acquisition of the Advisor -- has only begun to be revealed through the scrutiny of analysts and institutional investors whose attention was drawn to CNL for the first time by the now-abandoned Underwritten Offering.

11.    This is a class action on behalf of: (a) a class of all persons who were entitled to vote on the proxy statement filed with the SEC by CNL dated May 7, 2004, as amended or supplemented on June 21, 2004, July 7, 2004, July 8, 2004 and July 20, 2004 ("Proxy"), who suffered harm as a result of the actions complained of herein ("Proxy Class"); and, (b) a class of all persons who purchased or otherwise acquired CNL securities pursuant to the CNL's Prospectuses and Registration Statements, between August 16, 2001 and August 16, 2004[1], inclusive (the "Class Period"), who suffered damages as a result of the actions

---

[1] These Prospectuses and Registration Statements include, among others, the following:
(a) Post-Effective amendments for registration statement, POS AM, filed on: 04/27/2004; 01/26/2004; 11/04/2003;10/02/2003; 09/16/2003; 07/14/2003; 04/23/2003; 11/21/2002; 09/26/2002; 06/26/2002; 03/14/2002; 12/20/2001; 09/21/2001; 08/24/2001.
(b) Rule 424B3 Prospectus, filed on: 02/13/2004; 01/26/2004; 12/31/2003; 12/08/2003; 11/04/2003; 09/16/2003; 08/12/2003; 07/14/2003; 07/07/2003; 05/09/2003; 03/07/2003; 02/20/2003; 02/10/2003; 01/08/2003; 11/21/2002; 09/26/2002; 06/26/2002; 06/10/2002; 04/19/2002; 03/14/2002; 03/01/2002; 02/01/2002; 12/20/2001; 10/09/2001; 09/21/2001; 08/24/2001.
(c) Amended Registration of Securities, S-11/A, filed on: 12/08/2003; 1/29/2003; 12/23/2002; 03/28/2002; 10/31/2001.

complained of herein ("Purchaser Class"), collectively sometimes referred to as the "Class." Excluded from the Class are the Defendants, their affiliates, successors and assigns, officers and directors and members of their immediate families.

12.    Defendant CNL is a Maryland Real Estate Investment Trust ("REIT") formed in 1996 to invest in Hotel properties that would be leased to and managed by third-party operators. Since its formation through March 31, 2004, CNL has raised over $3.0 billion from the investing public, who have purchased approximately 303,761,532 shares via small broker dealers at a pre-reverse split price of $10 a share. Shares of CNL are not currently publicly traded on any national securities exchange.

13.    Because CNL securities have never been listed on any securities exchange, it operates outside the realm of a public market that responds to market conditions and analysts' commentary, and its investors are entirely reliant on the accuracy and completeness of the financial and other disclosures provided in CNL's prospectuses, supplements and annual and quarterly SEC filings for information about the Company, its business, it finances, and the value of its securities. Since CNL's securities are unlisted and relatively illiquid, institutional investors such as mutual funds, pension funds and other investors that purchase large volumes of securities do not typically purchase CNL stock, and securities analysts do not typically report on CNL. Absent from the body of investor information available about CNL stock in the marketplace, therefore, is the type of in-depth analysis that institutions generate about market-traded securities. As so aptly noted in a July 30, 2004 Report on CNL by GreenStreet Advisors, Inc. ("GreenStreet"), a nationally–recognized firm with an expertise in real estate investments, "[i]t is no wonder that these

(d) Registration of Securities, S-11, filed on: 7/23/2003; 08/13/2002; 08/09/2001.

entities [such as CNL] seek out retail investors, as most institutional investors would more thoroughly scrutinize the value of the shares."

14.   In order to qualify as a REIT for federal income tax purposes, CNL is obligated to distribute 90% of its taxable income to its stockholders.  For years ended December 31, 2003 and 2002, CNL declared cash distributions of approximately $130.0 million and $74.2 million respectively, purportedly representing investment returns of 7.75% per annum.  In 2004, CNL distributed approximately $50 million during the first three months, thereby purportedly maintaining its 7.75% annual dividend rate, but has recently announced a reduction of the dividend to 7% per annum.

15.   During the Class Period, Defendants have systematically and improperly inflated CNL's reported earnings and cash for the purpose of obfuscating from their stockholders and future purchasers of CNL's stock the reality that CNL could not, through its operating activities, support the projected or promised annual dividend amount.  The unsustainably high dividends were the driving force behind the public's and each class member's purchase of CNL's common stock during the Class Period at an otherwise unjustifiably high and inflated price of $10 a share through CNL's frequent stock offerings. Defendants engaged in this conduct in order to continue to generate substantial fees and commissions for themselves and their affiliates through the continued sale of CNL stock as an apparently successful company.

16.   To succeed in this scheme, CNL artificially inflated its Net Earnings[2] by, among other things, using accounting practices that violate Generally Accepted Accounting

---

[2]     As used herein, "Net Earnings" (as presented in the Company's Consolidated Statements of Earnings) refers to gross sales minus taxes, interest, depreciation and other expenses, and from which adjustments are made to arrive at "Net Cash Provided by Operating Activities" (which

Principles ("GAAP") and reported those and other inflated amounts in its documents filed with

the SEC. Through these and other devices, as more fully described below, Defendants

concealed that CNL, anxious to invest the investor capital pouring into its coffers from its

stock offerings, overpaid for its hotel acquisitions, entered into collusive arrangements with its

property managers, and funded CNL's dividends with the investors' own capital, with

borrowed funds and through other inappropriate sources.

17.    CNL's true financial condition cannot be ascertained without the analysis

of expert real estate accountants.

18.    One of CNL's stated investment objectives is to provide its stockholders

with liquidity for their investments and is required to list its common shares on a national

securities exchange or over-the-counter market by December 31, 2007, or else liquidate in an

orderly fashion.

19.    Pursuant to a Definitive Schedule 14A Proxy Statement (the "Proxy")

filed and issued pursuant to Section 14(a) of the Securities Exchange Act of 1934 ("Exchange

Act"), dated May 7, 2004 as supplemented, CNL presented five proposals (in addition to the

election of the nominees to CNL's board of directors) on which CNL sought its shareholders'

votes:

> (a)    **The Merger Proposal**: "A proposal to approve the Merger of the Advisor
> with and into CNL Hospitality Properties Acquisition Corp., a wholly owned subsidiary
> of ours (the "Merger Proposal"). . . In the Merger, all of the outstanding shares of capital
> stock of the Advisor will be exchanged for a total Merger consideration of $297 million,
> comprised of approximately $267.3 million of our common shares and approximately

---

appears in the Company's  Consolidated Statements of Cash Flows and is also referred to as
"Cash from Operations"). "Net Cash Provided by Operating Activities" and "Cash from
Operations" are an accounting of funds related to the Company's operations, reported on the cash
flow statement of the Company's annual report and calculated by adjusting Net Earnings to
reflect depreciation expenses, deferred taxes, accounts payable, accounts receivable, and any
extraordinary items (but not including cash received from other sources, such as investments).

$29.7 million in cash (the "Merger Consideration"). In addition, in connection with the Merger, we will assume and repay a note issued by the Advisor to Five Arrows Realty Securities II, LLC in the amount of approximately $10.98 million. In connection with the Merger, it is anticipated that the existing advisory agreement between us and the Advisor will be terminated and we will become self-advised. . . Certain of our officers and directors and their affiliates collectively own, directly or indirectly, 90% of the outstanding capital stock of Advisor and will receive, directly or indirectly, an aggregate of 25.5 million shares of our common shares in the Merger."

      (b)    **Increase in Equity Shares**:  "A proposal to approve an amendment to our Articles to increase the number of authorized equity shares from 516,000,000 shares (consisting of 450,000,000 common shares, 3,000,000 preferred shares and 63,000,000 excess shares) to 3,675,000,000 shares (consisting of 3,000,000,000 common shares, 75,000,000 preferred shares and 600,000,000 excess shares) (which we refer to in the accompanying proxy statement as the "Authorized Shares Proposal"). If approved, this proposal will be implemented regardless of whether the other proposals being considered at the Annual Meeting are approved by our stockholders."

      (c)    **Charter Amended to Permit REIT To Be Self-Advised**:  "A proposal to approve an amendment and restatement of our Articles, which requires the affirmative vote of the holders of a majority of our outstanding common shares (which we refer to in the accompanying proxy statement as the "Majority Vote Charter Amendment Proposal") to modify certain provisions to reflect that we have become self-advised and to conform more closely to the articles of incorporation of other Listed REITs."

      (d)    **Reverse Stock Split**:  "A proposal to approve an amendment to the Articles to effect a one-for-two reverse stock split."

      (e)    **LTIP**:  "A proposal to approve and adopt our 2004 Omnibus Long-Term Incentive Plan."

      20.    The Proxy (pages 1-2) explained that the Merger had been proposed because of the following:

> Since our inception, our common shares have not been listed on any national securities exchange or U.S. inter-dealer quotation system, and there has been no established trading market for our common shares. We have been evaluating, with the help of independent financial advisors, not only whether to list or liquidate, but also other alternatives, such as engaging in a sixth continuous best efforts offering of our common shares and using the proceeds to invest in additional properties, or acquiring or merging with another real estate company. After due deliberation and consideration of relevant factors, our Board of Directors (the "Board") determined that it would be in our best interest to engage in a or the proposed firm commitment concurrent underwritten

offerings of additional common shares and preferred shares (the "Underwritten Offerings") and to list those common shares and preferred shares, together with our existing outstanding common shares, on the New York Stock Exchange, Inc. (the "NYSE").

Presently, our day-to-day operations are managed and executed by our external advisor, CNL Hospitality Corp. (the "Advisor"), subject to the review of our Board. We do not have any of our own employees. In connection with our possible Listing and Underwritten Offerings, we believe that it is important to become a self-advised real estate investment trust ("REIT"). Listed public lodging REITs are predominantly self-advised. We believe that public equity investors and market analysts could view us less favorably once our shares are listed if we remain externally-advised, which could make it more difficult for us to successfully raise additional equity capital in the public securities markets after Listing. Accordingly, we have determined that the internalization of the Advisor through a merger of the Advisor with and into our wholly-owned acquisition subsidiary (the "Merger") would be beneficial to our Underwritten Offerings and Listing.[3]

21.    The Advisor, Defendant CNL Hospitality Corp. provides management, advisory and administrative services to CNL as well as assists in developing and identifying for acquisition hotel and resort properties for CNL and its subsidiaries.

22.    On July 30, 2004, CNL issued a press release announcing the preliminary results from the Company's 2004 annual meeting of shareholders and reporting that the following proposals described in its Proxy were approved:

---

[3]    The Proxy goes on to state that : "Certain of our directors also serve on the board of directors of the Advisor, and certain of our directors and officers, directly or indirectly, hold shares of capital stock of the Advisor that, in the aggregate, constitute more than a majority of the outstanding capital stock of the Advisor. These relationships result in those Board members and officers having interests in the Merger that potentially conflict with our interests and the interests of our stockholders. Accordingly, our Board formed a special committee consisting of three of our independent directors (the "Special Committee") to analyze, consider and negotiate the terms of the Merger and to make a recommendation to our entire Board as to whether or not to pursue the Merger and, if so, on what terms and conditions."

(a)    Proposal 1 - Election of Directors - The board was increased from six to nine members, and all director nominees were elected.[4]

(b)    Proposal 2 - Merger with CNL Hospitality Corp.

(c)    Proposal 3 - Increase in Authorized Shares.

(d)    Proposal 4 - Majority Vote Charter Amendment.

(e)    Proposal 6 - Reverse Stock Split - The reverse stock split will be effective following the close of business Monday, August 2, 2004, for shareholders of record on that date.

(f)    Proposal 7 - 2004 Long-Term Incentive Plan.

23.    In addition, the July 30, 2004 Press Release stated that the meeting and vote with respect to Proposal 5, also referred to as the Two-Thirds Vote Charter Amendment - an amendment to CNL's charter and bylaws which requires the affirmative vote of the holders of at least two-thirds of CNL's outstanding common shares to modify certain other provisions to reflect that CNL has become self-advised and to conform more closely to the articles of incorporation of other listed REITs -- was adjourned until August 27, 2004, in order to solicit additional proxies with respect to Proposal 5 for which a two-thirds vote had not yet been received. Pursuant to the Merger Agreement, a condition to the Merger is the Two-Thirds Vote Charter Amendment becoming effective.

24.    Finally, as part of the approved charter amendments, the name of CNL Hospitality Properties, Inc. was changed to CNL Hotels & Resorts, Inc.

25.    The Underwritten Offering was expected to be priced on August 3, 2004. Late that day CNL abruptly postponed the Underwritten Offering and Listing. According to its August 3, 2004 Press Release filed with the SEC on August 5, 2004 in a Form 8-K:

---

[4]    The three new directors joining the CNL Board are: James Douglas Holladay, Jack F. Kemp, and Dianna F. Morgan.

Due to market conditions, CNL Hotels & Resorts, Inc., the nation's second largest hotel real estate investment trust ("REIT"), has determined that it is **appropriate to postpone its firm underwritten offering and listing**.

In light of this decision, the company is evaluating the treatment of previously accrued transaction costs related to its second quarter earnings, which will likely result in the write-off of some or all of these expenses. (Emphasis added).

26.     CNL had previously stated that it expected to sell 35 million shares of common stock in the Underwritten Offering at a price range between $19 and $21 (comparable to the price previously charged members of the Purchaser Class) and list 151.8 million (post-reverse split) existing but previously unlisted shares. But even before the Company's announcement of the postponement of the Underwritten Offering and Listing, several stock analysts said the price was too high and might be lowered at the last minute. According to a August 4, 2004 Wall Street Journal article, Jackson Hsieh, global head of UBS Investment Bank's real-estate, lodging and leisure group (one of the three underwriters on the deal, along with Goldman Sachs and Bank of America), said that "the company was anticipating trying to price the deal Tuesday night, they went out with a filing range of $19 and $21 and **we were definitely getting some push-back on the price** in terms of pulling together a successful offering." (Emphasis added). Indeed, the press later reported that investors were only willing to pay between $10 and $12 per share, or approximately half of what the Purchaser Class had been charged by CNL on a split adjusted basis

27.     CNL may again try to complete the Underwritten Offering and Listing by November 30, 2004.[5] However, if the Underwritten Offering and Listing do not occur by

---

[5]     Pursuant to the Merger Agreement, the Underwritten Offerings and the Listing must be consummated on or before November 30, 2004; provided, that if the condition to the Merger that the Underwritten Offerings be consummated is waived, the Listing must occur on or before October 15, 2004. If the Listing does not occur within the applicable period described above, the

November 30, 2004, then the Merger (i.e., the shareholder-approved acquisition of the Adviser by CNL) might not be completed absent waiver of these pre-conditions upon the written consent of certain CNL directors and James M. Seneff, Jr., in accordance with the Merger Agreement, that would permit Defendants to proceed with the Merger.

28. By virtue of the Defendants' conduct, the Proxy, Registration Statements and Prospectuses described herein contained materially false and misleading statements and/or failed to disclose material information necessary in order to make the statements contained therein not misleading, and thereby violate Sections 11, 12 and 15 of the Securities Act, and Section 14(a) and 20 of the Exchange Act and Rule 14a-9 promulgated thereunder.  In addition, by virtue of the Defendants' conduct, Defendants have also breached their fiduciary duties owed to the CNL shareholders.

29. In addition to the other relief sought herein, the Defendants should be enjoined from completing the Underwritten Offering and/or Listing until:

(a) the Merger Proposal, including the merger agreement with the Advisor, is declared null and void;

(b) the Court approves the nomination and election of new independent directors and the retention of an independent financial advisor who will assess the advisability of: continuing, modifying or terminating the agreement between CNL and the Advisor; acquiring the Advisor and, if so, on what terms and conditions; negotiating for advisory services with another advisor; or becoming self-advised without acquiring the Advisor;

---

Merger Agreement may be terminated unless such period is otherwise extended by the parties to the Merger Agreement.

(c)     the CNL stockholders should be resolicited on all matters on which they

voted pursuant to the Proxy, and such resolicitation shall b e conducted pursuant to Court

supervision and Court-approved Proxy solicitation materials; and

the Defendants should be enjoined from: (i) waiving any requirement that CNL common stock

Listing occur as a pre-condition of the Merger; and (ii) waiving any other requirement or

condition to the Merger (without Court approval).

## JURISDICTION AND VENUE

30.   This Court has jurisdiction over the subject matter of this action pursuant

to section 22 of the Securities Act (15 U.S.C. § 77v) and section 27 of the Exchange Act (15

U.S.C. § 78aa) and 28 U.S.C. § 1331, 1337.

31.   Venue is proper in this Court pursuant to Section 22 of the Securities Act,

15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.

Many of the acts and transactions giving rise to the violations of law complained of herein

occurred in this District and certain of the Defendants have their principal places of business

within the District.

32.   In connection with the acts, conduct and other wrongs complained or

herein, Defendants used the means and instrumentalities of interstate commerce.

## PARTIES

33.   Plaintiff Mary M. Campbell purchased CNL securities as set forth in the

certification annexed hereto, and has suffered substantial damages as a result of Defendants'

wrongful acts, as alleged herein.  Plaintiff also received and voted on the Proxy.

34.   Defendant CNL is a corporation organized under the laws of the State of

Maryland on June 12, 1996, with its principal executive offices at 459 South Orange Avenue,

Orlando, Florida. Defendant CNL is primarily engaged in the acquisition, development and

ownership of interests in hotel and resort properties including, limited service hotels, extended stay hotels, and full service hotels and resorts (collectively, "Properties").

35.   Defendant CNL operates for federal income tax purposes as a real estate investment trust ("REIT").  Defendant CNL's portfolio includes ownership interests in 130 hotels and resorts in 37 states, the District of Columbia and Canada, comprising approximately 32,000 rooms, and is purportedly diversified by geography, brand affiliation and third-party management companies engaged to operate CNL's hotels and resorts.  CNL's hotel and resorts are operated under 19 nationally recognized hotel brands, including the Marriott, Hilton and Hyatt families of brands, and nine independent brands (collectively, "Third-party management companies").

36.   Defendant CNL's operating partnerships are Defendants CNL Hospitality Partners, L.P. ("CNL LP"), a Delaware limited partnership, and RFS Partnership, L.P. ("RFS"), a Tennessee limited partnership (collectively, "Operating Partnerships"), and are referred to herein, along with CNL, as "CNL".

37.   Defendant CNL Hospitality Corp., a Florida Corporation, organized on January 7, 1997, and its wholly-owned subsidiary, defendant CNL Hotel Development Company ("CHD") (the "Advisor"), provide management, advisory and administrative services.  CNL's day-to-day operations are conducted by the Advisor through the authority delegated to it under CNL's Articles and the Advisory Agreement and pursuant to the policies established by CNL's Board. CNL originally entered into an advisory agreement with the Advisor effective July 9, 1997 and this agreement has been renewed for successive one-year periods, most recently as of April 1, 2004. Under the terms of the current Advisory Agreement, the Advisor locates, analyzes, structures and negotiates investment opportunities for CNL,

arranges financing and refinancing, engages third parties to provide services for CNL, administers CNL's bookkeeping and accounting functions, serves as CNL's consultant in connection with policy decisions to be made by CNL's Board, provides asset management services with respect to our properties and renders other services as CNL's Board deems appropriate.   All of the officers and a majority of the directors of the Advisor are CNL's officers and directors.

38.   The Advisor is owned directly or indirectly by the following entity defendants who are collectively, along with the Advisor, referred to herein as the "Advisor":

(a)   Defendant CNL Financial Group, Inc. ("CFG") — CFG is a Florida corporation which is a diversified real estate company and was a direct stockholder of the Advisor from its inception until January 1, 2000, and thereafter has been an indirect stockholder. CFG is a wholly-owned subsidiary of CNL Holdings, Inc., which is controlled jointly by Defendant James M. Seneff, Jr. and his wife.

(b)   Defendant CNL Real Estate Group, Inc. ("CREG") — CREG is a Florida corporation which is a real estate investment company and has been a stockholder of the Advisor since January 1, 2000. CREG is a wholly-owned subsidiary of CFG and owns approximately 53.3% of the shares of outstanding common stock of the Advisor.

(c)   Defendant Five Arrows Realty Securities II, LLC ("Five Arrows") — Five Arrows is a Delaware limited liability company and has been a stockholder of the Advisor since February 24, 1999. Five Arrows owns 10% of the shares of outstanding common stock of the Advisor.

39.   Defendant James M. Seneff, Jr. ("Seneff") serves as Chairman of the Board of Directors of CNL.  In addition, defendant Seneff serves as a director, chairman of the

board of directors and chief executive officer of CFG.  Defendant Seneff, his wife and their affiliates control, and own a substantial majority of the economic interests in, CFG and its subsidiaries. Defendant Seneff also serves as a director and officer of a number of CFG subsidiaries and of REITs that CFG sponsors. Defendant Seneff owns directly approximately 15.3% of outstanding common stock of the Advisor.

40.    Defendant Robert A. Bourne ("Bourne") serves as Vice-Chairman of the Board of Directors of CNL.  In addition, defendant Bourne serves as the president and treasurer of CFG.  Defendant Bourne also serves as a director and officer of a number of CFG subsidiaries and of REITs that CFG sponsors.

41.    Defendant Thomas J. Hutchison III ("Hutchison") has served as CNL's Chief Executive Officer since May 2003.  He was a nominee for election to CNL's Board at the 2004 Annual Meeting of Stockholders. Hutchison served as Co-Chief Executive Officer and a director of the Advisor.  From June 2002 through March 2003, Hutchison served as CNL's President and President of the Advisor.  From May 2000 to June 2002, Hutchison served as CNL's Executive Vice President and Executive Vice President of the Advisor, and from May 2000 to July 2002, he served as Executive Vice President of CNL Hotel Investors, Inc.  In addition, Mr. Hutchison serves as President and Chief Operating Officer of CNL Real Estate Group, Inc., the parent company of CNL Retirement Corp. and the parent company of the Advisor.  He also served as the President and Chief Operating Officer of CNL Realty & Development Corp.  Hutchison also served as President and Chief Executive Officer of CNL Retirement Properties, Inc. and as President and Chief Executive Officer of CNL Retirement Corp., its advisor. He currently serves as a director of CNL Retirement Corp. Mr. Hutchison also serves as a director, Chairman and Chief Executive Officer of EMTG, LLC.  From 2000 to

June 2002, Mr. Hutchison served as Executive Vice President of CNL Retirement Properties,

Inc. and CNL Retirement Corp. from May 2000 to June 2002.

42. Defendant John A. Griswold ("Griswold") has served as CNL's President

since March of 2003 and as CNL's Chief Operating Officer since October of 2003. The

functions of Acquisitions and Business Development, Portfolio and Asset Management,

Planning, Design, Construction, and the Office of General Counsel report to Griswold.

Griswold also served as a director and President of the Advisor. He is a nominee for election

to CNL's Board at the 2004 Annual Meeting of Stockholders.

43. Defendants Seneff, Bourne, Hutchinson, and Griswold are referred to

collectively herein as the "Management Defendants".

44. Defendant Adams has served as a director of CNL since 1999. At relevant

times, Defendant Adams has served as a member of CNL's Audit Committee.[6]

---

[6]     According to the Proxy, CNL has a standing Audit Committee, and currently the
members of the Audit Committee are Defendants Craig M. McAllaster, Robert E. Parsons, Jr.,
and Charles E. Adams, who CNL has determined are "financially sophisticated and able to read
and understand our financial statements." According to the Proxy,

> the audit function of the committee is to help ensure the integrity of our
> financial statements, the qualifications and independence of our
> independent auditor and the performance of our internal audit function and
> independent auditors. The Audit Committee's functions are to select, assist
> and meet with the independent auditor, oversee each annual audit and
> quarterly review, establish and maintain our internal audit controls and
> prepare the report that federal securities laws require be included in our
> annual proxy statement. In addition, our Audit Committee has established
> procedures for handling any complaints we receive regarding accounting,
> internal accounting controls, or auditing matters, as well as any confidential,
> anonymous submissions by any of our employees regarding concerns about
> questionable accounting or auditing matters. We will provide appropriate
> funding, as determined by our Audit Committee, for payment of
> compensation to our independent accountants, any advisors it employs and
> other expenses of the committee.

45.   Since 1997, Defendant Charles E. Adams ("Adams") has served as the
President and a founding principal of Celebration Associates, LLC, a real estate advisory and
development firm.  Adams was previously with The Walt Disney Company from 1990 until
May 1997 and served as vice president of community business development for The
Celebration Company and Walt Disney Imagineering.  Adams participated in the planning for
residential development at EuroDisney in Paris, France.  He was a founding member of the
Celebration School Board of Trustees and served as president and founding member of the
Celebration Foundation Board of Directors.  Adams is a council member on the Resort/
Recreation Development Council for the Urban Land Institute.  Before joining The Walt
Disney Company, Mr. Adams worked with Trammell Crow Residential developing luxury
apartment communities in the Orlando and Jacksonville, Florida areas

46.   Defendant Lawrence A. Dustin ("Dustin") has served as a director of CNL
since 1999.  Since January 2002, Defendant Dustin has served as president, a director and a
principal stockholder of Dustin/ Massagli LLC, a company that manages the operations of
EMTG, LLC, which publishes the Mobil Travel Guide, a publication which features
information about domestic hotels, resorts, restaurants, sites and attractions and of which he
owns a 31.25% interest. Dustin also serves as a director and president of EMTG, LLC. From
August 1999 through January 2002, Dustin served as president of the lodging division for
Travel Services International, Inc., a specialized distributor of leisure travel products and
services. From September 1998 to August 1999, Dustin served as principal of BBT, an
advisory company specializing in hotel operations, marketing and development. From 1994 to
September 1998, Dustin served as senior vice president of lodging of Universal Studios, Inc.,
where he led Universal's entry into the lodging business. Dustin provided strategic direction

and tactical implementation for matters related to Universal's hotel interests in Singapore,
Osaka, Los Angeles and Orlando. Before joining Universal Studios in 1994, Dustin served as a
principal and chief executive officer of AspenCrest Hospitality, Inc., a professional services
firm that helped independent hotel owners enhance the asset value of their properties. From
1969 to 1989, Dustin held various positions in the hotel industry, including 14 years in
management with Westin Hotels & Resorts.

   47. Defendant Craig M. McAllaster ("McAllaster") has served as a director of
CNL since 1999. At relevant times, Defendant McAllaster has served on CNL's Audit
Committee and as Chair of CNL's Audit Committee.  Defendant McAllaster is dean of the Roy
E. Crummer Graduate School of Business at Rollins College. He directed the Executive MBA
program from 1994 through 2000, has been on the management faculty and served as executive
director of the international consulting practicum programs at the Crummer School. Prior to
Rollins College, McAllaster was on the faculty at the School of Industrial and Labor Relations
and the Johnson Graduate School of Management, both at Cornell University and the
University of Central Florida. McAllaster spent over ten years in the consumer services and
electronics industry in management, organizational and executive development positions, and
is a consultant to a variety of domestic and international companies in the areas of strategy and
leadership.

   48. Defendant Robert E. Parsons, Jr. ("Parsons") has served as a director of
CNL since September 2003. Parson serves on CNL's Audit Committee and CNL's Board
determined that Parsons is an Audit Committee financial expert as defined in Item 401 of
Regulation S-K. Since April 2004, Mr. Parsons has been providing consulting services to
Exclusive Resorts, a Denver based luxury residence club. Parsons also is the Managing

Director of Wasatch Investments, which provides advisory and consulting services to the real estate and lodging industries. Prior to Wasatch Investments, Parsons spent 22 years at Host Marriott Corporation, a REIT that owns more than $7 billion of full service hotel properties, where from 1995 to 2003, he served as Executive Vice President and Chief Financial Officer. He also previously served as Chairman of the Hotel Development Council of the Urban Land Institute.

49.    Defendants Adams, Dustin, McAllaster and Parsons are referred to collectively herein as the "Director Defendants", and together with the Management Defendants, as the "Individual Defendants".

50.    By reason of their management positions, and /or membership on CNL's or the Advisor's Board of Directors, and their authority and ability to make public statements in the name of CNL, the Individual Defendants were controlling persons of CNL and had the power to influence to cause (and did cause) CNL to engage in the conduct complained of herein.

51.    Because of their Board memberships and/or executive and managerial positions with CNL, each of the Individual Defendants had access to the adverse, non-public and undisclosed information with respect to CNL's operations and financial condition, or to cause and direct that such information be disseminated, and to promptly correct any previously disseminated information that was misleading to the market or any accounting treatment in CNL's financial statements that violated GAAP. As a result of their failure to do so, the $10 offering price of CNL stock was artificially inflated throughout the Class Period damaging Plaintiff and the Class.

52.    The Individual Defendants, because of their positions with CNL,

controlled the contents of the Proxy, as well as CNL's quarterly and annual reports and press

releases.  Each Individual Defendant was provided with copies of the Proxy, the filed reports

and press releases alleged herein to be misleading prior to or shortly after their issuance and

had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions and access to material non-public information, each knew that the

adverse facts specified herein had not been disclosed to, and were being concealed from, the

investing public and CNL's shareholders and that the positive representations that were being

made were then materially false and misleading.  As a result, each is responsible for the

accuracy of CNL's corporate statements detailed herein as "group-published" information and

is responsible and liable for the misrepresentations and omissions contained therein.

53.    Each Defendant is liable as a primary violator in making false and

misleading statements, and for participating in a scheme and course of business that operated to

inflict economic harm on purchasers and holders of CNL stock during the Class Period.  All of

the Defendants had financial motives to pursue this scheme in furtherance of their common

goal, i.e., misrepresenting the reported Net Cash Provided by Operating Activities, Cash from

Operations and Net Earnings of CNL and the value of CNL stock by making false and

misleading statements and concealing material adverse information.  The common course of

business did:  (i) deceive the investing public, including Plaintiff and other Class members to

purchase CNL stock; (ii) artificially inflate the price of CNL stock during the Class Period; (iii)

cause Plaintiff and other members of the Class to purchase CNL stock at inflated prices; (iv)

conceal CNL's Net Cash Provided by Operating Activities, Cash from Operations and Net

Earnings and the impact thereof on its value, the source and character of the monies used to

fund CNL's reputed 7.5% dividend yield, and its continued ability to fund future dividends
from its operations; and (v) mislead CNL stockholders in exercising their right to vote on the
proposals contained in this Proxy.

## CLASS ACTON ALLEGATIONS

54.    This is a class action pursuant to Rule 23(a), (b) (2) and/or (b)(3) of the
Federal Rules of Civil Procedure on behalf of:

(a)    a class of all persons who were entitled to vote on the proxy statement
filed with the SEC by CNL dated May 7, 2004, as amended or supplemented on June 21,
2004, July 7, 2004, July 8, 2004 and July 20, 2004  ("Proxy"), who suffered harm as a
result of the actions complained of herein ("Proxy Class"); and,

(b)    a class of all persons who purchased or otherwise acquired CNL securities
pursuant to the CNL's Prospectuses and Registration Statements, between August 16,
2001 and August 16, 2004, inclusive (the "Class Period"), who suffered damages as a
result of the actions complained of herein ("Purchaser Class"),

collectively sometimes referred to herein as the "Class."

55.    Excluded from the Class are the Defendants named herein, the officers and
directors of Defendants at all relevant times, members of each Individual Defendant's
immediate family, any entity in which any Defendant has a controlling interest, and the legal
affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or
assigns of any such excluded party.

56.    Because CNL has sold 303.8 million shares of CNL common stock by
way of public stock offerings through March 31, 2004, members of the Class are so numerous
that joinder of all members is impracticable. While the exact number of Class members can

only be determined through appropriate discovery, Class members number at least in the tens of thousands and they are geographically dispersed.

57.   Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct.

58.   Plaintiff will fairly and adequately protect the interests of all Class members and has retained counsel experienced and competent in class and securities litigations. Plaintiff has no interest contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

59.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members impracticable. Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it impossible for class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

60.   Final injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the entire Class.

61.   Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)      Whether Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act;

(b)     Whether the Prospectus and Registration Statements, since the 2001 offering, and the Proxy Statement of April 30, 2004, filed with the SEC, contained materially false and misleading statements and failed to disclose material facts necessary to make the statements therein not materially false and misleading;

(c)     Whether Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder by causing to be issued a materially false and misleading Proxy; and

(d)     Whether the members of the Class have sustained damages and, if so, the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

### Material Background Information

62.     CNL is a Maryland REIT formed in 1996 to invest in the Properties that would be leased to and managed by third-party operators. The Advisor made an initial capital contribution of $200,000 for 20,000 shares of CNL's common stock. (Among them, the Management Defendants own a de minimis number of CNL shares either directly or indirectly). Since that time and as of March 31, 2004, CNL sold 303.8 million shares of CNL common stock raising approximately $3.0 billion of capital through five best efforts public stock offerings. Nearly 90% of the total investor capital raised by CNL was invested through stock offerings made since 2001. Most recently, on February 4, 2003, CNL commenced a stock offering of an additional 175 million shares at a price of $10 a share, representing $1.75 billion of capital, which offering was completed in March 2004 ("2003 Offering.")

63.     REITs are not treated for federal income tax purposes as corporations, and thus, are not taxed at the corporate level on their "real estate investment trust taxable income" that is distributed to shareholders. REITS thereby eliminate "double taxation" on earnings,

where taxes are imposed at both the corporate and stockholder levels.  While a REIT pays no federal income tax on its earnings, it must distribute 90% of its taxable income to shareholders. To qualify as a REIT, a company can only own assets—traditionally real estate assets—but cannot operate or manage the assets, other than through a Taxable REIT Subsidiary ("TRS") which can be wholly owned by the REIT.

64.    The Individual Defendants marketed CNL as a solid investment generating 8% annual returns on initial investments of $10 per share.  The stock is not publicly traded.  As of February 20, 2004, there were approximately 93,569 stockholders of record of CNL common stock.  The following chart depicts the amount of capital raised by CNL since June 1996:

| Offering Year | Shares | Capital Raised |
|---|---|---|
| 1996 Offering | 20,000 | $        200,000 |
| 1997 Offering | 1,132,540 | 11,325,402 |
| 1998 Offering | 3,169,368 | 31,693,678 |
| 1999 Offering | 24,581,006 | 245,820,365 |
| 2000 Offering | 20,099,128 | 201,180,560 |
| 2001 Offering | 28,355,490 | 283,755,992 |
| 2002 Offering | 48,672,000 | 486,720,000 |
| 2003 Offering | 116,214,000 | 1,162,905,000 |
| 2004 Offering (though March 31) | 61,518,000 | 615,198,000 |
| TOTAL | 303,761,532 | $3,038,798,997.00 |

65.    CNL's success in selling its securities can be attributed to its misleading portrayal to the investing public of a portfolio of Properties capable of generating Net Cash Provided by Operating Activities, Cash from Operations and Net Earnings sufficient to maintain a 7% to 8% dividend rate, while preserving capital invested, at a time when most other investment or financial vehicles could not match that type of return.  Instead, only

through accounting machinations, GAAP violations and non arms-length transactions did CNL apparently generate the Net Cash Provided by Operating Activities, Cash from Operations and Net Earnings from which it distributed dividends to investors at an unsustainable 7.75% rate. Through such deception, Defendants were thereby able to continue to raise more and more capital from the investing public.[7]

66.    While REITs are predominantly self-advised, since its inception, CNL has opted for an externally advised structure and has been managed by the Advisor, which is principally owned by the Management Defendants.  Pursuant to an Advisory Agreement, the Advisor provides management services relating to CNL's business, the Properties and the mortgage loans that CNL may provide to other hotel and resort operators.

67.    Under the Advisory Agreement, the Advisor is responsible for assisting CNL in negotiating leases, permanent financing, mortgage loans to other hotel and resort operators and CNL's revolving line of credit; collecting rents and payments on any mortgage financing CNL provides; inspecting the Properties and the tenants' or managers' books and records; and responding to tenants' or managers' inquiries and notices.  In exchange for those services, the Advisor is entitled to receive fees.

(a)     For its services, the Advisor receives an asset management fee, which is calculated monthly in an amount equal to one-twelfth of 0.60% of the total amount invested in the Properties, exclusive of acquisition fees and acquisition expenses, plus one-twelfth of 0.60% of the outstanding principal amount of any mortgage loans, as of the end of the preceding month.  ("Asset Management Fee").

(b)     For identifying the Properties, structuring the terms of the acquisition and leases of the Properties and structuring the terms of the mortgage loans, the Advisor receives an acquisition fee equal to 4.5% of gross proceeds from the offerings, loan

---

[7]     As of March 31, 2004, CNL collected net proceeds in the amount of $4.7 billion from (i) their five public offerings, (ii) loan proceeds under capital contributions from CNL Hospitality Corp. after deduction of selling commissions, (iii) marketing support fees, (iv) due diligence expense reimbursements and (v) organizational and offering expenses.

proceeds from permanent financing and a portion of CNL's revolving line of credit that is used to acquire Properties. ("Acquisition Fee").

68.    Since 2002, the Advisor has earned more than $145 million in fees in connection with the offerings, acquisitions, the securing of permanent financing on properties, monthly management fees and accounting and administrative services (exclusive of the astronomical fees associated with the KSL Acquisition). The following chart sets forth the amounts CNL incurred or paid to the Advisor in both acquisition and management fees since January 2002:

| Period | Amount | Description |
|---|---|---|
| year end 2003 | $57M | -2002 Offering and 2003 Offering |
|  | $42M | -Permanent financing |
| Jan 30, 2003-<br>Sept 30, 2003 | $8.4M | -Monthly asset management fee |
|  | $5.1M | -Accounting and administrative fees |
| year end 2002 | $22M | -2000 and 2002 offering |
|  | $7.5M | -Permanent financing |
|  | $6.7M | -Monthly asset management fee |
|  | $4.3M | -Accounting and administrative fees |

## Defendants' False and Misleading Prospectuses

69.    The true operating and financial condition of CNL starkly contrast with the CNL that Defendants portrayed to the investing public. During a period where few investments were able to provide sustainable returns above 3-4% per annum, CNL stood high, purportedly providing its investors with 7% to 8% dividends. CNL states in the Recent Developments section of its Post Effective Amendment of its prospectus dated April 1, 2002:

> The Board of Directors declared distributions of $0.06458 per Share to stockholders of record on March 1 and April 1, 2002, payable in March 2002 and June 2002, respectively, representing an annualized distribution rate of 7.75%.

70.   Such distributions, however, were not based on accounting practices that conformed with GAAP, which CNL consistently informed its shareholders it complied with.

71.   CNL notes in the critical accounting policies section of its Simplified Registration Form, S-3, filed on 04/30/2004:

> Our consolidated financial statements include our account and those of all of our consolidated subsidiaries. Our discussion and analysis of our financial condition and the results of our operations is based upon our consolidated financial statements, which have been prepared in accordance with generally accepted accounting principles, or GAAP.

72.   Moreover, the selected financial section data presented in CNL's Post-effective amendment of its Prospectus dated April 1, 2002, note that:

> Cash distributions are declared by the Board of Directors and generally are based on various factors, including cash available from operations. Approximately 60%, 26%, 30%, 18% and 23% of cash distributions for the years ended December 31, 2001, 2000, 1999, 1998 and 1997, respectively, represent a return of capital in accordance with generally accepted accounting principles ("GAAP"). Cash distributions treated as a return of capital on a GAAP basis represent the amount of cash distributions in excess of accumulated net earnings on a GAAP basis, including deductions for depreciation expense. The Company has not treated such amounts as a return of capital for purposes of calculating Invested Capital and the Stockholders' 8% Return.

73.   Specifically, concerning the calculation of the funds from operations, CNL stated the following to its shareholders about its compliance with GAAP:

> Funds from operations ("FFO"), based on the revised definition adopted by the Board of Governors of the National Association of Real Estate Investment Trusts ("NAREIT") in October 1999 and as used herein, means net earnings determined in accordance with GAAP, excluding gains or losses from sales of property, plus depreciation and amortization of real estate assets and after adjustments for unconsolidated partnerships and joint ventures. (Net earnings determined in accordance with GAAP include the noncash effect of straight-lining rent increases throughout the lease terms. This straight-lining is a GAAP convention requiring real estate companies to report rental revenue

based on the average rent per year over the life of the leases. During the years ended December 31, 2001, 2000, 1999 and 1998, net earnings included $118,038, $117,282, $35,238 and $44,160, respectively, of these amounts. No such amounts were earned during 1997.) FFO was developed by NAREIT as a relative measure of performance and liquidity of an equity REIT in order to recognize that income-producing real estate historically has not depreciated on the basis determined under GAAP. However, FFO (i) does not represent cash generated from operating activities determined in accordance with GAAP (which, unlike FFO, generally reflects all cash effects of transactions and other events that enter into the determination of net earnings), (ii) is not necessarily indicative of cash flow available to fund cash needs and (iii) should not be considered as an alternative to net earnings determined in accordance with GAAP as an indication of the Company's operating performance, or to cash flow from operating activities determined in accordance with GAAP as a measure of either liquidity or the Company's ability to make distributions. FFO as presented may not be comparable to amounts calculated by other companies. Accordingly, the Company believes that in order to facilitate a clear understanding of the consolidated historical operating results of the Company, FFO should be considered in conjunction with the Company's net earnings and cash flows as reported in the accompanying consolidated financial statements and notes thereto. See Appendix B -- Financial Information.[8]

74. CNL's accounting practices and disclosures to the CNL shareholders were

beset with fundamental, material problems. Defendants knew that CNL's properties would not

---

[8] Since 2002, the same disclosures as to the GAAP compliance can be found in the Selected Financial Data section of the following SEC filings: (1) Post-Effective amendments for registration statement, POS AM, filed on 01/26/2004; (2) Post-Effective amendments for registration statement, POS AM, filed on 11/04/2003; (3) Post-Effective amendments for registration statement, POS AM, filed on 10/02/2003; (4) Post-Effective amendments for registration statement, POS AM, filed on 09/16/2003; (5) Post-Effective amendments for registration statement, POS AM, filed on 07/14/2003; (6) Post-Effective amendments for registration statement, POS AM, filed on 04/23/2003; (7) Pre-Effective amendment to an S-11 filing, S-11/A, filed on 01/29/2003; (8) Pre-Effective amendment to an S-11 filing, S-11/A, filed on 12/23/2002; (9) Post-Effective amendments for registration statement, POS AM, filed on 11/21/2002; (10) Post-Effective amendments for registration statement, POS AM, filed on 09/26/2002; (11) Registration of securities of certain Real Estate Companies, S-11, filed on 08/13/2002; (12) Post-Effective amendments for registration statement, POS AM, filed on 06/26/2002; (13) Pre-Effective amendment to an S-11 filing, S-11/A, filed on 03/28/2002; (14) Post-Effective amendments for registration statement, POS AM, filed on 03/14/2002.

be sufficiently profitable in the foreseeable future to maintain the dividend levels which CNL used to promote sales of its common stock to the Class.  Further, because of CNL's management contracts and its joint ventures, CNL would not be able to compensate for the non-arm's length dealings and accounting tricks it used to fund its prior dividends and maintain its REIT status.

75.   During the Class Period, while actively offering and selling CNL stock, Defendants failed to disclose CNL's true financial situation and the fact that it was not able to fund its dividends from its Net Cash Provided by Operating Activities, Cash from Operations and Net Earnings.  Rather, dividends represented, in substantial part, a return of investors' *own* capital not a return *on* investors' capital, as defined in the preferred return provisions of the Company's charter, and were funded in large part from funds raised from new investors.

76.   These non-disclosures materially assisted CNL in raising more than two billion dollars in their stock offerings during the Class Period.

**Defendants' Conflicts of Interest and**
**Self-Dealing Drove Their Promotion of CNL Stock**

77.   The decision-makers at CNL were also the owners and managers of its outside Advisor.  While CNL bought Properties recommended by its Advisor, which was receiving a commission in direct proportion to the amount expended by CNL for the Properties, both entities shared some of the same management.  From June 2002 through March 2003, Defendant Hutchinson served as both CNL's president and the Advisor's President.  From May 2000 to June 2002, Defendant Hutchison served as CNL's executive vice president and as the Advisor's executive vice president.  Since March 2003, Defendant John Griswold has served as CNL's president and as the Advisor's Director and President.

78.   Conflicts of interests permeated the Defendants' relationships:

(a)      Certain of CNL's directors and executive officers have interests that directly conflict with CNL's shareholder's interests in connection with negotiating, formulating and consummating the Merger.  In particular, all of the executive officers and a majority of the directors of the Advisor also are CNL's officers or directors.

(b)      Some of CNL's officers, directors and affiliates are stockholders of the Advisor and would receive the following in connection with the Merger:

|  |  | *Shares of CNL Common Stock:* |
|---|---|---|
| 1) | CNL Real Estate Group, Inc. | 15.8 million shares; |
| 2) | James M. Seneff, Jr. | 4.5 million shares; |
| 3) | Robert A. Bourne | 4.5 million shares; |
| 4) | Thomas J. Hutchison III | 0.9 million shares; |
| 5) | John A. Griswold | 0.4 million shares; |
| 6) | C. Brian Strickland | 0.3 million shares; |
| 7) | Paul H. Williams | 0.1 million shares; |
| 8) | Barry A.N. Bloom | 0.1 million shares. |

(c)      Moreover, James M. Seneff, Jr., CNL's Chairman of the Board and a director, shares, with his wife, ownership and voting control of CNL Holdings, Inc., the parent company of CFG, which, in turn, wholly owns CNL Real Estate Group, Inc., the owner of a majority of the outstanding shares of common stock of the Advisor. The Merger would result in Defendant Seneff receiving indirect beneficial ownership of over approximately $200 million of CNL's common shares.

(d)      Thomas J. Hutchison, III, John A. Griswold and C. Brian Strickland, executive officers of the Advisor who are also executive officers of CNL own an aggregate of approximately over 5% of the Advisor which would entitle them as part of the Merger to an aggregate of approximately over $16 million of CNL's common shares.

(e)      In addition, CNL entered into new employment agreements with Thomas J. Hutchison III, John A. Griswold, C. Brian Strickland, Paul H. Williams and Barry A.N.

Bloom, which are effective as of the effective time of the Merger. Subject to approval of the 2004 Omnibus Long-Term Incentive Plan at the Annual Meeting, such executive officers will also receive 400,000, 175,000, 175,000, 90,000 and 90,000 restricted common shares, respectively, and 1,050,000, 700,000, 520,000, 350,000 and 350,000 deferred phantom units.

79.    Directly, and indirectly through their ownership in CNL Real Estate Group, Inc., CNL's directors and officers stand in a very different position to that of CNL's shareholders.

80.    Throughout the Class Period, Defendants continued to promote the sale of CNL stock, raised additional capital for CNL, and invested all of the proceeds the Company received from its CNL stock sales in the purchase of Properties. The more Properties CNL purchased and the more stock CNL sold, the more money Defendants (in particular, the Management Defendants) made. In order to promote the need and desirability of CNL raising even more capital, it was necessary for the Defendants to dispose of previously raised capital. In order to continue to invest the billions of dollars of stock sale proceeds generated by Defendants' promotional efforts, Defendants caused the Company to engage in transactions that Defendants knew, or recklessly disregarded, would provide returns to CNL that would result in the reduction of the dividend that was the driving force for the sale of new shares, and would require Defendants to sell more and more stock, borrow more money and engage in greater accounting manipulations in order to conceal the fact that CNL stock was being sold for significantly more than its true value.

81.    This conflict of interest in the highest spheres of management of both CNL and its Advisor precluded CNL from conducting its business in the best interest of its

stockholders. CNL made acquisitions based on the substantial commissions and fees the Advisor would receive from the purchase of Properties rather than on the ability of the acquisitions to yield sufficient profitable revenues for CNL. The Individual Defendants approved such acquisitions on behalf of CNL and booked the commissions through the Advisor.

82.     The following transactions are indicative of the rampant conflict of interest within CNL which has created the financial fiasco into which CNL has been placed, caused the concealment of its true financial condition through accounting tricks, and is attempting to further conceal through a merger with its Advisor and its plan to go public, allegations that are further detailed below.

83.     In February 2004, CNL entered into an agreement to acquire all of the outstanding capital stock of KSL Recreation Corporation and its subsidiaries ("KSL") for a stated cost of approximately $2.6 billion which included the assumption of debt ("KSL Transaction"). Included in the $2.6 billion purchase price was almost $700 million of questionable intangible assets and goodwill whose earning potential is undisclosed and indeterminable by the Class; there is no indication other than representation that they were valued by a competent third party as to how their value was determined. Upon consummation of the KSL Transaction, six of the resorts owned by KSL became wholly owned subsidiaries of CNL. The KSL Transaction was inherently a bad deal for CNL: (i) CNL significantly overpaid for the properties given the amount of goodwill associated with the KSL Transaction; and, (ii) CNL picked up an enormous tax exposure, which potential amount should have been quantified and disclosed because the fair market value of the KSL properties exceed the depreciated basis of the properties owned by the corporation whose stock CNL purchased.

Thus, CNL cannot sell the properties within ten years without paying the highest corporate tax

rate that would be applicable to any gain on the sale, which is in clear conflict with the

Company's charter provisions to liquidate or list within almost 3.5 years of the KSL

Transaction. Furthermore, the amount of the fees the Advisor received for the KSL transaction

has yet to be disclosed, although the amount could exceed $100 million.

84.    The majority of CNL's Property acquisitions through the end of 2002

were existing or new properties owned, built and managed by Marriott International

("Marriott"). The exclusive nature of the acquisition strategy calls into question both the

independence of the CNL management and the extent of the effort that was actually expended

by the Advisor to earn the 4.5% acquisition fee that was paid to the Advisor each time a

property was acquired by CNL. In fact, Defendant Parsons, one of CNL's directors since

September 2003, spent 22 years at Host Marriott Corporation, a real estate investment trust

which owns full service hotel properties, where, from 1995 to May 2003, he served as

Executive Vice President and Chief Financial Officer. A substantial number of Properties had

been purchased from Marriott International, a former affiliate of Host Marriott Corporation.

85.    Associated with the acquisitions were long term management agreements

with Marriott providing for, among other things, up to fifty percent of cash flow accruing to

Marriott after a certain revenue level from the hotel is met, a right of first offer prior to the sale

of the hotel and certain non-cancellation provisions and the right of Marriott to scuttle a sale of

a hotel to a competitor of Marriott. In this regard, the Registration Statements (for example, in

Form S-3 filed with the SEC on April 30, 2004 at page 88-89) set forth that:

> In addition, most of the management agreements limit our ability to sell,
> lease or otherwise transfer the hotels and resorts unless the transferee is not

a competitor of the third-party management company and unless the transferee assumes the related management agreement and meets specified other conditions.

The management agreements generally do not allow the third-party management company to assign its interest in the management agreement other than to an affiliate without our prior written consent. In some cases, the management agreement provides that the third-party management company has a right to assign the management agreement in connection with the sale of substantially all of the assets of such third-party management company. In addition, some management agreements prohibit the third-party management company or its affiliates from operating another hotel or resort of the same or similar type as our property that is or will be located within a specified distance of our property. Also, some management agreements prohibit the transfer of the hotel or resort for a specified initial term of years or provide that if we desire to sell a hotel or resort, we must first offer to the third-party management company an opportunity to buy it. We also may have to pay a termination fee in some cases upon termination of the management agreement.

Given the fact that the duration of these contracts exceeded the proposed Listing or any liquidation date, their lucrative management fee, participation features, franchise and other fees associated with the Marriott branding, termination fees, etc. should have been quantified as an equity participation, or at the very least a contingent liability from the standpoint of the termination fee inherent in each contract, and exemplified why the possibility for CNL to recover the purchase price of the Marriott properties acquired by it is greatly diminished. In addition, the specific terms of these long term management agreements and their negative economic impact were never fully disclosed to the Plaintiff and Class.

86.     Concurrent with the direct acquisition of properties from Marriott, during 2001 and 2002, CNL entered into joint ventures to develop and redevelop two major properties:  the Desert Ridge Hotel in Phoenix and the Waikiki property.  During 2003 and 2002, CNL invested a total of approximately $0.7 million and $42.7 million, respectively, in

these unconsolidated subsidiaries and, as of December 31, 2003, had the following investments in them:

| | NAME | TOTAL AMOUNT INVESTED | CNL'S OWNERSHIP INTEREST | DESCRIPTION |
|---|---|---|---|---|
| a. | WB Resort Partners, L.P "Waikiki Partnership" | $41.6 million | 49.00% | A partnership which owns a resort in Hawaii |
| b. | Desert Ridge Resort Partners, LLC. "Desert Ridge Partnership". | $25.1 million | 44.00% | A joint venture which owns a resort in Arizona. |

87.   Specifically, as to the Desert Ridge Partnership, CNL's 2003 10-K at page 67 explains (emphasis added),

> During 2002, the Company **contributed an additional $16.2 million** into Desert Ridge Resort Partners, LLC (the "Desert Ridge Partnership"). The Desert Ridge Partnership owns a resort which was under construction in 2001 and the majority of 2002. The resort opened for business on November 30, 2002. Limited golf course operations were included in the consolidated results of operations of the Company until the resort opened in late 2002. The final costs of construction were paid in early 2003 and the total cost of the resort was approximately $301.7 million.

88.   Specifically, as to the Waikiki Partnership CNL's 2003 Form 10-K at page 67 explains (emphasis added)

> During 2002, the Company **contributed an additional $8.7 million** into WB Resort Partners, LP (the "Waikiki Partnership"). The Waikiki Partnership owns the Waikiki Beach Marriott in Honolulu, Hawaii, which was **undergoing significant renovations for the majority of 2002,** and was substantially complete as of December 31, 2002. The total cost of the resort including renovations was approximately $208.2 million.

89.   At the same time as these contributions, Desert Ridge Partnership and Waikiki Partnership were experiencing significant cash flow deficits, as follows:

|    | NAME | 2003 CASH DEFICIT | 2002 CASH DEFICIT | TOTAL CASH DEFICIT FOR 2003 & 2002 |
|----|------|-------------------|-------------------|-------------------------------------|
| a. | WB Resort Partners, L.P "Waikiki Partnership" | $(6,700,000) | $(6,100,000) | $(12,800,000) |
| b. | Desert Ridge Resort Partners, LLC. "Desert Ridge Partnership". | $(12,600,000) | $(6,000,000) | $(13,000,000) |

90.    However, during these same years, CNL received "distributions" (CNL is generally entitled to receive cash distributions in proportion to its ownership interest in each partnership) from these two unconsolidated subsidiaries, as follows:

|    | NAME | 2003 Distribution | 2002 Distribution |
|----|------|-------------------|-------------------|
| a. | WB Resort Partners, L.P "Waikiki Partnership" | $4,790,000 | $4,136,000 |
| b. | Desert Ridge Resort Partners, LLC. "Desert Ridge Partnership". | $2,891,000 | $1,432,000 |
| c. | Total | $7,681,000 | $5,568,000 |

These "distribution" were, in fact, return of capital.  The "distributions" were booked as Net Cash Provided by Operating Activities.  Such accounting treatment does not conform with GAAP and inflated improperly the operations performance of CNL.

91.    The performance of these Properties did not come as a shock to Management when they received the 2003 financial statements.  The nature of the hotel business is such that budgets and projections of operations are continually revised (as often as monthly) to reflect changes in rates, occupancy, reservations and general market conditions.  By the end of the 2003 Offering, which raised $1.75 billion in capital, Defendants knew that those two joint ventures alone representing $67 million of investment and almost $79 million

- 39-

of investor capital had not in the past, and could not going forward, provide any cash flow for the foreseeable future. Yet, for two years Defendants manipulated the Consolidated Statements of Cash Flows to disguise the inclusion of capital returned by these entities in Net Cash Provided by Operating Activities.

92.    Nevertheless, despite their knowledge of the above facts, Defendants negligently or recklessly failed to disclose any of this information to the investing public in its 2003 offering. Defendants concealed these and other facts that demonstrated that because of the conflict of interest with its Advisor, CNL was not sufficiently profitable and would not be sufficiently profitable in the near future to sustain 7.5% annual returns. As a result CNL was able to raise approximately $1.75 billion in capital through a 175 million share offering at the uniform stated price of $10 per share that was completed in March 2004.

93.    The success of that and CNL's other stock offerings was the direct result of CNL's perceived appeal as an investment that produces a 7% to 8 % return on investors' capital.

94.    This course of business misled investors into believing that CNL was in fact on its way to being sufficiently profitable to support such returns on investor capital. The victims of this scheme were: (i) the existing stockholders who were being kept silent by receiving a quarterly return of a material portion of their invested capital disguised as dividends, and (ii) the new investors who purchased CNL stock at inflated prices mislead by CNL's portrayal of itself as a REIT conducting business in a profitable manner and the appearance of the opportunity to earn a 7% to 8% return on their investment.

**Accounting Chicanery and Violations of GAAP**

95.    Defendants inflated CNL's reported revenues, and therefore its positive cash flow and ability to fund its dividend from operations, by using a series of misleading

revenue enhancing devices.  While CNL at times disclosed the enhancement of its revenues,

the Defendants failed to disclose that:  (i) such enhancements and the manner in which CNL

utilized them were in violation of GAAP, (ii) that CNL had engaged in a course of business

that would render it insufficiently profitable in the foreseeable future to continue to pay

dividends at the stated rates of return, and (iii) that these revenue enhancements were in fact in

perpetration of a Ponzi scheme whereby CNL used monies raised from new public offerings of

its securities to pay dividends at otherwise unsustainable levels.

### Improper Reporting of Credit Enhancements Improperly Inflated CNL's Income

96.    When leasing its Properties to third-party tenants or when entering into a

long-term management agreement with Marriott, CNL has "required certain of them to provide

performance guarantees or other credit enhancements in order to assure [CNL] minimum levels

of revenue." 2003 10-K at p. 10.  CNL noted that it received various types of credit

enhancements from managers of many of its hotel Properties, or Third-party managers (CNL

10-Q, for period Ended 9/30/03, Filed 11/14/03 ("9/30/03 10-Q")):

> These credit enhancements may be provided to the Company
> directly or indirectly through unconsolidated subsidiaries. All of
> the credit enhancements are subject to expiration, or "burn-off"
> provisions over time. There is no guarantee that the Company will
> continue to be able to obtain credit enhancements in the future. As
> a result of the downturn in the overall economy and the threat of
> terrorism and their adverse effect on the Company's operations, the
> Company has been relying on credit enhancements to substantially
> enhance its net earnings and cash flows. To the extent that this
> trend continues and current credit enhancements are fully utilized
> or expire, the Company's results of operations and its ability to pay
> distributions to stockholders may be affected.

97.    In addition, regarding these so-called Credit Enhancements, CNL noted in

its 2002 10-K that:

- 41-

With respect to certain of its Properties, the Company has received various credit enhancement guarantees from third-party managers who have guaranteed a certain level of performance for Properties they manage which are leased to TRS entities. When provided, these guarantees are typically in effect during the stabilization period for the hotel Property or Properties being guaranteed. These guarantees normally expire (i) when a predefined operating performance threshold is achieved for twelve consecutive months, (ii) after a specified period (typically three to five years) or (iii) when maximum allowable funding under that guarantee has been received, whichever occurs first.

* * *

The Company has amended the agreements relating to one of its credit enhancements with Marriott. Marriott is obligated to fund guarantee payments of certain minimum returns to TRS entities of the Company, however, the management contracts on the hotels subject to the credit enhancement were amended to provide that the first incentive management fee is payable up to a predefined amount rather than paying the fee primarily based on the amounts previously funded under the guarantee. The Company has recognized other income of approximately $10,280 [in thousands] during the fourth quarter of 2002 equal to the amounts previously funded under the credit enhancement through December 31, 2002, which Marriott has agreed will not be subject to repayment provisions. Additionally, the Company will recognize income in the future, rather than liabilities, whenever amounts are funded by Marriott under the arrangement. The Company will recognize incentive management fee expense if and when such incentive management fees are earned by Marriott. These amendments are not expected to have a significant effect on the Company's cash available for distribution to stockholders.

98.    Contrary to GAAP during the Class Period, CNL has not correctly reported the amounts funded by Marriott under the arrangement set forth above.

99.    The term "credit enhancements" is conventionally used to describe the additional comfort provided to a lender to secure financing. Such credit enhancements take many forms such as cross collateralization and guarantees by third parties, but are, indisputably, inducements to a lender to lend money.

- 42-