100.  In order to perpetuate its fundraising activities and possibly its relationship with Marriott, CNL entered into an arrangement with Marriott that enabled CNL to increase cash available for distribution by converting liabilities created by failing investments into income. The adjustment that resulted from this agreement represented 14% of CNL's total income for 2002.  During the following year this newly created "income" category increased to $27.8 million, and grew to 19% of distributions and 22% of cash available for distribution as represented by the Company.  These amounts, funded as the result of failed operations, will cease to accrue to the benefit of the shareholders when the Marriott limitation on funding is exhausted.

101.  CNL classified Limited Rent Guarantees ("LRG"), Threshold Guarantees ("TG"), Liquidity Facility Loans ("LFL"), and Senior Loan Guarantees ("SLG") as "credit enhancements that the Company benefits from." (9/30/03 10-Q at p. 21-22).  CNL describes these Credit Enhancements more fully, as follows (emphasis added):

(a)     *"Limited Rent Guarantees*—Limited rent guarantees ("LRG") are provided by hotel managers to the Company for certain Properties which the Company leases on a triple-net basis to unrelated third-party tenants. These credit enhancements guarantee the full, complete and timely payment of rental payments to the Company.  The expiration of LRGs may result in the inability of the Company to collect the full amount of rent from its third party tenants."

(b)     *"Threshold Guarantees*—Threshold guarantees ("TG") are provided by third-party hotel managers to the Company in order to guarantee a certain minimum return for each of the Properties covered by the TG. Generally, each TG is available for a specific Property or pool of Properties. Funding under these guarantees is either recognized as other income, as a reduction in base management fees or as liabilities by the Company, depending upon the nature of each agreement and whether the funded amounts are required to be repaid by the Company in the future. The expiration of TGs may result in a reduction of other income and cash flows derived from these Properties in future operating periods."

(c)     *"Liquidity Facility Loans*—Liquidity Facility Loans ("LFL") are provided by hotel managers to the Company in order to guarantee a certain minimum distribution for each of the Properties covered by the LFL. Funding under LFLs is recognized as a liability by the Company and its unconsolidated subsidiaries because the Company may

be required to repay amounts funded. The expiration of LFLs for the Company's Properties may result in a reduction in cash flows derived from these Properties."

(d)     *"Senior Loan Guarantees*—Senior loan guarantees ("SLG") are provided by hotel managers to the Company in order to <u>guarantee the payment of senior debt service for each of the Properties</u> covered by the SLG. Funding under SLGs <u>is recognized as a liability</u> by the Company and its unconsolidated subsidiaries because in the future the Company may be required to repay the amounts funded. The expiration of SLGs from Properties owned directly by the Company or through unconsolidated subsidiaries may result in a decrease in the cash distributions that the Company receives from such subsidiaries and may affect the Company's ability to pay debt service."

102.  As discussed below, all of these mechanisms are designed to enable failing lessees to pay rent.

103.  During 2003, CNL recognized $41.5 million in cash and approximately $24.8 million in revenue from one, all or some of these Credit Enhancements (2003 10-K at p. 10). During the fourth quarter of 2002, CNL recognized other income of approximately $10,280,000 which is equal to the amounts previously funded under the Credit Enhancements through December 31, 2002.

104.  On CNL's Consolidated Statements of Earnings in its 2003 10-K/A, in the Revenues section, CNL provided a line item titled "Credit enhancement funding" in the amount of $24,763,000 and $10,279,000 for years ended December 31, 2003 and 2002, respectively.  These amounts were improperly utilized by CNL to inflate the amount of CNL's Net Earnings, and ultimately, CNL's Cash Provided by Operating Activities, upon which the amount of cash distributions to CNL's stockholders is based.

105.  By booking these so-called Credit Enhancements, which are, in fact, guarantee payments, as Revenue, CNL artificially increased the amount of CNL's Net Cash and obfuscated from the investment community and its shareholders the reality that past dividend amounts were not the result of operating profits, but represented in substantial part, a return of investors' capital, and that CNL could not support the expected or promised future

dividend amounts from operating profits.  Yet it was the dividend distribution levels that were the driving force behind the continued sale of CNL common stock through new offerings at $10 per share.

106.  These so-called Credit Enhancements, which are, in fact, guarantee payments, were improperly booked as Revenue because of, at least, the following:

(a)     These Credit Enhancements are designed to permit the lessee of the Properties to pay rent to CNL equal to what is usually a 10% return on its investment in the Properties through an infusion of funds, in order to justify the price that CNL paid for the Property. These Credit Enhancements are cash flow guarantees in various wrappers.

(b)     The reason why CNL contracted for these credit enhancements is because it knew that income from certain Properties would be insufficient to meet the obligations of ownership or the required return on the investments.  The payments are properly intended for new or substantially vacant Properties, to supplement income to a pro-forma level only during lease-up.

(c)     A transaction involving guarantee payments being made by a seller to a buyer, as part of an overall sale should, under GAAP not be included as Revenue but constitutes, constitute an adjustment to the basis of the Properties.  Hypothetically speaking, if the purchase price of a newly built property was $50 million, in order to justify the $50 million purchase price for a hotel not yet fully leased, the seller may guarantee the buyer the greater of 3 years with a 10% return on the buyer's investment, or $5 million.

(d)     As such, this arrangement grossly distorted the realizable cash flow from the Properties by booking these so-called Credit Enhancements, which are, in fact,

guarantee payments, as Revenue, rather than payments designed to support a rental stream which should, under GAAP, be considered as a reduction of basis in the Properties.

(e)     Comparably, a similar situation exists in the context of "master leases." The purchasers of multi-tenant properties secure from the developer guarantee payments, which are designed solely to support a rental stream through the use of master lease arrangements. These arrangements provide that the seller lease vacant space from the purchaser and pay market rent until that space could be leased to third-parties. These payments are not cash flow from the properties, but rather payments by the lessee to cover yet-to-be leased space in these multi-tenant properties.  Accordingly, when such payments are booked as income, the realizable cash flow from the properties was grossly distorted.  The accounting industry's Emerging Issues Task Force pronouncement No. 85.27 states that "any payments received in respect of a master lease, designed to support a rental stream <u>should be considered reduction of basis, not income</u>." (emphasis added). The sum and substance of these limited payments from lessees, CNL's so-called Credit Enhancements, dictates identical accounting treatment.  The Credit Enhancements should not be booked by CNL as Revenue, but instead as a reduction of basis and, to the extent they were not booked as a reduction of basis, they are a return of capital.

(f)     In addition, Marriott, one of CNL's Third-party managers from whom CNL may receive these Credit Enhancements, provides in its filings with the SEC that they issue guarantees to certain hotel owners primarily to obtain long term management contracts and that the terms of the guarantees generally require Marriott provide the lessee additional funding if the affected hotels do not attain specified levels of operating

profit. Marriott's classification of these payments as such further demonstrates the impropriety of booking these amounts as Revenue or cash flow from the Properties instead of properly classifying them as a reduction in the Properties' basis.

107.  The improper inflation of CNL's revenues by these devices and in these amounts is material because, had they been properly recorded, the net cash available for distribution to CNL's Shareholders during the Class Period would have been materially reduced:

(a)  CNL's reported Net Cash provided by operating activities for the years ended December 31, 2003 and 2002, were approximately $112,887,000 and $76,660,000, respectively.  (2003 10-K at p. 46).

(b)  For the years ended December 31, 2003 and 2002, CNL declared cash distributions of approximately $130.0 million and $74.2 million, respectively, to the stockholders.

(c)  During 2003, CNL improperly recognized $41.5 million in cash and approximately $24.6 million in revenue from one, all or some of these Credit Enhancements (2003 10-K at p. 10,  and during the fourth quarter of 2002, CNL recognized $10,280,000 under the Credit Enhancement).

(d)  Thus, for 2003, if CNL's financials conformed (as CNL professed) with GAAP, its Net Cash provided by operating activities would have been reported as $88 million, not $113 million, after eliminating $25 million of Credit Enhancements.  Further reducing Net Cash provided by operating activities was CNL's improper booking of $7.5 million as Revenue of the "distributions from unconsolidated subsidiaries" (see ¶ 88), which in fact, constituted nothing more than return of capital.

(e)     Moreover, of the remaining $16.7 million of Credit Enhancements for 2003 ($41.5 million in cash less the $24.8 million in revenue), only $5 million of such amount was accounted for on CNL's Consolidated Statements of Cash Flows (2003 10-K at p.46), leaving shareholders in the dark as to the allocation of almost $12 million of Credit Enhancements.  Thus, this $16.7 million of Credit Enhancements is likely to have been used by Defendants, in addition to the $24.8 million of Credit Enhancements discussed in c. above, to improperly inflate CNL's earnings.  Making the GAAP-mandated adjustments for these improper bookings of revenue, CNL's Net Cash provided by operating activities for 2003 would drop from $113 million to $64 million, more than a 43% reduction.

(f)     For 2002, the Net Cash provided by operating activities of $76,660,000 would have been reduced by the $10,279,000 million of Credit Enhancements, thereby leaving only approximately $66,381,000 of Net Cash provided by operating activities.  Moreover, as in 2003, an additional $14.3 million of credit enhancements (requesting $24.5 million in cash, less $10.2 million in revenue) are likely to have been used by Defendants to inflate CNL's earnings.  That adjustment (which is mandated by GAAP) would reduce Net Cash provided by operating activities from $76.6 million to $52.0 million.  The additional adjustment mandated by the proper booking of "distributions from unconsolidated subsidiaries" (¶ 88) in the amount of $5.5 million further reduces Net Cash provided by operating activities to $46.5 million.  This amount represents only 62.6% coverage of the $74.2 million in dividends paid to stockholders in 2002, a far cry (and material difference) from the 103% coverage that CNL's financials disclose.

**Improper Use of FF&E Reserve Funds, Which Improperly Inflates CNL's Income**

108.  For leases to independent third parties, the tenants of the Properties

established reserve funds which are used for the replacement and renewal of furniture, fixtures,

and equipment, and routine capital expenditures. ("FF&E Reserve Funds"). FF&E Reserve

Funds and any replacement furniture, fixtures, or equipment are owned by CNL. (2002 10-K,

Item 2, Properties). In addition, CNL's management agreements "generally require [CNL] to

set aside 3% to 5% of hotel and resort revenues in FF&E Reserve accounts . . . ."(2003 10-K at

p. 44).

109.  Specifically concerning the FF&E Reserve Funds, the 2002 10-K in the

Critical Accounting Policies Section, sets forth that,

> In accordance with Staff Accounting Bulletin No. 101, the
> Company records FF&E reserve income for cash transferred by
> third-party tenants into restricted FF&E accounts during the years
> ended December 31, 2002, 2001 and 2000. The funds in the FF&E
> Accounts are maintained in a restricted cash account that the tenant
> is expected to use for purposes specified in the lease.  Cash is
> restricted because the funds may only be expended with regard to
> the specific property to which the funds related during the period
> of the lease.  The cash in the FF&E accounts, any interest earned
> thereon, and any property purchases therewith remain, during and
> after the term of the lease, the property of the Company. To the
> extent that funds in the FF&E Accounts are insufficient to
> maintain the Properties in good working condition and repair, the
> Company may make expenditures, in which case annual
> minimum rent is increased.  FF&E reserve income is not
> generated from hotels leased by TRS entities and operated by
> third-party managers; however, cash is restricted by the
> Company for the purposes stated above. As the Company's
> business shifts from leasing Properties to acting as tenant for these
> Properties and engaging third parties to manage operations, the
> amount of FF&E reserve income is expected to decline.

110.  In its Consolidated Statement of Earnings for Fiscal Year Ended

December 31, 2002 (2002 10-K) and in prior filings with the SEC, CNL reported FF&E

Reserve Income as Revenue, in the amounts of $4,236,000, $5,786,897, $2,508,949, $320,356

and $98,099 for FY Ended 2002, 2001, 2000, 1999 and 1998, respectively. These amounts were reported as income and thus treated as a component of cash from operations in the calculation of the distribution to be made to CNL's shareholders. In fact, this cash, by CNL's own admission, was restricted and unavailable. Accordingly, these amounts should have been deducted from CNL's cash available for distribution.

111. However, by manipulating its disclosures relative to the increase in restricted cash in CNL's Statement of Cash Flows by including this reduction in cash below the line for Net Cash provided by operating activities in the Consolidated Statement of Cash Flows as an "increase in restricted cash," CNL thereby facilitated the improper accounting treatment of the restricted cash and its use in artificially bolstering CNL's cash available for distribution.

112. By reporting FF&E Reserve Income as Revenue, when, in fact, it is restricted cash earmarked for a specific purpose, CNL improperly reported a total of $12,950,283 for FYs 1998-2002 as cash flows from operating activities, thereby improperly inflating CNL's net cash available for distribution to CNL's Shareholders, which otherwise would have been reduced.

113. For the year ended December 31, 2003, CNL ceased the listing of FF&E Reserve Income as a separate line item on its Consolidated Statement of Earnings or Cash Flows (2003 10-K, p. 46). However, on the Consolidated Balance Sheets for FY Ended December 31, 2003 (2003 10-K/A p.49-50; 2003 10-K  p. 41), CNL's Restricted Cash rose from $21,795,000 for FY 2002 to $60,105,000 for FY 2003, a difference of $38,310,000. Because CNL changed its reporting format to eliminate all reference to FF&E income, to the extent that this additional $38,310,000 is comprised of FF&E Reserve Funds, and those FF&E

Reserve Funds were utilized to calculate CNL's cash from operations, it has resulted in a material overstatement of CNL's cash from operations and/or cash available for distribution.

**Fee Deferral**

114. Apparently sometime "in late 2003," Defendants caused CNL to reach an agreement with the Advisor under which the Advisor would waive its fee for an indeterminate amount of time. That, coupled with the GAAP failures described above, continued to allow CNL to secretly fund dividends at inflated levels from sources other than those properly classified as cash from operations.

115. It was not until March 15, 2004—at about the time that the 2003 stock offering closed—with the filing of CNL's Form 10-K for the year ended December 31, 2003, that it was disclosed that management fees were being deferred.

> In late 2003, CNL Hospitality Corp. allowed us to defer the payment of the asset management fees indefinitely. The reason for the deferral was to provide us with additional liquidity as we evaluate the timing of economic and industry recovery. We did not pay asset management fees after August 2003 and in January 2004, CNL Hospitality Corp. refunded to us all of the asset management fees which had previously been paid during 2003. Out of the total $11.6 million due to related parties as of December 31, 2003, $5.3 million relates to asset management fees. These fees are due upon demand. We will continue to accrue and will remain obligated to pay asset management fees to CNL Hospitality Corp., however, it is uncertain as to when such fees will be paid.

116. Thus, all public statements filed with the SEC or made to the investing public as of at least September 2003 should have disclosed this material event. Defendants knew as of at least September 2003 that the Advisor's asset management fees were not being paid, and as of January 2004, that previously paid fees were refunded. Instead, Defendants failed to disclose these material facts to the public:

(a)    CNL's Post-Effective Amendment No. 4 to Form S-11 Registration

Statement, filed October 2, 2003, when Defendants knew CNL had stopped paying the

Advisor fees, and such fees were being deferred, instead only disclosed the following,

with no mention of the fees not being paid or being deferred:

> The Asset Management Fee, which will not exceed fees which are
> competitive for similar services in the same geographic area, may
> or may not be taken, in whole or in part as to any year, in the sole
> discretion of the Advisor. All or any portion of the Asset
> Management Fee not taken as to any fiscal year shall be deferred
> without interest and may be taken in such other fiscal year as the
> Advisor shall determine. During the six months ended June 30,
> 2003, the Company incurred approximately $5 million of such
> fees.

(b)    In Form 424B3, Supplement No. 3 dated November 4, 2003 to Prospectus

dated April 30, 2003, reiterated the same statement.

(c)    In Form S-11/A Filed 12/08/2003, Defendants again failed to disclose,

despite their knowledge at the time, that the Advisory Fee was being deferred:

> All or any portion of the Asset Management Fee not taken as to
> any fiscal year shall be deferred without interest and may be taken
> in such other fiscal year as the Advisor shall determine. During the
> nine months ended September 30, 2003 and the year ended
> December 31, 2002, the Company incurred approximately $8.4
> million and $6.7 million, respectively, of such fees.

(d)    Post-Effective amendments for registration statement, POS AM, filed

1/26/2004, failed to not only disclose that fees had been deferred since September 2003,

but that all fees for 2003 had been, in fact, refunded.  Instead, this filing misleadingly

stated:

> All or any portion of the Asset Management Fee not taken as to
> any fiscal year shall be deferred without interest and may be taken
> in such other fiscal year as the Advisor shall determine. During the
> nine months ended September 30, 2003, the Company incurred
> approximately $8.4 million of such fees.

117.   This information is material because a purchaser of CNL stock pursuant to the Registration Statements and Prospectuses, would deem it important to know whether CNL was able to pay the Advisor fees, instead of having to defer those fees, or have them refunded, in order for extra cash to be made available in order to sustain its inflated dividend.  This information should also have been disclosed in the Proxy with respect to the Merger inasmuch as the purported value of the Advisor should be based, in part, on the fees that it has been paid, not deferred or refunded.  Deferred and refunded fees reflect a significant risk of non-payment or default, conditions that impact significantly on Valuation assumptions.

**The Advisory Agreement Should Have Been Terminated or Renegotiated**

118.   Prior to the filing of the Proxy, CNL disclosed that if Listing occurs, CNL and the Advisor would "negotiate in good faith a fee structure. . . subject to approval by a majority of the Independent Directors."  Importantly, upon the Listing of CNL securities, it was noted to the CNL Shareholders that certain factors would be considered in negotiating a new fee structure with the Advisor, including:

(a)     "the amount of the advisory fee in relation to the asset value, composition, and profitability of the Company's portfolio";

(b)     "the success of the Advisor in generating opportunities that meet the investment objectives of the Company";

(c)     "the rates charged to other REITs and to investors other than REITs by advisors that perform the same or similar services";

(d)     "additional revenues realized by the Advisor and its Affiliates through their relationship with the Company, including loan administration, underwriting or broker commissions, servicing, engineering, inspection and other fees, whether paid by the Company or by others with whom the Company does business";

(e)     "the quality and extent of service and advice furnished by the Advisor";

(f)     "the performance of the investment portfolio of the Company, including income, conservation or appreciation of capital, and number and frequency of problem investments"; and

(g)    "the quality of the Property and Mortgage Loan portfolio of the Company in relationship to the investments generated by the Advisor for its own account."

119.  Indeed, the CNL Shareholders were also informed that "a new fee structure that, in its judgment, is more favorable to the Advisor than the current fee structure" could not be approved.  That is, in fact, in essence what the Advisor and Insider/Individual Defendants sought – a $300 million windfall.

120.  Based on CNL's and the Advisor's past performance, Defendants knew they could not negotiate a new fee structure using such criteria to justify further retention of the Advisor, at any cost, and certainly they would not be able to justify a new fee structure that would garner the $300 million they now stand to collect if the Merger is effected.  Thus, to evade any probe that would occur concomitantly with the negotiation of a new fee structure, Defendants propose that the Advisor merge into CNL, that CNL will become self-advised and the Insiders/Individuals Defendants abscond with $300 million.[9]

121.  Based on the criteria set forth in ¶ 118, above, the Advisor should have been terminated for at least the following reasons:

a.    A number of the transactions undertaken by the Advisor were not profitable, and thus the advisory fee was disproportionate to the Company's portfolio.  For example, as mentioned above in ¶ 83, the KSL Transaction was an inherently bad deal for CNL;

b.    The Advisor failed to preserve CNL's capital and thus was unsuccessful in generating opportunities that met the investment objectives of CNL.

---

[9]    CNL's Shareholders were also told that the Advisory Agreement could be terminated, without cause or penalty by either party, and a new successor Advisor could be hired, yet, now, to the Shareholders' detriment, the Advisor's abilities remain unverified and its incompetence hidden.

c.      The performance of CNL's investment portfolio was sub-par.  There is effective impairment in the value of CNL's investments in real estate and joint ventures. Under FASB 121, the accounting industry pronouncement that governs the write-down of assets whose value has been impaired, if the sum of the undiscounted cash flow from the property for ten years, plus the residual value of the property, is less than the depreciated carrying value, then the asset must be written down to the result of the calculation.  At least two instances of impairment may have occurred CNL's portfolio:

i.      It was set forth in CNL's Form 10-K/A for the FY Ended December 31, 2003, that:

In March, 2004, the third-party tenants affiliated with Marriott for ten of our Properties with combined net operating income of approximately $13.0 million and base rental obligations of $26.7 million informed us that the annual net operating income projected for these Properties would be insufficient to fund the full amount of scheduled base rent for 2004 and potentially subsequent years. As a result, we have begun discussions with those tenants on possible alternatives that would address the current circumstances including our possible acquisition of the leasehold interests in these Properties and the execution of management agreements with Marriott or its affiliates to operate the Properties under long-term contracts. Under this alternative arrangement, these Properties would be leased to one or more of our TRS subsidiaries and managed by an affiliate of Marriott. This possible alternative may include additional guarantees, provided by Marriott, of minimum returns which may not provide the same income stream as the base rents. The Properties are encumbered by debt and consequently any alternative solution will be subject to approval by the lender providing the related financing. As these discussions continue it is possible that Marriott, on behalf of the tenants, will continue to pay the rent due under the current lease structure until such time that these leases are assigned or modified. We may be required to return the security deposits received in connection with the current agreements. Should we take assignment of the leasehold interests, the operations of these hotels will be included in our consolidated statement of earnings in lieu of the rental income which is currently being recognized. The scheduled base rent payments on these Properties and the debt service payments on the related loans are current.

These Properties, which, as noted, were projected to yield $26.7 million. Assuming a 10% return criteria, the Properties probably cost CNL $267 million. If the current net operating income ("NOI") is $13 million, the maximum amount that might be available for rental payments is approximately $12 million. Thus, the value of these properties at December 31, 2003 would have declined by $147 million (the NOI decline of $14.7 million capped at 10%). Even if the Properties would not require a write-down for impairment under FASB 121, the impairment in the value of CNL stock is irrefutable and dramatic.

ii.       As discussed at ¶ 86-92 above, CNL entered into two joint ventures to develop and redevelop two major properties -- Desert Ridge Partnership and Waikiki Partnership. Both have underperformed. As to the Waikiki Partnership, CNL continues to carry an investment in Waikiki on its balance sheet. This is not an investment in real estate but rather an investment in a joint venture. According to APB 18, "Equity Method of Account for Investments in Common Stock," for purposes of determining impairment of such an investment, one should apply the provisions of FASB121. Given the financial condition of Waikiki and the prospect that further material contributions must be made to fund deficits, the investment is severely underperforming and a write-down of the investment is likely required.

d.       Finally, as discussed in detail above, the Advisor's inability to legitimately sustain expected distributions to CNL's Shareholders without the use

of questionable accounting machinations, the deferral and refunding of Advisory fees and the borrowing of money.

**The Self-Dealing Proposed Merger of the Advisor Into CNL**

122.  By early 2004, it became apparent to Defendants that they could no longer support the dividend to CNL shareholders even by the use of questionable accounting practices and the return of investors' capital, and that with the impending expiration of the Credit Enhancements, CNL would soon be exposed as an unsuccessful Company relative to its fulfillment of its investment objectives, that had been built by aggressive marketing of stock rather than by sound operations and performance, all with the purpose of obtaining as much investor capital as quickly as possible in order to enrich the Defendants.

123.  Thus, in order to conceal their misconduct, it was necessary for Defendants to propose that the Company's liquidity event occur several years earlier than originally anticipated so that the Defendants could profitably dispose of the Advisor.

124.  The Prospectuses stated that this liquidity event would consist of either a sale of the Properties or the listing of CNL stock on a national stock exchange by the end of 2007.  However, as discussed herein, with the symptoms of a severe cash flow deficit readily apparent to Defendants, such as:

(a)    their use of so-called Credit Enhancements and other accounting gimmickry to inflate Net Earnings and Cash from Operations, which vehicles of inflation were going to disappear;

(b)    the Company's management agreements with Marriott and other lessees;

(c)    the potentially devastating tax consequences that would be associated with the sale of any of the KSL acquisition properties;

(d)    the Advisor fees that had been returned to CNL and deferred; and

       (e)     the fact that many if not all of the Properties that were purchased are not performing at levels that would result in selling prices equivalent to the amounts paid for them, made it impracticable to sell the Properties,

left immediate listing as the only viable alternative for Defendants to achieve their objective of making money from the sale of the Advisor.

       125.  Pursuant to the Proxy, Defendants instead sought approval of their plan to list the Company stock for public trading, to authorize the issuance of 3.7 billion new shares of CNL stock, to effect a reverse 1 for 2 split of CNL stock (exchanging 1 share of stock for each 2 shares presently outstanding), and to merge the Advisor into CNL for a self-dealing payment of $297 million consisting of CNL stock and cash.

       126.  The reverse split was billed as designed to enable CNL shares to trade in the same price range as other comparable REIT stocks.  In fact, other comparable REIT stocks trade in the approximate range of $10 - $12 per share; thus, without the reverse stock split and once the market came to recognize that CNL's dividends were not paid based on its actual operating cash flow but rather were funded by borrowings, the use of accounting manipulations and the return of the shareholders' own capital, the Underwritten Offering of CNL's stock at approximately $20 per share was unfeasible. The indefinite abandoning of the Merger, Underwritten Offering and the Listing portends that CNL stock is worth far less than the $10.00 per share that the investors were duped into paying for it.

       127.  The Underwritten Offering and the payment of $267.3 million worth of CNL stock in exchange for the acquisition of the Advisor will substantially dilute the current shareholders' holdings.

       128.  According to the Proxy, the Defendants' payment of $297 million for the Advisor is guaranteed by a confusingly described price support mechanism.  The Proxy states:

In the Merger, all of the outstanding shares of capital stock of the Advisor will be exchanged for a total merger consideration of $297 million, comprised of approximately $267.3 million of our common shares and approximately $29.7 million in cash. In addition, in connection with the Merger, we will assume and repay the Five Arrows Note in the amount of approximately $10.98 million. Our officers, directors and their affiliates who own interests in the Advisor will receive $267.3 million of these shares but no cash. Upon completion of the Merger, the Surviving Corporation will continue as our wholly-owned subsidiary, and will succeed to all of the assets, business and liabilities of the Advisor, and the Advisor's officers and other employees will become our employees. As a result, we will become a self-advised REIT. By virtue of the Merger, the articles and bylaws of the Acquisition Sub in effect prior to the effective time of the Merger will be the articles and bylaws of the Surviving Corporation and the officers and directors of Acquisition Sub will be the officers and directors of the Surviving Corporation. In the Merger, our common shares will be valued at a per share price on the following basis: (i) if the Underwritten Offering is consummated prior to the effective time, the per share offering price to the public of our common shares in the Underwritten Offering will be the per share price in the Merger or, (ii) if the Underwritten Offering has not been consummated prior the effective time of the Merger, the per share price in the Merger will be the greater of (A) $10.00 per share (as adjusted for stock splits, etc.) or (b) the average closing price per share of our common shares on the NYSE on the 20-trading day period ending on the second business day prior to the closing of the Merger (the "Per Share Price").

129. The ambiguity and uncertainty created by the wording of the foregoing pricing formula arises from the fact that:

(a)    The Underwritten Offering has been postponed indefinitely;

(b)    The Underwritten Offering may not (and is likely not to) occur before the effective date, as defined in the Proxy;

(c)    The Listing is postponed indefinitely and may never occur, thus there will not be a determinable Per Share Price, as defined in the formula.

(d)    The pricing formula does not work under the existing circumstances.

130.   Defendants purposely sought the CNL stockholders' approval of the Merger before the Underwritten Offering was marketed because it removed the risk of the CNL stockholders becoming aware of the market valuation of CNL stock before the Merger was approved.

131.   On August 3, 2004, just days after the July 30 approval of the Merger, CNL's management "abruptly postponed" its Underwritten Offering.  In withdrawing the Underwritten Offering, CNL's management cited "market conditions," including "concerns with the recent terror alert." 8/04/04 *Wall Street Journal*.  The reasons given by Defendants for pulling CNL's Underwritten Offering were bogus.  The real but unstated reason was that CNL's management recognized that selling CNL stock in an Underwritten Offering for 55-60% of the Class Members' investment cost would legitimize the market's valuation of CNL stock.  In short, the market could value CNL stock at such low levels, but Defendants were not going to endorse that valuation.

132.   Defendants used the proposed Underwritten Offering as a ploy to create the false impression that CNL stock had a market value of $10 per share, pre-reverse split; $20 per share, post-reverse split, the price they had charged the Purchaser Class members during the Class Period.  For at least the reasons discussed above, Defendants knew or recklessly disregarded the fact that the intrinsic value of CNL stock, excluding the Advisor, was no more than $12 per share, post-reverse split or only 60% of the inflated value charged to Purchaser Class Members.  Therefore, Defendants knew or recklessly disregarded the fact that there was a strong likelihood that the Underwritten Offering would never go to market because the market price for CNL's stock would necessarily be no more than 60% of the professed offering price of $19 to $21 per share.  In turn, if the Underwritten Offering failed to go to market,

Defendants knew or recklessly disregarded the fact that "the prospects for [CNL's] business worsened due to the deflating impact on returns of earlier investors," i.e., the Class Members. (July 30, 2004 Green Street Advisors, Inc. Report on Company).  Consequently, "the idea that investors are being asked to pay an extraordinary price for the new advisory business is reminiscent of Tech-bubble pricing."  Id.

133.  Moreover, the valuation of the Advisor is grossly inflated because the valuation is based entirely on speculative cash flow projections, which are in turn based on the Advisor's recent performance.  However, since the Advisor will no longer be able to obtain fees and commissions from massive--and over-priced--acquisitions by CNL, there is no basis in fact for those projections.

134.  CNL does not have a need to purchase the Advisor in order to become self-advised.  As revealed in CNL's 2003 10-K:

> The Advisory Agreement continues until March 31, 2004, and thereafter may be extended annually upon mutual consent of CNL Hospitality Corp. and our Board of Directors unless terminated at an earlier date upon 60 days prior written notice by each party.

135.  Thus, CNL can terminate the Advisor at will, for no payment.  Its officers and employees, or others, can be hired to perform the Advisor's functions, and be paid for their duties just like other corporate officers and employees are paid.

136.  Indeed, when Defendants marketed CNL to the investing public, they never disclosed that it would cost the investors an additional $300 million--in addition to all the other fees and commissions paid to Defendants--to accomplish the promised liquidity event.

**The Management Defendants' Self-Serving Objectives in Structuring the Merger, Listing and Underwritten Offering**

137.  The Management Defendants' top objective in the timing, formulation and inter-relationship of the Merger, Listing and Underwritten Offering is to abscond with almost

$300 million from CNL's shareholders.  Absent these concomitant transactions, the

Management Defendants would never obtain this windfall for their ownership interests in the

Advisor.

      138.  The Company's S-11 for the 1996 Offering set forth a formula by which

the Advisor would be compensated with a substantial "Subordinated Incentive Fee" at the time

of the Listing:

> At such time, if any, as Listing occurs, the Advisor shall be paid the
> Subordinated Incentive Fee in an amount equal to 10% of the amount by
> which (i) the market value of the Company (as defined below) plus the
> total Distributions made to stockholders from the Company's inception
> until the date of Listing exceeds (ii) the sum of (A) 100% of Invested
> Capital and (B) the total Distributions required to be made to the
> stockholders in order to pay the Stockholders' 8% Return from inception
> through the date the market value is determined.  For purposes of
> calculating the Subordinated Incentive Fee, the market value of the
> Company shall be the average closing price or average of bid and asked
> price, as the case may be, over a period of 30 days during which the
> Shares are traded with such period beginning 180 days after Listing.  The
> Subordinated Incentive Fee will be reduced by the amount of any prior
> payment to the Advisor of a deferred, subordinated share of Net Sales
> Proceeds from Sales of assets of the Company.

      139.  The Individual Defendants, based on their insider knowledge of CNL's

operations and true financial performance, were mindful that they could not conceal

indefinitely from the investing public and the Class the misconduct of Defendants and the

Advisor.  Specifically:

      (a)    CNL booked so-called Credit Enhancements as Revenue, which along

with other accounting shenanigans, were used to artificially inflate CNL's Net Cash

Provided by Operating Activities, Cash from Operations and Net Earnings thereby

concealing CNL's inability to fund large percentages of future dividends from its

operations (along with concealing the source and character of the monies used to fund

CNL's reputed 7.5% dividend yield) at the promised annual yield, however, this would soon be revealed when such "Credit Enhancements" were no longer available for Revenue-inflating purposes;

(b)     Because of the KSL Transaction, CNL cannot sell the Properties within ten years without paying the highest corporate tax rate that would be applicable to any gain on the sale, which is in clear conflict with the Company's charter provisions to liquidate or list within almost 3.5 years of the KSL Transaction.  The KSL Transaction was inherently a bad deal for CNL:  (i) CNL significantly overpaid for the properties given the amount of goodwill associated with the KSL Transaction; and, (ii) CNL picked up an enormous tax exposure, which potential amount should have been quantified and disclosed because the fair market value of the KSL properties exceed the depreciated basis of the properties owned by the corporation whose stock CNL purchased.

(c)     There is effective impairment in the value of CNL's investments in real estate and joint ventures.

(d)     It has just been revealed that apparently sometime "in late 2003," Defendants caused CNL to reach an agreement with the Advisor under which the Advisor would waive its fee for an indeterminate amount of time. It was with this waiver, coupled with the GAAP failures described above, that CNL could continue to fund dividends at inflated levels from sources other than those properly classified as Cash from Operations.

140.  These circumstances, among others, are symptoms of a severe cash flow deficit; not symptoms of a temporary deficit, but a persistent and increasingly problematic one. These are also conditions that graphically demonstrate the incompetence of the Advisor and its inability to fulfill the criteria established by CNL and the Individual Defendants for retaining

and continuing a contractual relationship with an Advisor.  In light of these problems, the

Individual Defendants could not wait until 2007 for a listing to occur and bank on a pipe dream

that the Advisor would miraculously become entitled then to a Subordinated Incentive Fee.  It

was a much safer play for the Individual Defendants to overvalue or endorse the overvaluation

of the Advisor in 2004 and foist the Advisor on CNL's stockholders for an "ultra-rich price."

141.  Therefore, with the house of cards about to fall all around the Advisor, the

Individual Defendants orchestrated CNL's acquisition of the Advisor and the Listing of CNL's

stock.

142.  Not only did the Listing have to occur prematurely in order for Defendants

to collect their windfall, but it needed to occur concomitantly with the Merger of the Advisor

into CNL.  The Merger is the means by which the Management Defendants obtain a windfall,

approximately $267 million of CNL stock, and the Listing provides them with the vehicle for

liquidating their CNL stock, something the Class has never been able to do.


## COUNT I

### BY PURCHASER CLASS AGAINST ALL DEFENDANTS FOR
### VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AND AGAINST
### THE INDIVIDUAL DEFENDANTS AS CONTROLLING
### PERSONS UNDER SECTION 15 OF THE SECURITIES ACT


143.  Plaintiff, on behalf of the Purchaser Class, realleges and incorporates by

reference each and every allegation contained above.  This Count is asserted under Section 11

and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o, on behalf of the Purchaser Class against

all Defendants.

144.  The Prospectuses and Registration Statements from, and including, the

2001 offering contained untrue statements of material fact and omitted to state material facts

required to be stated therein or necessary to make the statements made therein not misleading, as set forth above.

145.  Pursuant to Section 11 of the Securities Act, the Purchaser Class is entitled to recover its damages jointly and severally from CNL as the registrant for the Registration Statement, and from the Individual Defendants, as persons who signed the Registration Statement.

146.  The Management Defendants owed the Purchaser Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that said statements were true and that there was no omission of material fact required in order for the statements contained therein not to be misleading.  In fact, through Defendants' negligence the Prospectus contained untrue statements of material fact and omitted material facts as set forth above.

147.  Defendant CNL owed the Purchaser Class an absolute duty to ensure that the statements contained therein were true and that there were no omissions of material facts.

148.  As a direct and proximate result of Defendants' conduct, the price of CNL stock was artificially inflated and the Purchaser Class consequently suffered substantial damages in connection with their acquisition of CNL shares.

149.  Plaintiff commenced this action within three years from the date of the registration statement. Under Item 512(a)(2) of Regulation S-K, 17 C.F.R. § 229.512(a)(2), this action is commenced within three years of the *bona fide* public offering of the Shares and is also commenced within one year of the time any member of the Purchaser Class could have learned of the wrongs alleged herein.

150.  By reason of the above, Defendants herein have violated Section 11 of the Securities Act and are liable to Plaintiff and the members of the Purchaser Class, each of whom has been damaged by reason of the violation.  The Management Defendants by reason of their stock ownerships in CNL and their management positions also are controlling persons of CNL within the meaning of Section 15 of the Securities Act and also are liable for CNL's violation of Section 11 of the Securities Act.

## COUNT II

### BY THE PURCHASER CLASS AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 12(2) OF THE SECURITIES ACT AND AGAINST THE INDIVIDUAL DEFENDANTS AS CONTROLLING PERSONS UNDER SECTION 15 OF THE SECURITIES ACT

151.  Plaintiff realleges and incorporates by reference each and every allegation contained above.

152.  This Count is asserted under Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(a)(2), 77o, on behalf of the Purchaser Class against all Defendants.

153.  The Defendants offered, sold, solicited and /or were a substantial factor in the sale of CNL stock offered pursuant to the Prospectus.  The Prospectus was materially misleading due to Defendants' negligence as set forth above.

154.  None of the materially misleading statements contained in and omissions from the Prospectuses were known to Plaintiff and the Purchaser Class at the time they made their decisions to purchase shares of CNL.

155.  Plaintiff has commenced this action within three years from the date the Defendants obligated themselves to perform.

156.  By reason of the above, Defendants violated Section 12(2) of the Securities Act and are liable to Plaintiff and the Purchaser Class, each of whom has been

damaged by reason of the violation. The Individual Defendants also are controlling persons of CNL within the meaning of Section 15 of the Securities Act and also are liable for CNL's violation of Section 12(a)(2) of the Securities Act.

157. Plaintiff and the members of the Purchaser Class still owning CNL stock hereby tender their stock upon return of the consideration paid, plus interest, and those members of the Purchaser Class who sold their stock hereby tender the consideration they received upon the return of the consideration they paid, plus interest.

### COUNT III

### BY THE PROXY CLASS AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 14(A) AND RULE 14a-9 THEREUNDER AND AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

158. Plaintiff repeats and realleges the allegations above as if fully set forth herein. This Count is asserted under § 14(a) of the Exchange Act and Rule 14a-1 promulgated thereunder on behalf of the Proxy Class against all Defendants.

159. The Defendants caused the Proxy to be disseminated to the Proxy Class through the use of the United States mails and the means and instrumentalities of interstate commerce.

160. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

161. SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false and misleading with respect to any material fact,

or which omits to state any material fact necessary to make the statements therein not false and misleading."

162.   Defendants solicited proxies from Plaintiff and members of the Proxy Class by means of a Proxy Statement which contained false and misleading statements concerning, *inter alia*, the state of CNL's revenues and the impact thereof on CNL's ability to distribute dividends, and omitted to state material facts which were necessary to make their statements contained therein not false and misleading, as alleged above.

163.   The Proxy was materially false and misleading in at least the following respects:

(a)     The Proxy failed to disclose that CNL had used improper accounting practices and other manipulative devices to carry out a systematic scheme of materially inflating CNL's reported income and, thereby, created and maintained the appearance that CNL generated sufficient cash flow from operations to consistently pay dividends to shareholders at the levels promised in CNL's Prospectuses.

(b)     The Proxy failed to disclose that since at least 2001, cash from CNL's operations has represented a decreasing percentage of the funds used to pay dividends to its shareholders.  These financial realities have been masked by accounting chicanery carried out by CNL and the Individual Defendants, which conduct GAAP and applicable federal law governing financial reporting and the sale of securities.

(c)     The Proxy failed to disclose that CNL securities were sold an inflated price of $10 per share.

(d)     The Proxy failed to disclose that the Underwritten Offering that CNL had planned in conjunction with certain transactions proposed in the Proxy, including the Listing of CNL's stock, was overpriced and unsupportable.

(e)     The Proxy failed to disclose that the Advisor has performed poorly for CNL and, thus, the Advisor Agreement should have been terminated under criteria that CNL's management has acknowledged would apply in evaluating an Advisor.

(f)     The Proxy failed to disclose that the Advisor is highly overvalued and valued based on an unsupportable and highly speculative methodology.

(g)     The Proxy failed to disclose the its portfolio of Properties was not capable of generating Net Cash Provided by Operating Activities, Cash from Operations and Net Earnings sufficient to maintain a 7% to 8% dividend rate, while preserving capital invested.

(h)     The Proxy failed to disclose that CNL's financial statements and accounting practices were not consistent with GAAP.

(i)     The Proxy failed to disclose that the Advisor and CNL made acquisitions based on the substantial commissions and fees the Advisor would receive from the purchase of Properties rather than on the ability of the acquisitions to yield sufficient profitable revenues for CNL.

(j)     The Proxy failed to disclose that the KSL Transaction was inherently a bad deal for CNL.

(k)     The Proxy failed to disclose certain specific terms of the long term management agreements associated with a majority of CNL's Property acquisitions (such as: their negative economic impact to CNL; that their duration exceeded the proposed

Listing or any liquidation date; their lucrative management fee, participation features, franchise and other fees associated with the Marriott branding; and termination fees, etc.) and failed to disclose that these agreements should have been quantified as an equity participation, or at the very least a contingent liability from the standpoint of the termination fee inherent in each contract.

(l)    The Proxy failed to disclose that because of failed and unsuccessful acquisitions, CNL was not sufficiently profitable and would not be sufficiently profitable in the near future to sustain 7.5% annual returns.

(m)    The Proxy failed to disclose that: (i) so-called credit enhancements and the manner in which CNL utilized them were in violation of GAAP, (ii) that CNL had engaged in a course of business that would render it insufficiently profitable in the foreseeable future to continue to pay dividends at the stated rates of return, and (iii) that these revenue enhancements were in fact in perpetration of a Ponzi scheme whereby CNL used monies raised from new public offerings of its securities to pay dividends at otherwise unsustainable levels.

(n)    The Proxy failed to disclose that through the reporting FF&E Reserve Income as Revenue, when, in fact, it is restricted cash earmarked for a specific purpose, CNL improperly inflated Net Earnings and Cash Flow From Operations.

(o)    The Proxy failed to disclose that the Advisory Agreement was subject to termination or renegotiation in accordance with the terms of the Advisor Agreement.

(p)    The Proxy failed to disclose that their proposal to commence the Company's liquidity event prematurely was self-serving and served to provide the

Management Defendants with a windfall exit strategy from their ownership in the Advisor.

(q)     The terms and descriptions of the Merger, Listing and Underwritten Offering contained in the Proxy were ambiguous and misleading.

(r)     The Proxy failed to disclose that Defendants sought the CNL stockholders' approval of the Merger before the Underwritten Offering was marketed so as to remove the risk that CNL stockholders would become aware of the market reaction and valuation of CNL stock before the Merger was approved.

(s)     The Proxy failed to disclose that the Defendants used the proposed Underwritten Offering as a ploy to create the false impression that CNL stock had a market value of $10 per share, pre-reverse split; $20 per share, post-reverse split, the price they had charged the Purchaser Class members during the Class Period, when Defendants knew or recklessly disregarded the fact that the intrinsic value of CNL stock, excluding the Advisor, was no more than $12 per share, post-reverse split or only 60% of the inflated value charged to Purchaser Class Members.

(t)     The Proxy failed to disclose that the valuation of the Advisor is grossly inflated because the valuation is based entirely on speculative cash flow projections, which are in turn based on the Advisor's recent performance; and that since the Advisor will no longer be able to obtain fees and commissions from massive--and over-priced-- acquisitions by CNL, those projections are inherently unreasonable.

(u)     The Proxy failed to disclose that the Management Defendants' top objective in the timing, formulation and inter-relationship of the Merger, Listing and Underwritten Offering is to abscond with almost $300 million from CNL's shareholders.

Absent these concomitant transactions, the Management Defendants would never obtain this windfall for their ownership interests in the Advisor.

164.  By reason of the foregoing, the Proxy is false and misleading, in violation of Section 14(a) and the rules and regulations promulgated thereunder.

165.  The Defendants named in this Count were responsible for the contents of the Proxy which is the subject of this Complaint, and for the dissemination thereof, and are thus liable under Section 14(a) of the Exchange Act.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy Statement were true, without omissions of any material facts, and not misleading.

166.  The Individual Defendants, as directors and/or officers of CNL, and who were signatories and/or joint issuers of the Proxy Statement/Prospectus and its accompanying documents (including the Merger Agreement), were responsible for the preparation of the Proxy Statement and failed to make a reasonable investigation or possess reasonable grounds for believing that the representations contained in the Proxy Statement were true and that they disclosed all material facts, and are thus liable under Section 14(a) of the Exchange Act.

167.  The Individual Defendants acted as controlling persons of CNL within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of CNL, and their control over the day-to-day activities of CNL, particularly with regard to the Proxy and Prospectus which they signed, Defendants had the power, influence and authority to cause or prevent the wrongful conduct described herein.  Each of the Individual Defendants is sued as a direct participant in the wrongdoing alleged herein and in his capacity as a controlling person of CNL.

168. None of the materially misleading statements contained in and omissions from the Prospectus were known to Plaintiff and the Proxy Class at the time they made their decisions to purchase shares of CNL.

## COUNT IV

## AGAINST THE ADVISOR AND INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

169. The Individual Defendants and the Advisor, by virtue of their positions with and responsibilities to CNL, owed CNL's shareholders fiduciary duties of trust, loyalty, full disclosure and due care at all relevant times.

170. By their conduct complained of herein, these Defendants have breached their fiduciary duties to the members of the Class.

171. As a result of those breaches of fiduciary duties, the Class members have suffered damages and are further threatened with immediate and irreparable harm.

172. The conduct of the Individual Defendants and the Advisor complained of herein is willful, oppressive and self-dealing, and as a result, the members of the Class are entitled to recover punitive damages against these Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.     An order certifying the Class as set forth herein and designating Plaintiff as the representative thereof;

B.     A judgment declaring the conduct of the Defendants to be in violation of law as set forth herein;

- 73-

C.      A judgment awarding plaintiff and the other members of the Class compensation for the damages which they have sustained as a result of the Defendants' unlawful conduct stated above;

D.      Awarding Plaintiff and the Purchaser Class rescission on Count II to the extent they still hold CNL, or if sold, awarding rescissory damages in accordance with Section 12(2) of the Securities Act;

E.      All authorizations secured by Defendants pursuant to the false and misleading Proxy should be declared null and void, and any resolicitation of shareholder votes shall be pursuant to Court supervision and Court-approved Proxy materials;

F.      In addition to the other relief sought herein, the Defendants should be enjoined from the Underwritten Offering and Listing until:

(a)      the Merger Proposal, including the merger agreement  with the Advisor, is declared null and void;

(b)      the Court approves the nomination and election of new independent directors and the retention of a new financial advisor who will assess the advisability of: continuing, modifying or terminating the agreement between CNL and the Advisor; acquiring the Advisor and, if so, on what terms and conditions; negotiating for advisory services with another advisor; or becoming self-advised without acquiring the Advisor, and

the Defendants should be enjoined from: (i) waiving any requirement that CNL common stock Listing occur as a pre-condition of the Merger; and (ii) waiving any other requirement or condition to the Merger (without Court approval).

G.      A judgment awarding Plaintiff's reasonable attorneys' fees, experts' fees, interest and cost of suit;

H.      Such other and further relief as this Court may deem just.

## PLAINTIFF DEMANDS A JURY TRIAL

Dated: August 16, 2004

                                  CHIMICLES & TIKELLIS LLP


                                  By: _____
                                      Nicholas E. Chimicles
                                      Kimberly M. Donaldson
                                      One Haverford Centre
                                      361 W. Lancaster Avenue
                                      Haverford, PA  19041
                                      Telephone: (610) 642-8500
                                      Facsimile: (610) 649-3633

                                      Lawrence A. Sucharow
                                      Beth Hoffman
                                      GOODKIND LABATON RUDOFF
                                        & SUCHAROW LLP
                                      100 Park Avenue
                                      New York, NY 10017
                                      Telephone: (212) 907-0700

                                      Lawrence P. Kolker
                                      Brian S. Cohen
                                      Aya Bouchedid
                                      WOLF HALDENSTEIN ADLER
                                        FREEMAN & HERZ LLP
                                      270 Madison Avenue
                                      New York, New York 10016
                                      Telephone: (212) 545-4600

                                      Leigh R. Lasky, Esquire
                                      LASKY & RIFKIND, LTD.
                                      11 South LaSalle Street
                                      Suite 1600
                                      Chicago, IL  60603

                                  **Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Mary M. Campbell:

1.      I have reviewed the complaint prepared by counsel, Chimicles & Tikellis LLP, and have authorized its filing.

2.      I did not purchase or otherwise acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or other litigation arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      I made the following transaction of CNL Hospitality Properties, Inc. common stock:

| Transaction | Date | Amount of Shares Acquired | Price Per Share |
|---|---|---|---|
| | SEE ATTACHED SHEET. | | |

5.      During the three years prior to the date of this Certificate, I have not sought to serve nor have I served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this *4th* day of August, 2004.

*Mary M. Campbell*
Mary M. Campbell

## Purchases by Mrs. Mary M. Campbell

| Transaction | Date | Amount of Shares Acquired | Price Per Share |
|---|---|---|---|
| BUY | 05/10/2000 | 3,188 | $10 |
| BUY | 05/11/2000 | 2,071 | $10 |

JS 44 (Rev 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM )

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Mary M. Campbell<br>5023 South 150th Plaza<br>Omaha, NE   68137 | CNL Hotels & Resorts Inc., et al.<br>450 South Orange Avenue<br>Orlando, FL   32801 |
| (b) County of Residence of First Listed Plaintiff  Douglas<br>(EXCEPT IN U S  PLAINTIFF CASES) | County of Residence of First Listed  Orange<br>(IN U S  PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES  USE THE LOCATION OF THE<br>LAND INVOLVED |
| (c)  Attorney's (Firm Name, Address  and Telephone Number)<br>Nicholas E. Chimicles, Esq.<br>Kimberly M. Donaldson, Esq.<br>Chimicles & Tikellis LLP, 361 W. Lancaster<br>Ave., Haverford, PA 19041 (610) 642-8500 | Attorneys (If Known) |

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☒ 3  Federal Question
      (U S  Government Not a Party)

☐ 4  Diversity
      (Indicate Citizenship of Parties
      in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br> & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br> Student Loans<br> (Excl  Veterans)<br>☐ 153 Recovery of Overpayment<br> of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br> Liability<br>☐ 320 Assault, Libel &<br> Slander<br>☐ 330 Federal Employers<br> Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br> Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br> Product Liability<br>☐ 360 Other Personal<br> Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury—<br> Med. Malpractice<br>☐ 365 Personal Injury—<br> Product Liability<br>☐ 368 Asbestos Personal<br> Injury Product<br> Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br> Property Damage<br>☐ 385 Property Damage<br> Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br> of Property 21 USC<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br> Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br> 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br> Corrupt Organizations<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/<br> Exchange<br>☐ 875 Customer Challenge<br> 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of<br> Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination<br> Under Equal Access to<br> Justice |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br> Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br> Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards<br> Act<br>☐ 720 Labor/Mgmt  Relations<br>☐ 730 Labor/Mgmt Reporting<br> & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret  Inc<br> Security Act | ☐ 870 Taxes (U.S. Plaintiff<br> or Defendant)<br>☐ 871 IRS—Third Party<br> 26 USC 7609 | ☐ 950 Constitutionality of<br> State Statutes<br>☐ 890 Other Statutory Actions |

## V.  ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
      Proceeding

☐ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      another district
      (specify)

☐ 6  Multidistrict
      Litigation

☐ 7  Appeal to
      District
      Judge from
      Magistrate
      Judgment

## VI.  CAUSE OF ACTION   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause
Do not cite jurisdictional statutes unless diversity)

Sections 11, 12 and 15 of the Securities Act of 1933 (15 USC Secs. 77k, 77o, 771) and
Section 14(a) of Securities Exchange Act of 1934 (15 USC Sec. 78n(a)) and SEC Rule 14a-9,*

| VII.  REQUESTED IN<br>COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION<br>UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:  ☒ Yes  ☐ No |
|---|---|---|---|
| VIII. RELATED CASE(S)<br>IF ANY | (See<br>instructions): | JUDGE | DOCKET NUMBER |

| DATE  August 16, 2004 | SIGNATURE OF ATTORNEY OF RECORD   Kimberly M Donaldson |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUN_____  APPLYING IFP_____  JUDGE_____  MAG JUDGE_____

*17 CFR Sec. 240.14a-9, promulgated thereunder.