# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re
**CNL HOTELS & RESORTS, INC.**
**Securities Litigation**

**Case No.  6:04-cv-1231-Orl-31KRS**

**(Consolidated with Case No.  6:04-cv-1341-Orl-19JGG)**

---

# ORDER

This matter is a putative securities class action in which shareholders seek relief against

CNL Hotels & Resorts, Inc. ("CNL"), individual corporate officers and directors of CNL, as well

as against business entities related to CNL.  The case is before the Court on motions filed by all

defendants seeking dismissal of the Corrected Consolidated Amended Class Action Complaint

(Doc. 99) (the "Complaint").  All of the parties filed memoranda,[1] and the Court held a hearing on

April 13, 2005, at which the parties presented oral argument.

---

[1] The Motions and memoranda include the following: Motion to Dismiss (Doc. 126) and Memorandum in Support (Doc. 127) filed by Five Arrows Realty Securities II, LLC; Motion to Dismiss (Doc. 128) and Memorandum in Support (Doc. 129) filed by Charles Adams, Lawrence Dustin, Craig McAllaster and Robert Parsons, Jr.; Motion to Dismiss (Doc. 130) and Memorandum in Support (Doc. 131) filed by CNL; Motion to Dismiss (Doc. 132) and Memorandum in Support (Doc. 133) filed by RFS Partnership, LP, CNL Hospitality Partners, LP, Thomas Hutchison III, and John Griswold; Motion to Dismiss (Doc. 135) and Memorandum in Support (Doc. 136) filed by CNL Hotel Development Company, CNL Hospitality Corporation, CNL Financial Group, Inc., and CNL Real Estate Group, Inc.; Motion to Dismiss (Doc. 138) and Memorandum in Support (Doc. 139) filed by James Seneff, Jr., and Robert Bourne; the Plaintiffs' consolidated Memorandum in Opposition (Doc. 147); and the Defendants' consolidated Reply brief (Doc. 158).

I.      **Background**

This action involves the claims of two overlapping classes of investor plaintiffs who purchased CNL stock.  First, the Purchaser Class consists of all persons who acquired CNL securities between August 16, 2001 and August 16, 2004 (the "Class Period").  These plaintiffs allege that they acquired their CNL securities pursuant to CNL's prospectuses and registration statements, that those documents contained materially false and misleading statements, and that the plaintiffs have been damaged as a result.  Second, the Proxy Class consists of all persons who received and were entitled to vote on a proxy statement (the "Proxy") that proposed, *inter alia*, CNL's merger with CNL Hotel Development Company, CNL's Advisor (the "Advisor"), a reverse stock split, and the listing of CNL stock on the New York Stock Exchange.  The Proxy Class plaintiffs allege that they were induced to approve the Proxy by materially false and misleading statements contained therein, and thus they seek relief rendering that approval void, as well as damages.[2]

A. The Parties

*1. Plaintiffs*

Mary M. Campbell ("Campbell") purchased 5,259 shares of CNL stock in May of 2000, at $10 per share.  In addition, Campbell was entitled to vote on the Proxy, and is thus a member of the Proxy Class.

Macomb County Employees' Retirement System ("Macomb") purchased 797,872.34 shares of CNL stock in September of 2000, at $9.40 per share.  Macomb was also entitled to vote

---

[2] In light of the April 8, 2005 disclosure (Doc. 159), the Court will defer consideration of the Proxy Class' claims in Count III of the Complaint.

on the Proxy, and is thus a member of the Proxy Class.  Pursuant to an Order dated December 21,

2004 (Doc. 96), the Court designated Macomb as the Lead Plaintiff for the Proxy Class.

The Elizabeth Hawkins Barack Revocable Trust ("Barack Trust") purchased 4,200 shares

of CNL stock on June 27, 2002, at $10 per share.  Thus, the Barack Trust is a member of the

Purchaser class. The Barack Trust was entitled to vote on the Proxy, and thus is also a member of

the Proxy Class.  Pursuant to its December 21, 2004 Order, the Court designated the Barack Trust

as the Lead Plaintiff for the Purchaser Class.

Edwin Wong ("Wong") purchased 2,500 shares of CNL stock on December 31, 2003, at

$10 per share, and thus is a member of the Purchaser Class.  Wong was entitled to vote on the

Proxy, and thus is also a member of the Proxy Class.

### 2. Defendants

#### i. Entity Defendants[3]

CNL, formerly known as CNL Hospitality Properties, Inc., is a corporation organized under

the laws of the State of Maryland, with its principle place of business in Orlando, Florida.  CNL is

engaged in the acquisition, development and ownership of interests in hotel and resort properties.

CNL operates, for federal income tax purposes, as a Maryland real estate investment trust

("REIT").

REITs are not treated, for federal income tax purposes, as corporations, and thus are not

taxed at the corporate level on their real estate investment trust taxable income, which is

---

[3] The Defendants listed in this section will be collectively referred to, where appropriate, as the "Entity Defendants." This group includes: CNL; CNL Hospitality Partners, L.P.; RFS Partnership, L.P.; CNL Hotel Development Company; CNL Hospitality Corporation; CNL Financial Group; CNL Real Estate Group; and Five Arrows Realty Securities II, LLC.

distributed to shareholders, thereby avoiding double taxation on earnings.  Although a REIT pays

no federal income tax on its earnings, it must distribute ninety percent (90%) of its taxable income

to shareholders.  A REIT may own assets, but may not operate or manage those assets, other than

through a Taxable REIT Subsidiary which may be wholly owned by the REIT.[4]

CNL Hotel Development Company ("CHD") is the entity referred to as, "the Advisor."[5]

The Advisor is a wholly owned subsidiary of CNL Hospitality Corporation ("CHC"), a Florida

corporation.  Together, the Advisor and CHC provide management, advisory and administrative

services to CNL.  The Advisor conducts CNL's day-to-day operations, under the authority

delegated to it by CNL's Articles of Incorporation, an Advisory Agreement, and policies

established by CNL's Board of Directors (the "Board").[6]  CNL originally entered into the Advisory

Agreement with the Advisor on July 9, 1997, and that agreement has been renewed annually for

successive one year terms.  Under that Agreement, the Advisor locates, analyzes and negotiates

investment opportunities for CNL, arranges financing for CNL, administers CNL's bookkeeping

and accounting functions, consults on policy decisions made by CNL's Board, and renders a

variety of other services to CNL.  In exchange for its services, the Advisor is entitled to receive

---

[4] CNL has two operating partnerships, both of which are defendants: CNL Hospitality Partners, L.P. ("CNL-HP"), a Delaware limited partnership, and RFS Partnership, L.P. ("RFS"), a Tennessee limited partnership.

[5] The Advisor made an initial capital contribution of $200,000 for 20,000 shares of CNL common stock.

[6] Although many REITs are self-advised, CNL has, until recently, opted for an externally advised structure.

fees, including asset management fees, acquisition fees, and development fees.[7]  All of the

Advisor's officers, and a majority of its directors, are also officers and/or directors of CNL.[8]

### ii. Individual Defendants[9]

James Seneff, Jr. ("Seneff") is the Chairman of the Board of CNL.  He is also the

Chairman of the Board, the chief executive officer, and a director of CFG.  Along with his wife

and their affiliates, Seneff controls, and owns a substantial majority of the economic interests in,

CFG and its subsidiaries.  He also serves as a director and officer of several CFG subsidiaries.

Seneff owns 15.3% of the Advisor's outstanding common stock.

Robert A. Bourne ("Bourne") is the Vice-Chairman of CNL's Board.  He is also the

president and treasurer of CFG.  Bourne also serves as a director and officer of several CFG

subsidiaries.

Thomas J. Hutchison III ("Hutchison") has served, or continues to serve, in a variety of

capacities:

---

[7] Since 1997, the Advisor has received payment of more than $208 million in fees, including asset management, acquisition and development fees.

[8] The Advisor is owned, directly or indirectly, by several entity defendants.  CNL Financial Group, Inc. ("CFG"), a Florida corporation, was a direct stockholder of the Advisor until January 1, 2000, when it became an indirect stockholder.  CFG is a wholly-owned subsidiary of CNL Holdings, Inc., which is controlled jointly by Defendant James Seneff Jr. and his wife.  CNL Holdings, Inc. is not a defendant in this case.  CNL Real Estate Group, Inc. ("CREG"), a Florida corporation, is a wholly-owned subsidiary of CFG.  CREG owns approximately 53.5 percent of the shares of the Advisor's outstanding common stock.  Five Arrows Realty Securities II, LLC ("Five Arrows") is a Delaware limited liability company that has been a stockholder of the Advisor since February 24, 1999.  Five Arrows owns 10% of the Advisor's outstanding shares of common stock.

[9] The Defendants listed in this section, James Seneff, Jr., Robert A. Bourne, Thomas J. Hutchison III, John A Griswold, Charles E. Adams, Lawrence A. Dustin, Craig M. McAllaster, and Robert E. Parsons, will be collectively referred to, where appropriate, as the "Individual Defendants."

- chief executive officer of CNL since May of 2003;
- nominee for election to CNL's Board at the 2004 annual
stockholder meeting;
- co-chief executive officer, and a director, of the Advisor;
- president of both CNL and the Advisor from June of 2002 through
March of 2003;
- executive vice president of both CNL and the Advisor from May of
2000 through June of 2002;
- executive vice president of CNL Hotel Investors, Inc. from May of
2000 through July of 2002;
- president and chief operating officer of CREG;
- president and chief operating officer of CNL Retirement
Properties, Inc., as well as of its advisor, CNL Retirement
Corporation;
- executive vice president of CNL Retirement Properties, Inc. and of
CNL Retirement Corporation from May of 2000 through June of
2002;
- director of CNL Retirement Corporation.

John A. Griswold ("Griswold") has served as CNL's president since March of 2003, and as

CNL's chief operating officer since October of 2003.  A variety of functions, including

Acquisitions and Business Development, Portfolio and Asset Management, Planning, Design,

Construction, and the Office of General Counsel, all report to him.  In the past, Griswold served as

a director and as president of the Advisor.  He was a nominee for election to CNL's Board at the

2004 stockholder meeting.[10]

Charles E. Adams ("Adams") has served as a director of CNL since 1999.  He has served,

and presently serves, as a member of CNL's Audit Committee.  He has also served as a member of

CNL's Nominating and Corporate Governance Committee, and its Compensation Committee.

---

[10] Seneff, Bourne, Hutchison and Griswold each directly or indirectly own a de minimis number of CNL shares.

Lawrence A. Dustin ("Dustin") has served as a director of CNL since 1999.  He has also served as a member of CNL's Nominating and Corporate Governance Committee, and its Compensation Committee.

Craig M. McAllaster ("McAllaster") has served as a director of CNL since 1999.  He has served as a member of CNL's Audit Committee, and as Chair of CNL's Audit Committee and Nominating and Corporate Governance Committee.

Robert E. Parsons, Jr. ("Parsons"), has served as a director of CNL since September of 2003.  He serves on CNL's Audit Committee and Compensation Committee.  CNL's Board has determined that Parsons is an Audit Committee financial expert under Item 401 of Regulation S-K.

B. Facts

CNL was formed in 1996 as a REIT to invest in properties that would be leased to and managed by third-party operators.  (Doc. 99 at 28).  Since that time, CNL has sold approximately 308 million shares of common stock, thereby raising approximately $3.1 billion in capital.  (*Id*.).  This capital was then invested in CNL's growing portfolio of properties.

During the Class Period, CNL made three "best efforts" offers of CNL stock at $10 per share, selling approximately 256.5 million shares, and raising approximately $2.56 billion.  (*Id*. at 29).  There is no public market for these shares.  (*Id*. at 7).  CNL provided distributions to its shareholders at an average rate of between seven and eight percent.  (*Id*. at 8, 31).

CNL planned an underwritten offering for late 2004, in conjunction with several other transactions, including the listing of CNL's stock on a national exchange and the merger of CNL and its Advisor whereby CNL was to become self-advised.  (*Id*. at 2).  CNL filed a Form S-3 with the SEC on April 30, 2004, in which CNL announced that it would engage in a firm commitment

underwritten offering of additional common and preferred shares, and that it would list those shares, together with existing outstanding common shares, on the New York Stock Exchange.[11] (*Id*. at 4).  CNL sought to sell 35 million additional shares for a reverse split adjusted price of between $19 and $21 per share.  (*Id*. at 5).  In connection with that underwritten offering, CNL sought shareholder approval, via a proxy statement, to become a self-advised REIT via a merger of CNL with the Advisor.  (*Id*.).

Until this time, because CNL's stock had previously been unlisted, analysts had not monitored or evaluated the stock.  (*Id*.).  However, in August of 2004, analysts determined that the underwritten offering was overpriced, and industry experts placed a value on CNL stock that represented only 55-60% of the $10 per share that investors had previously paid for their shares of CNL stock.  (*Id*. at 5, 14).  CNL dropped the underwritten offering on August 3, 2004, and announced that its decision was due to market conditions.  (*Id*. at 2-3).  CNL has not yet indicated how it will proceed regarding the listing and underwritten offering.  (*Id*. at 6).  In its Form 10-Q for the period ended September 30, 2004, CNL informed its shareholders that there was no assurance that the merger would be consummated, and that if it were consummated, there was no assurance as to either the terms or the timing thereof.  (*Id*.).  CNL also advised its shareholders that it may be required to reduce future shareholder distributions.  (*Id*. at 8).

C. Claims and Arguments

The Plaintiffs' Complaint consists of four counts.[12]  Count I, brought by the Purchaser Class against all Defendants, alleges violations of Section 11 of the Securities Act, 15 U.S.C. § 77k ("Section 11"), and alleges that the Individual Defendants were "controlling persons" under

---

[11] CNL would have listed 151.8 million post-reverse split shares.  (Doc. 99 at 13).

[12] As noted *supra* at note 2, the Court has deferred consideration of Count III.

Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15").  The Plaintiffs allege that each

member of the Purchaser Class acquired their shares pursuant to, and in reliance on, CNL's

prospectuses and registration statements, which documents contained false and misleading

statements of material fact as well as omissions of material facts.  The Plaintiffs further allege that

none of the Defendants made a reasonable investigation into those statements nor did they have

reasonable grounds for believing in the truth of those statements, and that the Defendants thus

issued and disseminated material misstatements to the investing public.  Finally, the Plaintiffs

allege that as a result of the Defendants' conduct, the price of CNL stock was artificially inflated

and the members of the Purchaser Class thus suffered damages in connection with their acquisition

of CNL stock.

Count II is brought by the Purchaser Class against all Defendants, and alleges violations of

Section 12(2) of the Securities Act, 15 U.S.C. § 77l ("Section 12(2)"), and also alleges that the

Individual Defendants were "controlling persons" under Section 15.  The Plaintiffs allege that the

Defendants offered, sold, solicited, and were a substantial factor in the sale of CNL stock that was

offered pursuant to prospectuses, and that the prospectuses contained untrue statements of material

fact, omitted other material facts, and failed to disclose other material facts.  The Plaintiffs also

allege that the Defendants had a duty to make a reasonable investigation of the facts contained in

the prospectuses, and that they either knew or should have known of the misstatements and

omissions therein.  The Plaintiffs allege that they acquired CNL stock pursuant to the prospectuses

without knowing of the material misstatements contained therein, and that they have been

damaged by reason of the Defendants' violation of Section 12(2).

The Plaintiffs bring Count IV against the Individual Defendants, and allege that these defendants breached their fiduciary duties.  The Plaintiffs allege that by virtue of their positions with CNL, the Individual Defendants owed CNL's shareholders a fiduciary duty, which these defendants breached by causing and permitting the Advisor to proceed with courses of action that materially devalued the Plaintiffs' investments in CNL.

The Defendants argue that the Plaintiffs have not pled their claims with the particularity required by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"); that certain of the Defendants, particularly some of the entity Defendants, are not proper defendants in this case; and that the Plaintiffs have no standing to bring Count IV, because it is a derivative claim for which the Plaintiffs have not shown either the required demand or futility.

## II.    Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232 (1974), and must limit its consideration to the pleadings and any exhibits attached thereto.[13]  FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  The Court will take the complaint's allegations as admitted by the Defendant and will liberally construe them in the Plaintiff's favor.  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  The Court will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

---

[13] On a motion to dismiss securities claims, the Court may consider "evidence outside the pleadings that is undisputedly authentic and on which the plaintiff specifically has relied in the complaint[,]" as well as "any relevant documents legally required by and publicly filed with the SEC." *In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1239 (N.D. Ga. 2002).

In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Center for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

## III.   Legal Analysis[14]

The Plaintiffs claim, in essence, that during the Class Period, CNL over-stated its operating revenue by more than $200 million, and that its shareholder distributions therefore impaired shareholder capital. For the purposes of their Motions to Dismiss, the Defendants do not

---

[14] In this section, the statements of fact and statements regarding accounting principles are derived from the Complaint. The Court assumes, for purposes of this analysis, that these statements are accurate.

strenuously take issue with the alleged misrepresentations or omissions.  Rather, the Defendants argue that the Plaintiffs have violated the pleading requirements of Rule 9(b), and that certain of the Defendants have no legal liability under Sections 11 and 12(2).

A. Alleged Misrepresentations and Omissions

The Plaintiffs allege that the Defendants improperly booked as revenue funds from three sources: credit enhancements, FF&E reserves, and the Waikiki and Desert Ridge Partnerships.  In addition, the Plaintiffs allege that the Defendants failed to disclose the deferral and refund of certain fees CNL paid to the Advisor.

*1. Credit Enhancements*

When leasing properties to third parties, and when entering into management agreements, CNL requires performance guarantees or other credit enhancements in order to ensure CNL a minimum level of revenue or a minimum return on each property.[15]  (Doc. 99 at 43).  The Plaintiffs assert that because credit enhancements are payments designed to support a rental stream, under Generally Accepted Accounting Principles ("GAAP"), they should be considered reductions of basis in the relevant properties, not revenue.  (*Id*. at 47-48).[16]

_____

[15] Credit enhancements require the lessee to pay rent to the lessor (here, CNL) equal to a percentage return on the lessor's investment in the property, in order to justify the price paid for that property.  (Doc. 99 at 47).

[16] CNL classified credit enhancements in a variety of forms, including "limited rent guarantees," " threshold guarantees," "liquidity facility loans," and "senior loan guarantees," all of which guarantee a minimum return for the properties covered.  (*Id*. at 45-46).  Limited rent guarantees "guarantee the full, complete and timely payment of rental payments . . . ." (Doc. 99 at 45).  Threshold guarantees "guarantee a certain minimum return for each of the properties covered" by such a guarantee.  (*Id*.).  Funding under threshold guarantees is recognized as other income, a reduction in base management fees, or as liabilities, depending on the nature of the particular agreement and whether the funded amounts must be repaid by CNL in the future.  (*Id*.).  Liquidity facility loans

CNL also entered into an arrangement with Marriott (arising out of pre-existing contracts and agreements between CNL and Marriott) that enabled CNL to increase cash available for distribution by converting liabilities created by failing investments into income. (*Id*. at 45). That adjustment represented fourteen percent (14%) of CNL's total income in 2002, and in 2003 grew to $27.8 million, accounting for nineteen percent (19%) of distributions and twenty-two percent (22%) of cash available for distributions as represented by CNL. (*Id*.). The fact that these amounts would cease to accrue to the benefit of shareholders when the limitation on funding was exhausted was not disclosed. (*Id*.).

During 2002 and 2003, CNL recognized millions of dollars of credit enhancements as income and revenue. (*Id*. at 46; *see also* Doc. 148, Ex. 3 at 10). By including these credit enhancements in revenue, CNL increased the net cash available for distribution to shareholders in a material way. (Doc. 99 at 49). CNL did not disclose to shareholders and investors that past distributions were not wholly the result of operating profits but instead represented in part a return of investor capital.[17] (*Id*. at 47). This reporting also concealed from investors the fact that CNL

---

"guarantee a certain minimum distribution" for each property covered, funding under which is recognized as a liability because CNL could be required to pay back the amounts funded. (*Id*. at 46). Senior loan guarantees "guarantee the payment of senior loan debt service" for each property covered, funding under which is recognized as a liability because CNL could be required to pay back the amounts funded. (*Id*. at 46).

[17] However, see, for example, CNL's 2002 Form 10-K for the period ended December 31, 2002, which specifically states that varying percentages of distributions for the years 1998 through 2002, inclusive, represented a return of capital in accordance with GAAP, and also notes that CNL did not treat such amounts as return of capital for the purposes of calculating shareholders' return on invested capital. (Doc. 148, Ex. 4 at 18, 31).

would not be able to support future distribution amounts from operating profits.[18]  (*Id*.).  Thus, the

Plaintiffs allege that because CNL failed to disclose this information CNL's public filings,

including registration statements and prospectuses, contain materially misleading information.

The Plaintiffs specifically reference CNL's 2003 10-K as a document containing this misleading

information.  (*Id*. at 49).[19]

 *2. FF&E Reserves*

 For CNL's leases to independent third parties, tenants of the properties establish reserve

funds used for the replacement and renewal of furniture, fixtures and equipment, and for routine

capital expenditures ("FF&E Reserves").  (Doc. 99 at 51).  These FF&E Reserves are owned by

CNL.[20]  (*Id*.).  In addition, CNL's management agreements require CNL to set aside between three

and five percent of hotel and resort revenues in FF&E Reserves accounts.  (*Id*.).  However, in its

Consolidated Statement of Earnings for Fiscal Year Ended December 31, 2002 (2002 10-K), as

well as in prior filings with the SEC, CNL reported FF&E Reserve income as revenue, thereby

---

[18] On September 9, 2004, CNL filed a Form 8-K with the SEC, declaring a distribution.  In contrast to previous Form 8-Ks, in the September 9, 2004 8-K, CNL specifically noted that it "may rely on credit enhancements and/or borrowings to partially fund distributions."  (Doc. 99 at 55-56). In addition, in its 2004 Third Quarter 10-Q (for the period ended September 30, 2004), CNL noted that cash flows from operating activities were supported by credit enhancements which were used, in conjunction with proceeds from long term borrowing, to fund a portion of the distributions.  (*Id*. at 56-57).

[19] However, CNL's 2003 10-K/A (Doc. 148, Ex. 3) specifically notes that CNL has used credit enhancements to fund distributions, that credit enhancements are subject to burn-off such that the funds may be depleted, and that should adverse economic conditions continue to affect CNL's business, CNL's ability to pay distributions would be affected.  *Id*. at 38, 43-44, 45-46.

[20] In its 2002 10-K, CNL indicates that the funds in these FF&E Reserves accounts are maintained as restricted cash, which may only be expended with regard to the specific property to which the funds related.  (Doc. 99 at 51-52; *see also* Doc. 148, Ex. 4 at 33).

treating those funds as a component of cash from operations in the calculation of cash distributions to be made to shareholders.[21]  (Doc. 99 at 52; *see also* Doc. 148, Ex. 4 at 34).  By reporting FF&E Reserves funds as revenue, CNL allegedly inflated its net cash available for distributions, which otherwise would have been reduced.  (Doc. 99 at 52-53).[22]  Thus, the Plaintiffs allege that the registration statements and prospectuses contain material misstatements and/or omissions.  The Plaintiffs specifically reference CNL's 2002 and 2003 10-Ks as documents containing this misleading information.  (*Id.* at 52, 53).

### 3. *Waikiki and Desert Ridge Partnerships*

As of December 31, 2003, CNL had also entered into several "joint ventures" to develop and redevelop properties, which operated as unconsolidated subsidiaries of CNL.  (Doc. 99 at 40).  First, CNL entered the "Waikiki Partnership," which owns a resort in Hawaii, and is run through WB Resort Partners, L.P.[23]  (*Id.*).  Second, CNL entered the "Desert Ridge Partnership," which owns a resort in Arizona, and is run through Desert Ridge Resort Partners, LLC.[24]  (*Id.*).  In 2002,

---

[21] CNL reported a total of $12,950,283 as cash from operating activities for the years 1998 through 2002, inclusive, which amount included FF&E Reserve funds.  (Doc. 99 at 52).

[22] For the year ended December 31, 2003, CNL stopped listing FF&E Reserves income as a separate line item. (Doc. 99 at 53).  However, CNL's consolidated balance sheets show that restricted cash rose from $21.795 million in 2002 to $60.105 million in 2003.  (*Id.*; *see also* Doc. 148, Ex. 3 at 50).  The Plaintiffs assert that to the extent that the additional $38.31 million consists of FF&E Reserve funds, and to the extent that amount was used to calculate CNL's cash from operations, CNL's cash from operations as well as its cash available for distribution have been materially overstated.  (Doc. 99 at 53).

[23] CNL invested $41.8 million, and has a 49 percent ownership interest in the Waikiki Partnership project.  (Doc. 99 at 40).

[24] CNL invested $25.1 million, and has a 44 percent ownership interest in the Desert Ridge Partnership project.  (Doc. 99 at 40).

CNL contributed an additional $8.7 million into the Waikiki Partnership, and $16.2 million into the Desert Ridge Partnership.  (*Id*.).  At the time CNL was making these contributions, both partnerships were experiencing cash flow deficits.  (*Id*. at 41).  However, during that same time, CNL received distributions from both partnerships, which allegedly consisted of returns of capital, but which CNL treated as Net Cash Provided by Operating Activities.  (*Id*.).  The Plaintiffs allege that the fact that these two partnerships had not been able to provide a cash flow, and would not be able to do so for the foreseeable future, was not disclosed to the investing public in CNL's 2003 offering.  (*Id*. at 42).[25]

The Plaintiffs also allege that CNL's treatment of these returns of capital as "distributions" improperly inflated CNL's operating performance, and that the combination of the nondisclosures and improper accounting treatment misled investors into believing that CNL was sufficiently profitable to continue providing a seven to eight percent return on investor capital.  (*Id*.).  In terms of relevant documents, the Plaintiffs point to the discussion of these partnerships in CNL's 2003 10-K, and allege that disclosures should have been made in CNL's 2003 offering documents.  (*Id*. at 40, 42).

---

[25] *See*, however, Doc. 148, Ex. 3 (CNL Form 10-K/A, filed April 30, 2004) at 35 ("Losses from Unconsolidated Subsidiaries . . . Losses were primarily due to net losses incurred by Desert Ridge Resorts Partners, LLC . . . . The JW Marriott Desert Ridge Resort and Spa Property opened in November 2002 and is expected to continue to generate losses until it gains market share. . . . [T]he Waikiki Beach Marriott Resort Property (owned by WB Resort Partners, LP) [has] continued to be negatively impacted by current economic conditions . . . . Losses . . . may increase if the economy and lodging industry do not recover."); *see also id*. at 37, 43, 114 (addressing Desert Ridge), 129 (addressing Waikiki).  *See also* CNL's Form S-11/A (pages 93, 96), filed January 29, 2003, which discusses losses from unconsolidated subsidiaries, and notes that these losses are expected to continue through 2003.

*4. Advisor Fee Deferral*

In late 2003, CNL reached an agreement with the Advisor whereby the Advisor deferred the payment of asset management fees for an indeterminate time, and refunded all of the asset management fees CNL had paid to the Advisor during 2003. (*Id*. at 53-54). CNL did not disclose either the deferral or the refund until March 15, 2004, when it filed its 2003 Form 10-K. (*Id*. at 53). The Plaintiffs allege that these deferrals and refunds allowed CNL to continue to fund shareholder distributions at inflated levels from sources other than cash from operations. (*Id*. at 53, 55). The Plaintiffs further allege that as of September 2003, CNL should have been disclosing the facts of these deferrals and refunds, but that a variety of documents filed after September of 2003 failed to make such a disclosure, including: Post-Effective Amendment No. 4 to Form S-11 Registration Statement, filed October 2, 2003; Form 424B3, Supplement No. 3, dated November 4, 2003 to Prospectus dated April 30, 2003; Form S-11/A filed December 8, 2003; and Post-Effective Amendments for Registration Statement, filed January 26, 2004. (*Id*. at 54-55).

Since CNL's operating revenues were (according to the Plaintiffs) inadequate to fund shareholder distributions, the Plaintiffs allege that CNL had to obtain prohibited loans for this purpose.[26] (Doc. 99 at 8, 9, 56-57, 67).

The Court assumes for the purposes of this Order that material misrepresentations and omissions were made, and thus finds the allegations in this regard sufficient to survive a motion to dismiss.[27]

──────────────────────

[26] However, CNL's 2003 10-K/A notes that CNL borrowed, and may in the future borrow, money in order to make shareholder distributions. (Doc. 148, Ex. 3 at 6).

[27] However, when repleading, the Plaintiffs should designate those representations and omissions which pertain to all the issuing documents, clearly delineate the representations and

B. Defendants' Liability

The Plaintiffs claim that the Defendants are liable under Sections 11 and 12 for "CNL's disclosures to prospective purchasers of CNL stock concerning its financial condition in its Registration Statements and Prospectuses [which] were materially false and misleading," including the artificial inflation of income by improperly including credit enhancements, investor capital and FF&E reserves in that calculation, and the omission of material facts regarding the reporting of CNL's net cash from operations. (Doc. 99 at 4-5, 15, 79, 82). The Plaintiffs specifically reference CNL's prospectuses and registration statements filed during the Class Period.[28] (*Id*. at 7). Finally, the Plaintiffs make specific references to misstatements and omissions in particular documents, such as: failing to disclose that distributions were not based on accounting practices that conform with GAAP, in CNL's Post-Effective Amendment of its Prospectus dated April 1, 2002 (*Id*. at 31); failing to disclose, in CNL's 2003 offering, that the Waikiki and Desert Ridge Partnerships had not

―――――――――――――

omissions in each document, and separate those that are specific to a particular issue.

[28] These documents include the following:
(1) Registration of Securities, Form S-11, filed on: July 23, 2003; August 13, 2002; and August 9, 2001.
(2) Amended Registration of Securities, Form S-11/A, filed on: December 8, 2003; January 29, 2003; December 23, 2002; March 28, 2002; and October 31, 2001.
(3) Post-effective Amendments for Registration Statements, filed on: April 27, 2004; January 26, 2004; November 4, 2003; October 2, 2203; September 16, 2003; July 14, 2003; April 23, 2003; November 21, 2002; September 26, 2002; June 26, 2002; March 14, 2003; December 20, 2001; September 21, 2001; and August 24, 2001.
(4) Rule 424B3 Prospectus, filed on: February 13, 2004; January 26, 2004; December 31, 2002; December 8, 2003; November 4, 2003; September 16, 2003; August 12, 2003; July 14, 2003; July 7, 2003; May 9, 2003; March 7, 2003; February 20, 2003; February 10, 2003; January 8, 2003; November 21, 2002; September 26, 2002; June 26, 2002; June 10, 2002; April 19, 2002; March 14, 2002; March 1, 2002; February 1, 2002; December 20, 2001; October 9, 2001; September 21, 2001; and August 24, 2001. (Doc. 99 at 7, n.2).

in the past, and could not going forward, provide any cash flow (*Id*. at 42); misrepresenting credit

enhancements as part of net earnings and cash from operating activities in CNL's 2003 10-K/A

(*Id*. at 46); improperly reporting FF&E reserve income as revenue in CNL's 2002 10-K and in

prior filings with the SEC (*Id*. at 52); and failing to report the deferral and refund of the Advisor's

fees in a variety of documents,[29] including CNL's Post-Effective Amendment No. 4 to Form S-11

Registration Statement filed October 2, 2003, Form 424B3 Supplement No. 3 dated November 4,

2003 to April 30, 2003 Prospectus, Form S-11/A filed December 8, 2002, and Post-Effective

Amendment for Registration Statement filed January 26, 2004 (*Id*. at 54-55).

*1. Section 11*

Section 11 provides for civil liability for false or misleading registration statements as

follows:

> In case any part of the registration statement, when such part became effective,
> contained an untrue statement of a material fact or omitted to state a material fact
> required to be stated therein or necessary to make the statements therein not
> misleading, any person acquiring such security . . . may, either at law or in equity,
> in any court of competent jurisdiction, sue - -
>> (1) every person who signed the registration statement;
>> (2) every person who was a director of (or person performing similar
>> functions) or partner in the issue are the time of the filing of the part
>> of the registration statement with respect to which liability is
>> asserted;
>> (3) every person who, with his consent, is named in the registration
>> statement as being or about to become a director, person performing
>> similar functions, or partner;
>> (4) every accountant, engineer, or appraiser, or any person whose
>> profession gives authority to a statement made by him, who has with

---

[29] The Plaintiffs allege that the Defendants also failed to disclose the Advisor's waiver of an $83 million fee in connection with the "KSL Transaction" in several documents, including: Form S–3 dated April 30, 2004 and June 21, 2004; Form 10-Q for the period ended June 30, 2004, filed on August 9, 2004; and Form 8-K filed on August 19, 2004.

> his consent been named as having prepared or certified any part of
> the registration statement . . . ;
> (5) every underwriter with respect to such security.

15 U.S.C. § 77k; *In re AFC Enter., Inc., Sec. Litig.*, 348 F. Supp. 2d 1363, 1380 (N.D. Ga. 2004)

("Subsection (a) of section 11 enumerates those persons who are liable for false or misleading

statements on a registration statement.").

The Plaintiffs have alleged that registration statements filed during the Class Period contain

material misstatements and omissions, and that certain Individual Defendants signed certain

registration statements, as follows: first, they allege that Seneff, Bourne, Adams, Dustin, Griswold

and McAllaster all signed Forms S-11 and S-11/A as filed with the SEC on October 31, 2001,

March 28, 2002, August 13, 2002, and July 23, 2002 (Doc. 99 at 24); second, the Plaintiffs allege

that all of the Individual Defendants signed an amended registration statement on Form S-3/A as

filed with the SEC on July 20, 2003 (*Id.* at 25).  The Plaintiffs have also alleged that the Individual

Defendants serve or have served as directors of CNL at times relevant to the Complaint.  (*Id.* at

20-23).  CNL issued registration statements, and is alleged to be the registrant for those statements.

Thus, as to CNL and the Individual Defendants, the Complaint contains sufficient allegations from

which Section 11 liability may be inferred.[30]  The Complaint, however, is devoid of allegations

--------

[30] This result is supported by the "group pleading doctrine."  That doctrine:

allows plaintiffs to rely on a presumption that statements in prospectuses, registration
statements, annual reports, press releases, or other group-published information are the
collective work of those individuals with direct involvement in the everyday business
of the company.  Where the misstatements appear in certain types of documents that
plaintiffs believe were written by groups, some courts have allowed plaintiffs to link
certain defendants to alleged misrepresentations simply by pleading that the defendants
were part of the "group" that likely put the challenged documents together.  Instead of
being required to plead that a defendant actually made, authored or approved an

linking the remaining Entity Defendants (other than CNL) to the registration statements.  Thus,

under the facts alleged, there is no basis to find direct liability under Section 11 on the part of any

of the Defendants other than CNL and the Individual Defendants, and the Section 11 claim (Count

I) should be dismissed as to the remaining Defendants.[31]

*2. Section 12(a)(2)*

Section 12(a)(2) provides for civil liability in connection with the issuance of a prospectus

against:

> Any person who - -
>
>> (2) offers or sells a security . . . by the use of any means or
>> instruments of transportation or communication in interstate
>> commerce or of the mails, by means of a prospectus or oral
>> communication, which includes an untrue statement of a material

---

> offending statement in a corporate communication, the "group pleading" doctrine in
> its broadest form allows unattributed corporate statements to be charged to one or more
> individual defendants based solely on their corporate titles.  Under this doctrine, the
> plaintiff need not allege any facts demonstrating an individual defendant's
> participation in the particular communication containing the misstatement or omission
> where the defendants are "insiders or affiliates" of the company.

*Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 363 (5th Cir. 2004) (internal
citations and quotations omitted).  District courts in the Eleventh Circuit have relied on this doctrine,
while noting that the Eleventh Circuit has not explicitly ruled on its use.  *See Phillips v. Scientific-*
*Atlanta, Inc.*, 374 F.3d 1015, 1019 (11th Cir. 2004) (discussing doctrine, but determining the plaintiff
did not have to rely upon it); *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1371 (N.D.
Ga. 2004) (applying doctrine to Section 11 claim); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d
1308, 1327 (M.D. Fla. 2002); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1341 (S.D. Fla. 1999).

[31] It is not clear, however, from the face of the Complaint what misstatements and omissions
are contained in each registration statement the Plaintiffs reference in their Complaint.  The Plaintiffs
make reference to misstatements and omissions in certain documents, but do not address the entire
list they have created at footnote 2 to paragraph 16 of the Complaint.  Upon repleading, the Plaintiffs
should not only link particular Defendants with particular registration statements as they have already
(at least partially) done, but also specify the material misstatements or omissions contained therein.

> fact or omits to state a material fact necessary in order to make the
> statement, in the light of the circumstances under which they were
> made, not misleading . . . .

15 U.S.C. § 77l(a)(2). This section "extends liability only (1) to those persons who actually transfer title to the security and (2) to those that successfully solicit the purchase." *Ehlert v. Singer*, 85 F. Supp. 2d 1269, 1274 (M.D. Fla. 1999) (internal citations and quotation omitted); *see also Pinter v. Dahl*, 486 U.S. 622, 647 (1988) (under section 12(1), defining solicitor as "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.").[32] Courts have rejected attempts to expand the scope of liability under Section 12(2) to those persons who were a "substantial factor" in the transaction. *Pinter*, 486 U.S. at 653-54; *Ryder*, 943 F.2d at 1527. Instead, the "purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a [Section] 12(2) seller." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3rd Cir. 1990).[33]

In Count II, the Plaintiffs allege that "[t]he Defendants offered, sold, solicited and/or were a substantial factor in the sale of CNL stock offered pursuant to the Prospectuses[,]" and that the "Individual Defendants' actions of solicitation included participating in the preparation of false

---

[32] In *Ryder International Corp. v. First American National Bank*, 943 F.2d 1521, 1526-27 (11th Cir. 1991), the Eleventh Circuit found that the Supreme Court's language in *Pinter* defining a "solicitor" under Section 12(1) could also be applied to Section 12(2).

[33] "To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003).

and misleading Prospectuses." (Doc. 99 at 82). In addition, the Plaintiffs allege that the

Individual Defendants signed various prospectuses and registration statements.[34]

CNL is the issuer. The Plaintiffs have made a number of allegations connecting CNL to

the sale of CNL stock by way of prospectuses. First, the Plaintiffs allege that "CNL's disclosures

to prospective purchasers of CNL stock concerning its financial condition in its Registration

Statements and Prospectuses were materially false and misleading."[35] (Doc. 99 at 4-5). The

Plaintiffs also allege that CNL filed Prospectuses with the SEC on a number of occasions during

the Class Period, including September 21, 2001, December 20, 2001, March 14, 2002, June 26,

2002, November 21, 2002, April 23, 2003, July 14, 2003, September 16, 2003, and January 26,

2004 (*Id*. at 24). Next, the Plaintiffs allege that the Defendants engaged in a "common course of

business" that "deceive[d] the investing public, including Plaintiffs and other Class members to

purchase CNL stock[,]" (*Id*. at 25), and that CNL raised approximately seventy-five percent of its

---

[34] Plaintiffs allege that the Individual Defendants signed certain prospectuses and amendments, as follows. Seneff, Bourne, Adams, Dustin, Griswold and McAllaster signed prospectuses and amendments filed by CNL on September 21, 2001, June 26, 2002, November 21, 2002, and April 23, 2003. Seneff, Bourne, Adams, Griswold and McAllaster signed prospectuses and amendments filed by CNL on December 20, 2001, and March 14, 2002. Seneff, Hutchison, Adams, Dustin, Griswold and McAllaster signed prospectuses and amendments filed by CNL on July 14, 2003, September 16, 2003, and January 26, 2003. As to the registration statements the Individual Defendants signed, *see supra,* page 21.

[35] The Plaintiffs allege specific misrepresentations in these Prospectuses, such as: (1) making misleading representations about GAAP compliance regarding the basis of cash distributions in a Post-effective amendment of a Prospectus, dated April 1, 2002 (Doc. 99 at 32); and (2) "[d]uring the Class Period, while actively offering and selling CNL stock, Defendants failed to disclose CNL's true financial situation and the fact that it was not able to fund its distributions from its Net Cash Provided by Operating Activities, Cash from Operations and Net Earnings." (*Id*. at 33).

investor capital in stock offerings made since 2001.  (*Id.* at 28).  Taken together, these allegations

are sufficient to state a cause of action against CNL for liability under Section 12(a)(2) as a seller.

Under the facts as alleged, however, there is no basis for holding any of the remaining

Entity Defendants liable under Section 12.  An allegation that a defendant was a "substantial

factor" is clearly deficient.  Other than their conclusory labeling of the Defendants as sellers and

solicitors, the Plaintiffs have not alleged any facts to show that any of the remaining Entity

Defendants either sold or actively solicited the sale of, CNL stock.  Thus, the Section 12 claim

(Count II) should be dismissed as to all Entity Defendants, other than CNL.

Turning to the Individual Defendants, there are no factual allegations to support the

Plaintiffs' conclusory assertion that the Individual Defendants were sellers of CNL stock.

However, courts have concluded that prospectuses and registration statements are the documents

that solicit the sale of securities, and thus hold those individuals who sign those documents liable

as solicitor sellers under Section 12.  *See In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL

1052004, at 11 (S.D.N.Y. Nov. 19, 1999); *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213,

1222-23 (D. Colo. 1998); *Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp.

1101, 1133 (W.D. Mich. 1996); *In re Valence Tech. Sec. Litig.*, 1995 WL 274343, at 18 (N.D. Cal.

May 8, 1995).  All of the Individual Defendants are alleged to have signed at least one registration

statement or prospectus, and thus the Plaintiffs have stated a claim against each of the Individual

Defendants for solicitor-seller liability under Section 12.[36]

---

[36] Although the Court has found that the Plaintiffs have provided sufficient allegations to state
a claim for Section 12 liability against the Individual Defendants, it is not clear from the face of the
complaint which Defendants are responsible for particular documents containing particular
misrepresentations.  In the future, the Plaintiffs should clearly link the Individual Defendants to the

*3. Control Person Liability*

The Plaintiffs allege that the Individual Defendants are also liable as "controlling persons" under Section 15 for violations of both Sections 11 and 12.  Section 15 provides that

> Every person . . . who controls any person liable under [Section 11] and [Section 12], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . .

15 U.S.C. § 77o; *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("Section 15 . . . extends Section 11 and 12 liability to persons who control entities liable under those sections.").[37]  "To make out a prima facie case of a § 15 violation, Plaintiffs must prove that Defendants (1) each had power or influence over the controlled person and (2) each induced or participated in the alleged violation."[38]  *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001); *AFC Enter.*, 348 F. Supp. 2d at 1381 ("[A] plaintiff must allege that the defendant had the power to control both the general operations of the offending corporation and the specific corporate policy that resulted in the offense.").

The Plaintiffs allege that: (1) the Individual Defendants had the ability to control CNL by reason of their management positions and/or membership on CNL's or the Advisor's Board (Doc. 99 at 20-23); (2) the Individual Defendants had access to information regarding CNL's operations

---

particular documents they signed and specify the misstatements or omissions contained therein.

[37] "Control over the entity responsible for the primary violation is essential (sic) element of a claim for controlling person liability." *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1368 (S.D. Fla. 2001).

[38] An individual may be liable for a violation of Section 12 as a control person under Section 15, even if that individual is not a "seller" under Section 12. *In re Sahlen & Assoc., Inc. Sec. Litig.*, 773 F. Supp. 342, 364 (S.D. Fla. 1991).

and financial condition, the ability to cause and direct the dissemination of that information, and

the ability to correct previously disseminated information (*Id*. at 23); (3) the Individual Defendants

were provided with copies of Registration Statements and Prospectuses, as well as the filed reports

and press releases alleged to be misleading, and had the ability and opportunity to prevent their

issuance or cause them to be corrected (*Id*.); (4) each Individual Defendant had the power to

control the general affairs of the entity primarily liable for the violations (*Id*.); and (5) each

Individual Defendant had the power to control or influence the specific policy that resulted in

primarily liability in that they controlled the dissemination of the documents containing the

misrepresentations and omissions (*Id*. at 23-24).  The Plaintiffs have also alleged the positions

each of the Individual Defendants held with CNL and its affiliates.  (*See supra* at 5-7; Doc. 99 at

20-23).

Accepting the Plaintiffs' allegations as true for the purposes of the instant motions to

dismiss, these allegations are sufficient to state a claim for control person liability.[39]  *In re Lernout*

*& Hauspie Sec. Litig.*, 286 B.R. 33, 44 (D. Mass. 2002) (status as director, along with special

status within corporation, power to control content of documents, and signature on documents

---

[39] The Plaintiffs allege that: (1) Seneff, Bourne, Adams, Dustin, Griswold and McAllaster signed Prospectuses and "POS Ams" as filed by CNL with the SEC on September 21, 2001, June 26, 2002, November 21, 2002, and April 23, 2003; (2) Seneff, Bourne, Adams, Griswold and McAllaster signed Prospectuses and "POS Ams" as filed by CNL with the SEC on December 20, 2001 and March 14, 2002; (3) Seneff, Hutchison, Adams, Dustin, Griswold and McAllaster signed Prospectuses and "POS Ams" as filed by CNL with the SEC on July 14, 2003, September 16, 2003, and January 26, 2004; (4) Seneff, Bourne, Adams, Dustin, Griswold and McAllaster all signed Forms S-11 and S-11/A as filed with the SEC on October 31, 2001, March 28, 2002, August 13, 2002, and July 23, 2002; and (5) the Individual Defendants signed the amended registration statement filed July 20, 2003.

sufficient for pleading purposes (Exchange Act section 20(a) claim));[40] *In re Oxford Health Plans,*

*Inc., Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999) (pleading sufficient where plaintiff alleged

defendants held high level management positions, day-to-day participation in operations,

awareness of internal control and accounting issues, and dissemination of misleading information

(Exchange Act section 20(a) claim)); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1480 (N.D.

Ga. 1997) (allegations of control over general affairs and specific relevant conduct (Exchange Act

section 20(a) claim)); *In re Sahlen & Assoc., Inc. Sec. Litig.*, 773 F. Supp. 342, 362-63 (S.D. Fla.

1991) (for officers, "it is sufficient for the plaintiff to allege who the defendants allegedly

controlled and what acts or status demonstrate their ability to control.") (internal citations

omitted).

Further, with respect to certain documents, the Plaintiffs' allegations set forth the nature of

the misstatements and/or omissions contained therein, the dates certain documents were filed, (*see*

discussion *supra,* Section III(B) introduction, at pages 18-19 and n.28), and the dates the various

Individual Defendants allegedly served as officers or directors of CNL.  Together, these allegations

are sufficient to state a claim against the Individual Defendants for liability as controlling persons

under Sections 11, 12 and 15 for certain statements and/or omissions made in CNL's filings.[41]

C. Rule 9(b)

Claims under Sections 11 and 12 do not require allegations of scienter, *In re Suprema*

*Specialties, Inc. Sec. Litig.*, 334 F. Supp. 2d 637, 647 (D.N.J. 2004); *Unicapital Corp.*, 149 F.

---

[40] "The Controlling person analysis under § 15 of the Securities Act and § 20(a) of the Exchange Act . . . is identical." *Unicapital*, 149 F. Supp. 2d at 1367 n.22.

[41] When repleading, the Plaintiffs should clearly link each Individual Defendant with the particular false or misleading documents filed during their respective tenures as controlling persons.

Supp. 2d at 1363, and the Plaintiffs disavow any attempt to assert claims of fraud. Thus the

pleading requirements of Rule 9(b) are not applicable. *In re Nationsmart Corp. Sec. Litig.*, 130

F.3d 309, 315-16 (8th Cir. 1997); *In re Ins. Mgmt. Solutions Group, Inc., Sec. Litig.*, 2001 WL

34106903 at 9 (M.D. Fla. 2001) (notice pleading applies to Section 11 and 12 claims that sound in

negligence). However, the Complaint is replete with allegations of intent to deceive. (*See* Doc. 99

at 25 (alleging that Defendants are liable "for participating in a scheme . . . that operated to inflict

economic harm . . . ")); (*id*. at 36 (alleging that "Defendants caused the Company to engage in

transactions that Defendants knew, or recklessly disregarded, would provide returns to CNL that

would result in the reduction of the distribution . . .")); (*id*. at 41-42 (alleging that "Defendants

knew that the joint ventures . . . could not going forward, provide any cash flow . . . . Yet, for two

years Defendants manipulated the Consolidated Statements of Cash Flows to disguise the

inclusion of capital . . .")); (*id*. at 43 (alleging that "Defendants inflated CNL's reported revenues .

. . by using a series of misleading revenue enhancing devices.")); (*id*. at 53 (alleging that CNL

"secretly fund[ed] distributions at inflated levels")); (*id*. at 57 (referring to CNL's operations as a

"house of cards")).

Thus, to the extent that the Plaintiffs' claims survive (*see infra*), the Plaintiffs will be given

leave to amend and directed to delete these superfluous allegations.

D. Count IV - Breach of Fiduciary Duty

The Plaintiffs allege that the Individual Defendants have breached their fiduciary duty to

CNL and to CNL's shareholders in a number of ways. First, by causing or permitting the

registration statements and prospectuses to contain materially false and misleading statements and

omissions. Second, because officers and directors of CNL were also the officers and directors of

the Advisor, CNL's business was conducted in a way that would benefit the Advisor, not in a way that served the best interests of CNL's shareholders.[42]  Third, the Individual Defendants caused CNL to execute transactions, including the KSL Transaction, Marriott acquisitions, and the Waikiki and Desert Ridge Partnerships, all of which have damaged CNL's financial situation, but which transactions benefitted the Individual Defendants as a result of their dual positions with CNL and the Advisor.  Fourth, the Individual Defendants failed to implement appropriate measures to ensure that the Advisor did not become a vehicle for wrongful self-dealing, and thus caused CNL to pay fees to the Advisor far in excess of the average industry rate, and caused CNL to renew the Advisory Agreement with the Advisor notwithstanding the Advisor's poor performance as measured by CNL's poor financial performance and by certain enumerated criteria.

Maryland law is clear that

> an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder, though the injury may incidentally result in diminishing or destroying the value of the stock.

*Waller v. Waller*, 49 A.2d 449, 452 (Md. 1946); *Werbowsky v. Collomb*, 766 A.2d 123, 133 (Md. 2001) (obligation of directors to act in good faith runs "to the corporation and not, at least directly, to the shareholders.").[43]

---

[42] CNL disclosed potential conflicts of interest in its documents.  (*See*, for example, Doc. 148, Ex. 3 at 13).

[43] The law of the state of incorporation governs the liability of officers and directors to the corporation.  *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989).  Because CNL is incorporated in Maryland, the law of that state applies.

However, the parties dispute whether Count IV is a derivative or direct claim.[44]  The nature

of such claims is to be determined from the body of the complaint,  *Paskowitz v. Wohlstadter*, 822

A.2d 1272, 1277 (Md. Ct. Spec. App. 2003), not from the "Plaintiff's designation or stated

intention."  *Gonzalez v. Fairgale Properties Co., N.V.*, 241 F. Supp. 2d 512, 516 (D. Md. 2002).

The Complaint alleges, at paragraph 237, that

> Defendants have breached their fiduciary duties to the members of the Class by
> their conduct complained of herein, generally, and specifically by permitting and
> causing the Advisor to proceed with the courses of action described herein which
> materially devalued the Class' investment in CNL.

(Doc. 99 at 91).  The actions of the Advisor of which the Plaintiffs complain in their Complaint,

and which they reiterate in their Reply Brief (Doc. 147), include poor investments in and

overpayment for properties, overpayment of fees, self-dealing actions, and improper renewal of the

Advisory Agreement.  These are claims that, under Maryland law, should be brought as derivative

actions.  *Strougo v. Bassini*, 282 F.3d 162, 170-71 (2nd Cir. 2002) (under Maryland law, where

harm to shareholders flows from injury to corporation's business, such as where officers and

directors mismanage or waste funds, or make imprudent investments, the corporation alone has a

cause of action to recover); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F.

---

[44] "A derivative action is a claim asserted by a shareholder plaintiff on behalf of the
corporation to redress a wrong against the corporation. . . . By contrast, a direct action is a claim
asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an
injury personal to the shareholder." *Paskowitz v. Wohlstadter*, 822 A.2d 1272, 1276 (Md. Ct. Spec.
App. 2003) (internal citations and quotations omitted).   To bring an individual or direct action, a
plaintiff must suffer a direct or special injury. *Gonzalez v. Fairgale Properties Co., N.V.*, 241 F. Supp.
2d 512, 516 (D. Md. 2002).  "A special injury is established were there is a wrong suffered by plaintiff
that was not suffered by all stockholders generally or where the wrong involves a contractual right of
the stockholders, such as the right to vote." *Id*. (internal citation and quotation omitted); *Strougo v.
Bassini*, 282 F.3d 162, 170-71 (2nd Cir. 2002) (to determine whether shareholder may bring direct
suit, inquiry is whether the shareholders' injury is distinct from that suffered by the corporation)
(internal citation and quotation omitted).

Supp. 2d 243, 260-61 (S.D.N.Y. 2003) (under Maryland law, claims that defendants caused fund to purchase securities at inflated prices, and to pay excessive advisory fees, which caused reduction in value of shareholders' shares, alleged derivative injuries).

Under Maryland law, a stockholder cannot initiate a derivative action unless he has "alleged the following with particularity: (1) [his] efforts to make a demand on the Board, and shareholders, if necessary, and the reasons for [his] failure to obtain action; or (2) the reasons why demand would have been futile." *Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 442 (D. Md. 1996); *Byington v. Vega Biotechnologies, Inc.*, 869 F. Supp. 338, 343 (D. Md. 1994) (as a general rule, Federal Rule of Civil Procedure 23.1 requires either demand or pleading of futility); *Werbowsky*, 766 A.2d at 133 ("[A] shareholder [must] make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed."). Plaintiffs' Count IV is a derivative claim, but they have failed to either make a demand on the board or to properly plead futility, and so Count IV will be dismissed. The dismissal of Count IV will be without prejudice and with leave to amend as appropriate.

## IV.    Conclusion

The Plaintiffs have alleged sufficient facts to state a claim for liability under Sections 11 and 12 against CNL and against the Individual Defendants (both directly and as control persons under Section 15), but not as to the other Entity Defendants. Thus, the Section 11 and 12 claims against the Entity Defendants (other than CNL) will be dismissed. Count IV constitutes a derivative action, and the Plaintiffs have failed to either make a demand or plead futility, and so Count IV will be dismissed. Accordingly, it is

**ORDERED THAT**:

-31-

As to Count I, the Defendants' Motions to Dismiss (Docs. 126, 132, 135) are GRANTED as to the following Defendants: Five Arrows, CNL-HP, RFS, the Advisor (CHD), CHC, CFG, and CREG.

As to Count II, the Defendants' Motions to Dismiss (Docs. 126, 132, 135) are GRANTED as to the following Defendants: Five Arrows, CNL-HP, RFS, the Advisor (CHD), CHC, CFG, and CREG.

As to Count IV, the Defendants' Motions to Dismiss (Docs. 128, 132, 138) are GRANTED.

The Defendants' Motions to Dismiss are DENIED in all other respects.

The Plaintiffs shall have twenty days to replead in a manner consistent with this Order.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 9, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

Unrepresented Party