# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**In re**
**CNL HOTELS & RESORTS, INC.**
**Securities Litigation**

Case No. 6:04-cv-1231-Orl-31KRS

(Consolidated with Case No. 6:04-cv-1341-Orl-19JGG)

## ORDER

This case involves the claims of investors who purchased stock in CNL Hotels & Resorts, Inc. ("CNL"), who allege that they were damaged as a result of acquiring CNL securities pursuant to prospectuses and registration statements containing materially false and misleading statements. This matter comes before the Court on a Motion to Dismiss (Doc. 194) filed by CNL Securities Corporation ("CSC") concerning the Plaintiffs' claim in Count II of their Amended Complaint (Doc. 172) that CSC is liable as a statutory seller under section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* ("Section 12(2)").[1] The parties filed supporting memoranda,[2] and the Court held a hearing on this matter on September 9, 2005, at which the parties presented oral argument.

---

[1] This Order is limited to CSC's opposition to Count II. By separate Orders, the Court has already addressed other claims. (*See* Docs. 205 and 206). The Plaintiffs' remaining claims will be addressed, as necessary, by additional separate Orders. (*See* Doc. 205).

[2] CSC's Memorandum in support appears at Doc. 195. The Plaintiffs' Response appears at Doc. 197.

**I.      Background**

A. Relevant Parties

*1) Plaintiffs*

Mary M. Campbell ("Campbell") purchased 5,259 shares of CNL stock in May of 2000, at $10 per share. Macomb County Employees' Retirement System ("Macomb") purchased 797,872.34 shares of CNL stock in September of 2000, at $9.40 per share. The Elizabeth Hawkins Barack Revocable Trust ("Barack Trust") (collectively referred to, where appropriate, with Campbell and Macomb as the "Plaintiffs") purchased 4,200 shares of CNL stock on June 27, 2002, at $10 per share. Thus, the Barack Trust is a member of the Purchaser class. Pursuant to its December 21, 2004 Order, the Court designated the Barack Trust as the Lead Plaintiff for the Purchaser Class. Each of the Plaintiffs continues to hold shares of CNL stock.

*2) CNL Securities Corporation*

CNL Securities Corporation ("CSC"), a Florida corporation, is the managing dealer for CNL's public offerings, and is an affiliate of CNL, CNL Hospitality Corporation (the "Advisor"), James Seneff and Robert Bourne, who are also defendants in this case. CSC is a wholly-owned subsidiary of CNL Financial Group, Inc. ("CFG"). James Seneff is a principal stockholder of CFG's parent company, and has served as a director, Chairman of the Board, and Chief Executive Officer of CFG and its subsidiaries since 1973. Robert Bourne also serves as a director, President and Treasurer for CSC and certain CFG affiliates.

B. Facts

The primary facts underlying this case are set out in detail in the Court's Order of May 9, 2005, (Doc. 166). The particular facts relevant to this matter relate to CSC's operations, and the manner in which the Plaintiffs acquired their CNL stock.

CNL offered its shares to the investing public through five best efforts offerings, through which CNL sold approximately 308 million shares of CNL common stock and raised approximately $3.1 billion dollars.[3] (Doc. 172 at 38). As the managing dealer for CNL's public offerings, CSC engaged soliciting dealers (the "Soliciting Dealers") -- broker-dealers that were members of the National Association of Securities Dealers, Inc., or other entities that were exempt from broker-dealer registration -- to sell the CNL shares. (*Id*. at 24). The Soliciting Dealers were to use their best efforts during the offering period to find eligible buyers. (*Id*. at 22-23). CSC, its affiliates, and the Advisor were entitled to receive fees and compensation for services provided in connection with the stock offerings. (*Id*.).

CSC, along with the Advisor and the individuals included as defendants in this action, were charged with disseminating offering documents in support of the stock offerings (the "Offering Documents"). (Doc. 172 at 2). The Plaintiffs allege that the Offering Documents contained materially false and misleading statements about CNL's operations and financial affairs, and that the Offering Documents enabled CNL to sell its stock at an inflated price. (*Id*. at 2, 8). Using these Offering Documents, the Defendants in this action marketed CNL shares to over 90,000 investors. (*Id*. at 47).

---

[3] The Initial Offering took place between July 9, 1997 and June 17, 1999, resulting in the sale of 15,007,264 shares. The 1999 Offering began with the filing of Registration Statement 333-67787, covering 27.5 million shares, and ended on September 14, 2000. The 2000 Offering began with the filing of Registration Statement 333-89691, covering 45 million shares, and extending from the termination of the 1999 Offering through April 22, 2002. The 2002 Offering began with the filing of Registration Statement 333-67124, covering 45 million shares, and extending from the termination of the 2000 Offering through February 4, 2003. Finally, the 2003 Offering began with the filing of Registration Statement 333-98047, covering 175 million shares, and extending from the termination of the 2002 Offering through March 12, 2004.

The Plaintiffs allege that: (1) CSC "offered, sold, solicited and/or [was] a substantial factor in the sale of CNL stock offered pursuant to the Offering Documents," (Doc. 172 at 115); (2) CSC's "actions of solicitation included participating in the preparation of false and misleading Offering Documents," (*id.*); and (3) "Plaintiffs and other members of the Class purchased or otherwise acquired CNL securities pursuant to and/or traceable to the defective Offering Documents." (*Id.* at 116).

### C. Arguments

CSC argues that the Plaintiffs have failed to state a claim against it under Section 12(2) because they have failed to allege: (1) that CSC actually transferred title to the CNL shares to the Plaintiffs, and (2) that CSC actively solicited the Plaintiffs' purchases of CNL shares. In response, the Plaintiffs assert that they have showed that CSC sold CNL shares and, moreover, that CSC is liable as a seller because it "exercised almost complete control over the participating brokers such that the brokers were acting as mere employees of CSC." (Doc. 197 at 33).

## II.   Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County*, 1 F.3d 1558, 1565 (11th Cir. 1993), and must limit its consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, "conclusory

allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief." *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id*. (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

**III.   Legal Analysis**

A. *Pinter v. Dahl* and the Test for Liability Under Section 12(2)

Section 12(2) provides for civil liability in connection with the issuance of a prospectus against any person who:

> (2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statement, in the light of the circumstances under which they were made, not misleading . . . .

15 U.S.C. § 77l(a)(2) (such person "shall be liable . . . to the person purchasing such security from him . . . .").

In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court addressed the issue of who constitutes a "seller" within the meaning of section 12(1) of the Securities Act of 1933 ("Section 12(1)").[4] The Court first noted that the language of Section 12(1)[5] "contemplates a buyer-seller relationship not unlike traditional contractual privity," and thus concluded that it is a settled principle that Section 12(1) "imposes liability on the owner who passed title, or other interest in the security, to the buyer for value."[6] *Id*. at 642. The Court further concluded that "a natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase." *Id*. at 644; *see also id*. at 645 ("Congress' express definition of "sells" in the original Securities Act to include solicitation suggests that the class of those from whom the buyer "purchases" extended to persons who solicit him."). Thus, it is clear that "when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller." *Id*. at 646.

---

[4] In *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1526-27 (11th Cir. 1991), the Eleventh Circuit found that the Supreme Court's language in *Pinter* defining a "solicitor" under Section 12(1) could also be applied to Section 12(2). Other Circuits have also applied *Pinter*'s holding to Section 12(2). *See In re Craftmatic Sec. Litig.*, 890 F.2d 628, 635 (3rd Cir. 1989); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2nd Cir. 1989).

[5] Section 12(1) provides that "[a]ny person who – (1) offers or sells a security in violation of section 77e of this title . . . shall be liable . . . to the person purchasing such security from him . . . ." 15 U.S.C. 77l(a).

[6] "The purchase requirement clearly confines § 12 liability to those situations in which a sale has taken place." *Pinter*, 486 U.S. at 644.

Finally, the Court specifically rejected the "substantial factor test," which many courts had used to establish seller liability under Section 12. *Id*. at 654. The substantial factor test focused on a defendant's degree of involvement in the transaction and its surrounding circumstances, and thus embraced participants who were "only remotely related to the relevant aspects of the sales transaction." *Id*. at 651. The Court noted that such a test could expose to liability professionals such as accountants and lawyers whose involvement was limited to performing professional services even though a buyer "does not, in any meaningful sense, purchase the security from such a person." *Id*. (internal citation and quotation omitted). The Court concluded that there was "no support in the statutory language or legislative history for expansion of §12(1) primary liability beyond persons who pass title and persons who "offer," including those who "solicit" offers." *Id*. at 650.

Because Section 12(2) "extends liability only (1) to those persons who actually transfer title to the security and (2) to those that successfully solicit the purchase[,]" *Ehlert v. Singer*, 85 F. Supp. 2d 1269, 1274 (M.D. Fla. 1999), *aff'd*, 245 F.3d 1313 (11th Cir. 2001) (internal citation and quotation omitted), the Court will examine both potential bases for liability as they apply to CSC.

B. CSC's Potential Liability as a Seller

Section 12 imposes direct "seller" liability only on the buyer's immediate seller or, in other words, the person who passed title to the securities at issue to the purchaser. *Pinter*, 486 U.S. at 642; *Ehlert*, 85 F. Supp. 2d at 1274. Thus, it is not sufficient for a plaintiff to allege that they "acquired the securities through the defendant, or that the defendant made the sale of securities possible." *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 330 (S.D.N.Y. 1999). Absent an allegation that a defendant directly sold a plaintiff the securities, that defendant cannot be liable under Section 12(2) for "selling" shares. *Daniels v. Blount Parrish & Co., Inc.*, 308 F. Supp. 2d 886, 888-89

-7-

(N.D. Ill. 2004), *aff'd*, 113 Fed. Appx. 174 (7th Cir. 2004); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) (Section 12(2) claim failed where plaintiff did sufficiently allege that she purchased shares directly from any defendant).

In the instant case, the Plaintiffs allege, in conclusory fashion, that CSC sold CNL shares. The Plaintiffs also allege that CSC sold CNL shares during the public offerings, but that allegation is based on statements extracted from various Offering Documents, such as: (1) shares were offered to the public on a best efforts basis through CSC; (2) CSC was contractually entitled to receive compensation for services in connection with the CNL offerings; and (3) in connection with the CNL shares, CSC could incur fees and expenses related to sales seminars and wholesaling activities.  However, they do not allege that CSC ever owned and passed title to (or directly sold) CNL shares to the Plaintiffs (or anyone else).  Indeed, because CSC was only engaged as a managing dealer for CNL's stock offerings, CSC cannot be liable as a direct seller because it did not have, and thus could not pass, title to CNL shares.  *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1530-31 (11th Cir. 1991); *In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431 at *13 (C.D. Cal. June 4, 2001) (defendant who did not pass title to purchaser is not a seller under the first prong of *Pinter*).  Accordingly, the Plaintiffs have failed to state a claim against CSC for direct seller liability under Section 12(2).

C. CSC's Potential Liability for Soliciting the Sale of CNL Shares

There is a two-part test for solicitation liability under Section 12(2) for participants who do not own the securities at issue: "[f]irst, whether the participant in the sale 'solicited' the purchase; and second whether the participant or the owner of the security sold benefit[t]ed." *Ryder*, 943 F.2d

at 1531 (internal citation and quotation omitted).[7] A claim of solicitation requires allegations that the defendant directly solicited the plaintiff to purchase the securities at issue, and absent such an allegation, the defendant cannot be held liable as a statutory seller under Section 12(2).[8] *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 636 (3rd Cir. 1989) ("purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a [Section] 12(2) seller."). In other words, a court should focus on the defendant's relationship with the plaintiff purchaser, not on the defendant's involvement in the securities transaction. *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 723-24 (S.D.N.Y. 1990).

Therefore,

> to state a claim under § [12(2)], the complaint must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser.

*In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 406 (D. Md. 2004). Along those same lines, a plaintiff must allege not only that the defendant actively solicited investors, but that the plaintiff purchased securities as a result of that solicitation. *Griffin v. Painewebber, Inc.*, 2001 WL 740764 at *2 (S.D.N.Y. June 29, 2000). Mere conclusory allegations that a defendant solicited

---

[7] The court in *Ryder* also drew a distinction between a broker engaging in the general solicitation of business and solicitation directed at producing a sale, noting that it is only the latter type of solicitation from which liability may arise. *Ryder*, 934 F.2d at 1534.

[8] "To find solicitation in a case in which no attempt has been made by a defendant to channel information to the particular plaintiff would result in the broadening of the definition of a statutory seller to such an extent as to render meaningless the Supreme Court's statement that a buyer cannot recover against his seller's seller." *PPM Am., Inc. v. Marriott Corp.*, 853 F. Supp. 860, 875 (D. Md. 1994) (*citing Pinter*, 486 U.S. at 644 n.21).

the sale of stock and was motivated by financial gain to do so are insufficient to state a claim under Section 12. *Lalor v. Omtool, Ltd.*, 2000 WL 1843247 at *8 (D.N.H. Dec. 14, 2000).

Regarding brokers or other seller's agents, the Eleventh Circuit has noted that "[e]ven a seller's agent must solicit the purchase before section 12 applies, although . . . it would be uncommon for a seller's agent not to engage in solicitation if he or she is hired to sell a principal's securities." *Ryder*, 943 F.2d at 1531. In fact, courts have observed that it is the "type of one-to-one exchange of information which is typical of the broker-investor relationship" which the Supreme Court viewed, in *Pinter*, as "the most typical example of solicitation." *PPM*, 853 F. Supp. at 875 (internal citation and quotation omitted); *see also DeWit v. Firstar Corp.*, 879 F. Supp. 947, 984 (N.D. Iowa 1995) (securities vendor's agent who solicited a purchase would be person from whom the buyer purchased, even if the agent himself did not pass title). Thus, a broker can be liable under Section 12(2) when selling securities owned by another. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001) (broker acting for issuer can be a seller); *Cady v. Murphy*, 113 F.2d 988, 990 (1st Cir. 1940). However, the "mere collection of a commission does not automatically convert a broker's conduct into a solicitation," particularly absent any evidence of other profits, incentives or promotions in connection with the securities at issue. *Montcalm County Bd. of Comm'rs v. McDonald & Co. Sec., Inc.*, 833 F. Supp. 1225, 1233 (W.D. Mich. 1993).

In an effort to establish solicitation liability on the part of CSC, the Plaintiffs allege that: (1) CSC received commissions on CNL shares sold; (2) CNL shares were to be offered to the public through CSC; (3) CSC was charged with disseminating Offering Documents; (4) using the Offering Documents, the Defendants marketed CNL to over 90,000 investors; and (5) CSC's acts

of solicitation included participating in the preparation of the Offering Documents.[9] Absent, however, are any allegations that CSC directly solicited any investors, including the Plaintiffs, or that the Plaintiffs' purchases of CNL shares resulted from that solicitation. Further, where the Plaintiffs attempted to enumerate the ways in which CSC solicited sales, (*see* Doc. 172 at 115), the Plaintiffs' only allegation was that CSC participated in the preparation of the Offering Documents, an allegation which is clearly insufficient to establish solicitation liability.[10] Therefore, the Plaintiffs have failed to state a claim against CSC as a solicitor-seller under Section 12(2).

D. Exertion of Control

Some courts have concluded that a narrow exception exists to the direct solicitation requirement, holding that "a court may find a defendant liable when he exerts such control over another's solicitation that those efforts are directly attributable to the defendant." *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1063 (D. Minn. 2003).[11] This exception arises from *Capri v. Murphy*, 856 F.2d 473 (2nd Cir. 1988), in which the court found that where a seller's promotional efforts were done at the behest of certain defendants, the seller provided no information to investors other than that which the defendants supplied, and the seller took no action in relation to investors other than that which the defendants authorized, the seller's

---

[9] The Plaintiffs also allege that "CSC offered, sold [and] solicited . . . CNL stock . . . ." (Doc. 172 at 115). This sort of conclusory allegation is plainly insufficient to survive a motion to dismiss.

[10] *See In re Newbridge Networks Sec. Litig.*, 767 F. Supp. 275, 281 (D.D.C. 1991).

[11] Absent an allegation that the soliciting broker was under the defendant's control, there is no Section 12 liability. *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 582 (S.D.N.Y. 1996).

promotional efforts were directly attributable to those defendants, and thus the defendants could be liable under Section 12(2).[12] *Id*. at 478.

In their motion, the Plaintiffs assert that CSC "directed all promotional activity, supplied the information, and retained 'full authority' over all promotional activity." (Doc. 197 at 34). The Plaintiffs further assert that

> CSC was a direct and active participant in the solicitation of all sales because: (1) all information was channeled through CSC; (2) all purchase money was channeled through CSC; (3) the participating brokers were "employed" by CSC; (4) CSC retained "full authority" with respect to "all matters pertaining to the performance of the [participating brokers]"; (5) CSC received commissions on all sales (even those it did not personally consummate); (6) CSC received fees for assistance in "selling and marketing shares" and a "soliciting dealer servicing fee"; and (7) CSC consented to having its name placed on the offering documents as a seller.

(Doc. 197 at 36). Therefore, they argue, even if CSC did not directly communicate with the Plaintiffs, they have shown that CSC was in control of the solicitation process, which is sufficient to state a claim under Section 12(2) against CSC as a seller. Notably, however, neither the assertions numbered (1), (2), (3), (4) and (7), nor the assertion that CSC "directed all promotional activity, supplied the information, and retained 'full authority' over all promotional activity" (Doc. 197 at 34), appear in the Amended Complaint.

The Eleventh Circuit does not appear to have adopted the Capri court's "direct attribution" standard.[13] Further, the Plaintiffs' argument in this regard highly resembles the "substantial participation" test that *Pinter* explicitly rejected. The Plaintiffs' argument runs counter to the

---

[12] The *Capri* court also found, however, that those defendants "prepared and circulated the prospectus" to the plaintiffs. *Capri*, 856 F.2d at 478.

[13] Indeed, the Court has not found a single case by any court in the Eleventh Circuit applying the *Capri* standard in the manner espoused by the Plaintiffs. Further, it does not appear that any other Circuit has embraced the view expressed in *Capri*.

substantial body of authority requiring direct contact with a purchaser before a defendant may be held liable as a solicitor-seller. (*See* section III(C), *supra*).

However, the Court need not decide whether to apply the *Capri* exception, because the Plaintiffs have not alleged facts necessary to establish control. The Plaintiffs allege that CSC engaged the Soliciting Dealers, but make no factual allegations regarding the nature of the relationship between CSC and the Soliciting Dealers, the degree of control that CSC had over the Soliciting Dealers, any contractual limitations that CSC imposed on the Soliciting Dealers, any information that CSC supplied to the Soliciting Dealers, or any of the other facts present in the cases on which the Plaintiffs rely. Most notably, the Plaintiffs fail to make even the conclusory allegation in their Amended Complaint that CSC controlled the Soliciting Dealers.[14]

**IV.   Conclusion**

For the reasons stated herein, the Plaintiffs have failed to make sufficient factual allegations in their Amended Complaint to support a Section 12(2) claim against CSC. Accordingly, it is

**ORDERED THAT** CSC's Motion to Dismiss (Doc. 194) is GRANTED. Count II of the Amended Complaint, as it relates to CSC, is dismissed.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 20, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[14] Although the Plaintiffs have not plainly enunciated aider and abettor liability as a theory to establish CSC's liability, the minimal allegations they provide in their Amended Complaint seem, at best, far closer to attempting to assert this sort of liability as opposed to actual control. It is clear, however, that there is no separate claim for aider and abettor liability under Section 12(2). *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1017 (2nd Cir. 1989) ("after *Pinter*, there is no separate aider and abettor liability under section 12").

Copies furnished to:

Counsel of Record
Unrepresented Party