**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re
**CNL HOTELS & RESORTS, INC.**
**Securities Litigation**

**Case No.  6:04-cv-1231-Orl-31KRS**

**(Consolidated with Case No.  6:04-cv-1341-Orl-19JGG)**

---

## ORDER

This case involves the claims of investors who purchased stock in CNL Hotels & Resorts,

Inc. ("CNL"), who allege that they were damaged as a result of acquiring CNL securities pursuant

to prospectuses and registration statements containing materially false and misleading statements.

This matter comes before the Court on a Motion to Dismiss (Doc. 191) filed by CNL Hospitality

Corporation ("CHC" or the "Advisor") concerning the Plaintiffs' claim in Count I of their

Amended Complaint (Doc. 172) that the Advisor is liable as a control person under sections 11

and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (respectively, "Section 11" and

"Section 15").[1]  The parties filed supporting memoranda,[2] and the Court held a hearing on this

matter on September 9, 2005, at which the parties presented oral argument.[3]

---

[1] Section 11 appears at 15 U.S.C. 77k; Section 15 appears at 15 U.S.C. 77o.

[2] The Advisor's Memorandum in support appears at Doc. 193.  The Plaintiffs' Response appears at Doc. 197.

[3] This Order is limited to the Advisor's opposition to Count I.  By separate Orders, the Court has already addressed other claims.  (*See* Docs. 205, 206 and 207).  The Plaintiffs' remaining claims will be addressed, as necessary, by additional separate Orders.  (*See* Doc. 205).

## I.     Background

A. Relevant Parties

*1) Plaintiffs*

Mary M. Campbell ("Campbell") purchased 5,259 shares of CNL stock in May of 2000, at

$10 per share.  Macomb County Employees' Retirement System ("Macomb") purchased

797,872.34 shares of CNL stock in September of 2000, at $9.40 per share.  The Elizabeth Hawkins

Barack Revocable Trust ("Barack Trust") (collectively referred to, where appropriate, with

Campbell and Macomb as the "Plaintiffs") purchased 4,200 shares of CNL stock on June 27, 2002,

at $10 per share.  Thus, the Barack Trust is a member of the Purchaser class.  Pursuant to its

December 21, 2004 Order, the Court designated the Barack Trust as the Lead Plaintiff for the

Purchaser Class.  Each of the Plaintiffs continues to hold shares of CNL stock.

*2) The Advisor*

The Advisor is a Florida corporation that "provides CNL with management, advisory and

administrative services." (Doc. 172 at 13).  The Advisor owns 20,000 shares of CNL's common

stock, which the Advisor received in exchange for an initial capital contribution of $200,000.  (*Id*.

at 38).  All of the Advisor's officers, and a majority of its directors, are also officers and directors

of CNL.  (*Id*. at 14, 88 n.17).  Several individuals named as defendants in this case also own,

directly or indirectly, common stock of the Advisor, including: Robert Bourne ("Bourne") and

James Seneff ("Seneff"), who each own 15.3% of the Advisor's common stock; and Thomas

Hutchison ("Hutchison") and John Griswold ("Griswold") who, together with three other

individuals, own 6.1% of the Advisor's common stock.  (*Id*. at 14-15).  The Advisor is also owned,

directly and indirectly, by several entities, including: CNL Financial Group, Inc. ("CFG"), which is

a wholly owned subsidiary of another entity (CNL Holdings, Inc.) that is controlled by Seneff;

CNL Real Estate Group, which is a wholly owned subsidiary of CFG and owns 53.5% of the

Advisor's common stock; and Five Arrows Realty Securities II, LLC, which owns 10% of the

Advisor's common stock.  (*Id*. at 14).

    B. Facts

    The primary facts underlying this case are set out in detail in the Court's Order of May 9,

2005, (Doc. 166).  The particular facts relevant to this motion relate to the Advisor's activities and

its relationship with CNL.

    The Advisor entered into a contract with CNL to direct or perform CNL's day-to-day

business affairs (the "Advisory Agreement").[4]  (Doc. 172 at 14).  The Advisor "is subject to the

supervision of [CNL's] Board of Directors and has only such functions as are delegated to it."  (*Id*.

at 16-17).  CNL is "dependent on" the Advisor which, with the approval of CNL's Board of

Directors (the "Board"), is responsible for the daily management of CNL and its investments, and

has therefore been delegated extensive authority to manage CNL's daily affairs.[5]  (*Id*. at 18, 19).

The Advisor thus "provides management, advisory and administrative services to CNL as well as

assists in developing and identifying for acquisition [p]roperties for CNL and its subsidiaries."

---

    [4] The Advisory Agreement is an annual contract, which could be extended based on mutual consent.  (Doc. 172 at 104).  On March 31, 2005, CNL and the Advisor entered into a renewal agreement, which extended the Advisory Agreement for an additional one year term, from April 1, 2005 through March 31, 2006.  (*Id*. at 105).

    [5] *See also* Doc. 172 at 18 (CNL relies "on the Advisor and the Board of Directors to manage" CNL); *id*. at 88 (CNL's "day-to-day operations are managed and executed by [the Advisor], subject to the review of [CNL's] Board."); *id*. at 14 (Advisor conducts CNL's day-to-day operations through the authority delegated to it by CNL's Articles of Incorporation and the Advisory Agreement, as well as policies established by CNL's Board of Directors).

(*Id*. at 15).  Because CNL has no employees, the Advisor performs "the most critical of CNL's business functions," and is responsible for CNL's accounting, financial and regulatory compliance reporting, as well as for CNL's stockholder distributions and reporting.[6]  (*Id*.).  In addition, the Advisor serves as CNL's consultant regarding policy decisions made by CNL's Board and provides other services that CNL's Board "deems appropriate."  (*Id*.).

Subject to the Board's approval, the Advisor: (1) selects the properties that CNL acquires; (2) identifies potential tenants and/or managers for those properties; (3) identifies potential borrowers for mortgage loans; (4) formulates, evaluates and negotiates the terms of the leases, management agreements or mortgage loans; (5) negotiates the terms of CNL's borrowings; and (6) selects assets for sale by CNL.[7]  (*Id*. at 17-18).

In exchange for its services, the Advisor receives fees and, since 1997, has received more than $267 million in connection with the acquisition, development and securing of permanent financing on properties, and, to a lesser extent, monthly asset management fees.  (Doc. 172 at 20). Between 1997 and December 31, 2004, the Advisor was paid over $205 million in acquisition fees, which the Advisor receives for identifying properties, and for structuring the terms of the

---

[6] The Advisor also performs services related to due diligence, marketing, investor relations, the inspection of books and records, and bookkeeping.  (Doc. 172 at 16).

[7] The Advisory Agreements lists the Advisor's duties as: (1) serving as CNL's investment and financial advisor; (2) providing "the daily management of [CNL] and perform[ing] and supervis[ing] the various administrative functions" of CNL; (3) "investigat[ing], select[ing], and, on behalf of [CNL], engag[ing] and conduct[ing] business with such [p]ersons as the Advisor deems necessary;" and (4) "consult[ing] with the officers and Directors of [CNL] and assist[ing] the Directors in the formulation and implementation of [CNL's] financial policies, and, as necessary, furnish[ing] the Directors with advice and recommendations with respect to the making of investments . . . ."  (Doc. 172 at 19).

acquisition, leases and mortgage loans.[8]  (*Id*. at 73).  As of December 31, 2003, the Advisor had

received asset management fees totaling $5.3 million.  (*Id*. at 71).

In Count I of their Amended Complaint, the Plaintiffs allege that they obtained CNL

securities "pursuant to or traceable to, and in reliance on, the Offering Documents," which the

Plaintiffs allege were false and misleading.  (Doc. 172 at 113).  Next, they allege that as the issuer,

CNL is liable for the material misstatements and omissions contained in the Offering Documents.[9]

(*Id*. at 114).  The Plaintiffs then allege that the Advisor has a "managerial position" with CNL, and

that, "by reason of its position, and intimate involvement in the day-to-day management of CNL

and in its advisory role to CNL and CNL's Board of Directors," the Advisor "had the power to

cause (and did cause) CNL to engage in" the conduct of which the Plaintiffs complain.  (*Id*. at 21,

113).  More specifically, the Plaintiffs allege that the Advisor controlled the contents of the

offering documents by which CNL offered its stock to investors (the "Offering Documents"), as

well as the contents of CNL's quarterly and annual reports, other SEC filings, and press releases.

(*Id*. at 22).  The Advisor was provided with copies of those documents prior to or shortly after

their issuance, and thus had the ability to either prevent their issuance or cause them to be

corrected.  (*Id*.).  Instead, the Plaintiffs allege, the Advisor "issued and disseminated, caused to be

issued and disseminated, and participated in the issuance and dissemination of, material

misstatements to the investing public."  (*Id*. at 114).  Thus, the Plaintiffs assert that the Advisor is

---

[8] The acquisition fees are calculated based on 4.5% of the gross proceeds from the offerings, loan proceeds from permanent financing, and a portion of CNL's revolving line of credit which is used to acquire properties.  (Doc. 172 at 73).

[9] This allegation is the basis for the Plaintiffs' Section 11 claim against CNL in Count I.

subject to control person liability under Section 15 for CNL's alleged violation of Section 11.  (*Id.* at 113).

The Advisor argues that the Plaintiffs have failed to make the allegations necessary to establish control person liability because the Advisor was always subject to the authority and supervision of CNL's Board of Directors.

## II.    Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County*, 1 F.3d 1558, 1565 (11th Cir. 1993), and must limit its consideration to the pleadings and any exhibits attached thereto.  FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief."  *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)).  This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action.  *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th

Cir. 2001).  Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id*. (internal citation and quotation omitted).  "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

## III.   Legal Analysis

A. Section 11

Section 11 provides for the civil liability of certain persons for false or misleading registration statements.[10]  *In re AFC Enter., Inc., Sec. Litig.*, 348 F. Supp. 2d 1363, 1380 (N.D. Ga.

---

[10] Section 11 provides, in relevant part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue --
> (1) every person who signed the registration statement;
> (2) every person who was a director of (or person performing similar functions) or partner in the issue are the time of the filing of the part of the registration statement with respect to which liability is asserted;
> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
> (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement . . . ;
> (5) every underwriter with respect to such security.

15 U.S.C. § 77k

2004) ("Subsection (a) of section 11 enumerates those persons who are liable for false or misleading statements on a registration statement.").  The Court previously determined that the Plaintiffs had sufficiently pled a cause of action against CNL for direct liability under Section 11.[11] (Doc. 166 at 20).  However, the Court also concluded that the Plaintiffs failed to state a direct claim under Section 11 against the Advisor.  (*Id*. at 20-21).

B. Section 15

The Plaintiffs have now alleged that the Advisor is liable as a "controlling person" under Section 15 for CNL's violation of Section 11.  Section 15 provides that

> Every person . . . who controls any person liable under [Section 11] . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . .

15 U.S.C. § 77o; *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("Section 15 . . . extends Section 11 . . . liability to persons who control entities liable under those sections.").[12]  "To make out a prima facie case of a § 15 violation, Plaintiffs must prove that Defendants (1) each had power or influence over the controlled person and (2) each induced or participated in the alleged violation."  *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001); *AFC Enter.*, 348 F. Supp. 2d at 1381 ("[A] plaintiff must allege that the defendant had the power to

---

[11] "[I]f there is no primary violation under . . . § 11, there can be no vicarious liability under § 15." *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1367 (S.D. Fla. 2001).

[12] "Control over the entity responsible for the primary violation is essential (sic) element of a claim for controlling person liability." *Unicapital Corp.*, 149 F. Supp. 2d at 1368; *see also Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986) (Section 15 "is applicable only to people who actually exercised control over the issuers, sellers, and other people directly liable.").

control both the general operations of the offending corporation and the specific corporate policy that resulted in the offense.").[13]

In this case, the Plaintiffs have made sufficient allegations to establish both prongs of control person liability under Section 15. First, the Plaintiffs allege that by virtue of its management position with CNL, the Advisor has extensive authority to manage and perform CNL's primary business functions, including property and investment management. Further, because CNL has no employees, the Advisor performs essentially all of CNL's management functions. And, while the Advisor is subject to the supervision and approval of CNL's Board, the Plaintiffs also allege that CNL is dependent upon the Advisor. Further, the Plaintiffs have made allegations showing the intertwined nature of the management of CNL and the Advisor, in that: (1) all of the Advisor's officers, and a majority of its directors, are officers and directors of CNL, (Doc. 172 at 14, 88 n.17); (2) Seneff, who is Chairman of CNL's Board, owns or controls approximately 68.6% of the Advisor's common stock, (*id*. at 25-26);[14] (3) Bourne, the Vice-Chairman of CNL's Board, owns 15.3% of the Advisor's common stock, and is the president of CFG, which owns the Advisor's parent company, (*id*. at 26-27); (4) Hutchison is CNL's Chief

---

[13] It will not suffice for a plaintiff to allege only that a pre-existing relationship existed between the purported control person and the corporation, nor will it suffice to allege that the purported control person merely provided services to the issuer or simply controlled stock or assets of the issuer. *See Theoharous v. Fong*, 256 F.3d 1219, 1227-28 (11th Cir. 2001); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 790, 810-11 (C.D. Cal. 2004); *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 649 (N.D. Cal. 1980); *Arena Land & Inv. Co., Inc. v. Petty*, 906 F. Supp. 1470, 1482 (D. Utah. 1994).

[14] Seneff owns 15.3% of the Advisor's common stock. He also controls CNL Holdings, Inc., which owns CFG, which in turn owns CNL Real Estate Group, which owns 53.5% of the Advisor's common stock. (Doc. 172 at 25-26). He is also a director, the Chairman of the Board, and the Chief Executive Officer of CFG, which owns the Advisor's parent company. (*Id*. at 26).

Executive Officer, and along with several other individuals (including Griswold, *infra*), owns

6.1% of the Advisor's common stock, (*id*. at 27);[15] and (5) Griswold, who owns a portion of the

Advisor's common stock, is CNL's President and Chief Operating Officer, as well as a director of

CNL, (*id*. at 28).[16]   Therefore, the Plaintiffs have made allegations from which the Court can infer

that the Advisor had sufficient power or influence over CNL as to constitute control under Section

15.  *See In re Friedman's Inc. Sec. Litig.*, --- F. Supp. 2d. ----, 2005 WL 2175936 at *23 (N.D. Ga.

Sept. 7, 2005) (plaintiffs alleged ability to influence general affairs of corporation by alleging that

defendant had the ability to appoint a majority of the issuer's board of directors, served as a

financial advisor to the issuer, received fees for financial consulting, and shared many officers and

directors with the issuer); *AFC Enter.*, 348 F. Supp. 2d at 1382 (defendant was a significant

minority shareholder in the issuer and shared officers, directors and representatives with the issuer,

which individuals participated in preparing the issuer's filings).

Second, the Plaintiffs specifically allege that the Advisor had the power to control the

contents of the offering documents and other statements, and that the Advisor caused and

participated in the dissemination of material misstatements to the public.  Thus, the Plaintiffs have

alleged that the Advisor induced or participated in the alleged primary violation.  *See Johnson v.

Aegon USA, Inc.*, 355 F. Supp. 2d 1337, 1349 (N.D. Ga. 2004) (plaintiffs sufficiently alleged

control person liability by alleging that defendant was the parent company of other defendants that

---

[15] Hutchison also previously served as both an officer and director of the Advisor.  (Doc. 172 at 27).

[16] Seneff, Bourne, Hutchison and Griswold are all alleged to have signed various Offering Documents.  (Doc. 172 at 26-28).

developed, marketed, issued or underwrote securities at issue, and controlled the dissemination of registration statements and prospectuses,); *In re Mirant Corp. Sec. Litig.*, 2003 WL 24027927 at *22 (N.D. Ga. July 14, 2003) (defendant had the power to control the alleged misconduct by reason of stock ownership and management position, as well as through participation in, and awareness of, the corporation's operations).[17]

## IV.    Conclusion

The Plaintiffs have stated a claim against the Advisor for control person liability under Section 15.  Accordingly, it is

**ORDERED THAT** the Advisor's Motion to Dismiss (Doc. 191), as it relates to Count I of the Amended Complaint, is DENIED.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 21, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[17] The Court decides only that the Plaintiffs' allegations in this regard are sufficient to survive a motion to dismiss.  Many of the Advisor's arguments seem more directed at challenging the Advisor's role and disputing whether the Advisor actually controlled CNL, as opposed to addressing the sufficiency of the Plaintiffs' allegations.  These are issues that are more appropriate for summary judgment.  *See Unicapital*, 149 F. Supp. 2d at 1368 n.23 ("The key variable in the controlling person inquiry -- whether an individual defendant can be said to have the requisite control over the corporation -- is a fact intensive issue.  Thus, the disposition of controlling person liability is most appropriate at the summary judgment stage.") (internal citations and quotation omitted); *Harvey M. Jasper Ret. Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1268 (S.D. Fla. 1995) (where complaint specifically alleged that defendants were control persons, contention that they were not could not be resolved on motion to dismiss).